FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING
2023 APR 11  AM 11: 00

# United States District Court

for the

District of Wyoming

MARGARET BOTKINS, CLERK
CASPER

| | | |
|---|---|---|
| Jake Stanley DeWilde | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-00003-SWS |
| | ) | |
| Attorney General of the United States; Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT, AND BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................2

    I.   Under Supreme Court Precedent, Machineguns Are Protected by the Second
        Amendment ...........................................................................................................2

           A.  Defendants Misread the Common Use Test ......................................................2

           B.  The Common Use Test Protects Arms Commonly Used in the Military at the
               Time of Litigation, Which Includes Machineguns ...........................................4

           C.  The Common Use Test Also Protects Arms Outside of Military Service .........5

           D.  The Product of an Unconstitutional Law Cannot be Used to Justify Its
               Existence .........................................................................................................8

           E.  *Bruen* Clarified That Dangerous and Unusual Refers to the Manner of Bearing
               Arms, Not Possession of a Class of Arms ......................................................10

           F.  Arms That Are in Common Use Are Protected, Even If They Are Dangerous
               and Unusual ...................................................................................................10

           G.  Machineguns Are Not Unusual.......................................................................11

    II.   Arms Not in Common Use May Also be Protected Under the Plain Text of the
        Second Amendment .............................................................................................12

    III.  *Heller* Did Not Determine That Machineguns May be Banned .................................15

    IV.  Courts of Appeals Upholding § 922(o) Since *Heller* Did Not Meet the Standards of
        *Bruen*..................................................................................................................17

    V.   District Courts Upholding § 922(o) Since *Bruen* Have Not Complied With *Bruen* ...20

    VI.  Section 922(o) Does Not Comport With *Bruen*...........................................................22

A. Defendants Improperly Conflate the Two Prongs of *Bruen* ...........................22

B. The Plain Text of the Second Amendment, as Informed by History, Protects the Possession of a Machinegun ......................................................................23

C. Section 922(o) is Not Consistent With This Nation's Historical Traditions of Regulating Arms ............................................................................................26

CONCLUSION.............................................................................................................29

# TABLE OF AUTHORITIES

## CASES

*Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015) ........................................................16

*Caetano* v. *Massachusetts,* 577 U.S. 411 (2016).................................................................... passim

*District of Columbia v. Heller*, 554 U.S. 570 (2008).............................................................. passim

*Firearms Policy Coalition, Inc. et al., v. McCraw*, No. 4:21-cv-1245-P (N.D. Tex., Aug 25, 2022) ..................................................................................................................................................24

*Friedman v. City of Highland Park,* 784 F.3d 406 (7th Cir. 2015) ..................................................8

*Hamblen v. United States*, 591 F.3d 471 (6th Cir. 2009)........................................................19, 20

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) ........................................................................ passim

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019)................................................................................23

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)......................................................................24

*New York State Rifle & Pistol Assn., Inc.* v. *Bruen,* 597 U.S. ___ (2022)............................. passim

*State v. Kessler*, 289 Or. 359, 368, 614 P. 2d 94 (1980)..................................................................3

*United States v. Adamiak*, No. 2:22-cr-47 (E.D. Va. Sept. 22, 2022)............................................21

*United States v. Dixon*, No. 22-cr-140 (N. D. Ill. Mar 28, 2023) .................................................21

*United States v. Fincher*, 538 F.3d 868 (8th Cir. 2008)...........................................................18, 19

*United States v. Henry*, 688 F.3d 637 (9th Cir. 2012) ...................................................................18

*United States v. Hoover*, No. 3:21-cr-22(S3)-MMH-MCR (M.D. Fla. Oct. 18, 2022) .................21

*United States v. Miller,* 307 U.S. 174 (1939)........................................................................ passim

*United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown*

*Caliber Serial No. LW001804,* 822 F.3d 136 (3d Cir. 2016)............................................18, 19, 20

*United States v. Price*, No. 2:22-cr-00097 (S.D. W. VA. Oct 12, 2022)..................................24, 25

*United States v. Quiroz*, No. PE:22-cr-00104-DC (W.D. Tex. Sep 19, 2022) ..............................25

*United States v. Simien*, No. SA-22-cr-00379-JKP (W.D. Tex. Feb. 10, 2023)...........................21

*United States v. Wilks*, 58 F.3d 1518 (10th Cir. 1995) ...................................................................28

*United States v. Zaleski*, 489 F. App'x 474 (2d Cir. 2012)......................................................19, 20

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. II...............................................................................................................1, 13

## STATUTES

10 U.S.C. § 246.............................................................................................................................1

18 U.S.C. § 922(g)(1) ..................................................................................................................21

18 U.S.C. § 922(k) ..................................................................................................................24, 25

18 U.S.C. § 922(n) .......................................................................................................................25

18 U.S.C. § 922(o) ................................................................................................................. passim

18 U.S.C. § 924(c)(4).....................................................................................................................27

Alaska Stat. § 11.61.200 ................................................................................................................9

Ariz. Rev. Stat § 13-3101 ..............................................................................................................9

iv

Ariz. Rev. Stat § 13-3102 ...........................................................................................9

Colo. Rev. Stat. § 18-12-102 .......................................................................................9

Firearm Owners Protection Act of 1986, Pub. L. No. 99-308, 100 Stat. 449 ................................1

Fla. Stat. § 790.221 ....................................................................................................9

Ga. Code Ann. § 16-11-122 ........................................................................................9

Ga. Code Ann. § 16-11-124 ........................................................................................9

Ind. Code § 35-47-5-8 .................................................................................................9

Ind. Code § 35-47-5-10(7) ..........................................................................................9

Kan. Stat. § 21-6301 ...................................................................................................9

Me. Rev. Stat. Ann. tit. 17-A, § 1051 ..........................................................................9

Mich. Comp. Laws § 750.224 .....................................................................................9

Mo. Ann. Stat. § 571.020 ...........................................................................................9

N.C. Gen. Stat. § 14-409 ............................................................................................9

N.D. Cent. Code § 62.1-05-01 ....................................................................................9

Neb. Rev. Stat. § 28-1203 ..........................................................................................9

Nev. Rev. Stat. § 28-1203 ..........................................................................................9

Ohio Rev. Code Ann. § 2923.11 .................................................................................9

Ohio Rev. Code Ann. § 2923.17 .................................................................................9

Or. Rev. Stat. § 166.272 ..................................................................................................... 9

S.C. Code Ann. § 16-23-230 .............................................................................................. 9

S.C. Code Ann. § 16-23-250 .............................................................................................. 9

S.D. Codified Laws § 22-14-6 ........................................................................................... 9

Tenn. Code Ann. § 39-17-1302 ......................................................................................... 9

Tex. Penal Code Ann. § 46.05 ........................................................................................... 9

W. Va. Code § 61-7-9 ........................................................................................................ 9

## OTHER AUTHORITIES

Brian L. Frye, *The Peculiar Story of* United States v. Miller, 3 N.Y.U. J.L. & Liberty 48 (2008),

    https://uknowledge.uky.edu/law_facpub/265/ ..................................................................... 5

Bureau of Alcohol, Tobacco, Firearms, and Explosives, *ATF National Firearms Act*

    *Handbook* – ATF E-Publication 5320.8 – Revised: April 2009 ......................................... 6

Bureau of Alcohol, Tobacco, Firearms, and Explosives, *Firearms Commerce in the*

    *United States – Annual Statistical Update 2021* (2021) ...................................................... 6

Daniel Page, *Dangerous and Unusual Misdirection* (4 May 2011), https://ssrn.com/abstract=

    1859395 ................................................................................................................. 10, 18, 27

*FOPA Hughes Amendment VOTE APRIL 10 1986* (25 Jan. 2011),

    https://www.youtube.com/watch?v=a6Mx2UcSEvQ ....................................................... 28

George Neumann, *Swords and Blades of the American Revolution* (1 Jan. 1973)..........................3

Madison, James, Federalist 46, THE FEDERALIST PAPERS .............................................................13

National Firearms Act Trade & Collectors Association, *The Partisan*, Volume 4, Issue 3, Third

    Quarter, 2012 .........................................................................................................................6

National Shooting Sports Foundation, *Commonly Owned: NSSF Announces Over 24 Million*

    *MSRs in Circulation* (20 Jul. 2022), https://www.nssf.org/articles/commonly-owned-nssf-

    announces-over-24-million-msrs-in-circulation/ ................................................................8

RESOLUTIONS OF FAIRFAX COUNTY COMMITTEE, 17 Jan. 1775.....................................................14

Tasha Tsiaperas, *Constitution a 'dead, dead, dead' document, Scalia tells SMU audience*,

    Dallas Morning News (February 20, 2013), http://web.archive.org/web/20130530011243/

    http://www.dallasnews.com/news/community-news/park-cities/headlines/20130128-

    constitution-a-dead-dead-dead-document-scalia-tells-smu-audience.ece .........................15

Tom Morganthau, et al., *Machine Gun U.S.A.,* Newsweek (Oct. 14, 1985) ...................................7

Veterans of Foreign Wars, *Veteran-Signers of the U.S. Constitution*, VFW Magazine (Sep. 2010)

..........................................................................................................................................................4

**INTRODUCTION**

Plaintiffs' complaint challenges the constitutionality of 18 U.S.C. § 922(o) ("the machinegun ban"), passed as an amendment to the Firearm Owners Protection Act. Plaintiff is a law-abiding citizen, United States Marine Corps veteran, and member of the militia as defined at 10 U.S.C. § 246. Having been trained and qualified in the employment of machineguns while on active duty, primarily the M-16 platform, Plaintiff is acutely aware of the fundamental necessity for machinegun tactics and operations in military and militia service, as well as the importance of arms and discipline being standardized and well regulated. Accordingly, Plaintiff desires to make and own an M-16, but is prohibited from doing so as a result of section 922(o).

Enacted in 1986, the machinegun ban constitutes the first time in this Nation's history that the possession by citizens of the standard small-arms weapon used by the U.S. armed services has been prohibited. Since then, the understanding of the scope of Second Amendment protections has been greatly expanded and clarified. *District of Columbia v. Heller*, 554 U.S. 570 (2008) defined the standard of review for challenges to regulations of conduct protected under the Second Amendment, and *New York State Rifle & Pistol Assn., Inc.* v. *Bruen,* 597 U.S. ___ (2022) clarified the holdings in *Heller* after lower courts repeatedly misapplied those holdings.

History is repeating itself as district courts are now misapplying *Bruen*, and Defendants' arguments perpetuate that misinterpretation. The Second Amendment commands: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Plaintiff objects that "if weapons that are most useful in military service—M-16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause." *Heller*, 554 U.S. at 627. "Logic demands that there be a link between the stated purpose and the command." *Id*. at 577.

1

Both *Heller* and *Bruen* determined that *total bans* on Second Amendment conduct are not constitutional. When the standards of *Heller* and the clarifications of *Bruen* are applied to the machinegun ban, it too must be found unconstitutional. The Court should thus deny Defendants' Motion to Dismiss and grant Plaintiffs' Motion for Summary Judgment.

## ARGUMENT

I.    **Under Supreme Court Precedent, Machineguns Are Protected by the Second Amendment**

   **A. Defendants Misread the Common Use Test**

*Bruen* prescribes the framework for a Second Amendment challenge. *Bruen* identified two evaluations that must be carried out. First, it must be determined whether or not the challenged conduct is protected by using a "test rooted in the Second Amendment's text, as informed by history." *Bruen*, slip op. at 10.[1] Second, if the conduct is protected, then the government holds the burden of providing historical analogues showing that the challenged regulation is "consistent with this Nation's historical tradition of firearm regulation." *Id*. at 8. In *Bruen,* the Court found that the first prong of the test was met by determining that, in addition to the right to bearing arms being protected, the type of arms in the challenged conduct, handguns, were "in common use." *Id*. at 23 (citing *Heller*, 554 U.S. at 627). Since *Heller* had already determined that handguns were in common use, and reaffirmed that arms in common use were protected, *Bruen* had "little difficulty"

---

[1] There are three independent and alternative grounds upon which this Court should find, at *Bruen*'s first prong, that machineguns are arms protected by the Second Amendment:

   1. Machineguns are protected by the plain text of the Second Amendment, as informed by history. *See infra*. at Part II.
   2. Machineguns are in common use in the military, which grants them protection under the Second Amendment. *See infra*. at pp. 3-5.
   3. Machineguns are in common use in the citizenry, which grants them protection under the Second Amendment. *See infra*. at pp. 5-10. This ground can be decided on the existing record and can be supported further, should the Court require, with additional discovery. *See infra*. at pp. 7-8.

concluding that the challenged conduct was protected under the Second Amendment. *Id*. Important

to the instant case is the "common use" test used by *Heller*.

*Heller* found the "common use" test in *United States v. Miller*, 307 U.S. 174 (1939)*.* The

Court analyzed *Miller* in-depth, and determined that the central question in *Miller* was whether or

not the "type of weapon at issue" enjoyed the protection of the Second Amendment. *Heller*, 554

U.S. at 622. The *Miller* Court sought to perform this evaluation by determining if the arm was

"part of the ordinary military equipment." *Miller,* 307 U.S. at 178*. Heller* requires that the "part of

ordinary military equipment" language be used "in tandem with what comes after": "[O]rdinarily

when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied

by themselves and of the kind in common use at the time." *Heller,* 554 U.S. at 624 (citing *Miller*,

307 U.S. at 179) (referring to *Miller*'s description of arms brought by militiamen). *Heller* went on

to say that, among those commonly used arms, there was no difference between those used by

militiamen and citizens in their homes; "In the colonial and revolutionary war era, [small-arms]

weapons used by militiamen and weapons used in defense of person and home were *one and the*

*same*." *Id.* at 624-625 (citing *State v. Kessler*, 289 Ore. 359, 368, 614 P. 2d 94, 98 (1980) (citing

G. Neumann, Swords and Blades of the American Revolution 6-15, 252-254 (1973))) (emphasis

added).

Thus, the "common use" test, used in *Heller*, is derived from *Miller. *The test in *Miller* was

used to determine if an arm was commonly used for service in the militia, which would grant it

protection under the Second Amendment. In looking to historical analogues, *Miller* determined

that arms in "common use" by militiamen were protected, because those arms had a "reasonable

relationship to the preservation or efficiency of a well regulated militia." *Miller,* 307 U.S. at 178.

Applying the same logical comparisons, *Miller* set out to determine if the "type of weapon at

issue," a short-barreled shotgun, contained any such "reasonable relationship." *Id*. "The defendants made no appearance in the case, neither filing a brief nor appearing at oral argument," so there was an absence of factual record and no "judicial notice that this weapon is any part of the ordinary *military equipment* or that its use could contribute to the common defense." *Heller*, 554 U.S. at 622-623 (emphasis added) (referring to the *Miller* proceedings).

The Defendants misread this aspect of the "common use" test, saying that "use by the military is the wrong metric" and that "*Heller* squarely rejected the argument that 'weapons useful in warfare are protected[.]'" Def. Mem. at p. 20 (citing *Heller*, 554 U.S. at 624). This is certainly the boldest reading that Defendants make in their memorandum. The Founders would have undoubtedly been dumbfounded by the notion that weapons useful in warfare were not protected by the Second Amendment, given that the majority of them were veterans of the American Revolution[2] and used such arms to *secure our independence*. A single preceding word that Defendants did not include in their quote from *Heller*, however, completely turns over their argument: *only*. *Heller* rejected the argument that "*only* weapons useful in warfare are protected[.]" *Heller*, 554 U.S. at 624 (emphasis added). This of course enabled *Heller*'s holding, that the "common use" test may *also* protect arms used by civilians in the present day, as opposed to *only* those "useful in warfare." *Id*. Defendants' reading of *Heller* abrogates *Miller* altogether. But *Heller* did not abrogate *Miller*, and the holdings in *Miller* remain binding authority; contrarily, *Heller* derived the "common use" test from *Miller*, and *expanded* it.

## B. The Common Use Test Protects Arms Commonly Used in the Military at the Time of Litigation, Which Includes Machineguns

---

[2] Veterans of Foreign Wars, *Veteran-Signers of the U.S. Constitution*, VFW Magazine (September 2010); *See* Ex. A

Although *Heller expanded* the "common use" test to permit the measure of civilian-owned arms, which are *also* protected, *Miller* did not so much as suggest that there was any requirement to apply the "common use" test to arms owned by civilians in 1939; *Miller* did not even *consider* whether or not short-barreled shotguns were commonly used by civilians. The Court considered whether or not the arm in question was commonly used *in the military at the time of litigation*, because the militia, in their historical analogue, was expected to perform the same functions as a "disfavored standing arm[y.]" *Miller,* 307 U.S. at 179. Accordingly, it would not have made sense for *Miller* to apply the "common use" test to arms owned by civilians. Further, *Miller* did not determine that short-barreled shotguns *were not* useful in military service; rather, there was no judicial notice that short-barreled shotguns *were* useful in military service. This lack of judicial notice was surely due to the fact that neither Mr. Miller nor his counsel appeared in his defense. *See* Brian L. Frye, *The Peculiar Story of* United States v. Miller (2008) (*See* Ex. G).

At this point, the historical context and methodology that *Miller* identified and applied in the "common use" test can be used to evaluate whether or not machineguns are arms protected by the Second Amendment. The militiamen of the colonial and revolutionary war era commonly used the *same* small-arms weapons that a citizen of the same era would use in defense of person and home; to contribute to the common defense; to suppress insurrections; and to repel invasions. Those arms had a "reasonable relationship to the preservation or efficiency of a well regulated militia[.]" *Miller,* 307 U.S. at 178. Correspondingly, the standard small-arms weapon in common use by the U.S. armed services today, the M-16, has a "reasonable relationship to the preservation or efficiency of a well regulated militia"; is accordingly suitable for the militia and citizens of today to use for the *same* purposes; and is therefore protected by the Second Amendment. *Id.*

**C.  The Common Use Test Also Protects Arms Outside of Military Service**

Notwithstanding the historical context of the "common use" test, there have been many additional cases since *Heller* that have applied the test to arms in common use outside of military service in the present day pursuant to *Heller*'s expansion. One particularly relevant case, *Caetano v. Massachusetts,* 577 U.S. 411 (2016) *(per curiam),* determined that stun guns were arms protected under the Second Amendment, and vacated and remanded the judgment of the Supreme Judicial Court of Massachusetts. In Justice Alito's concurrence, he wrote that stun guns were used and useful in the U.S. armed services, and acknowledged that the approximately 200,000 stun guns owned by civilians classified them as "widely owned" and in "common use," and therefore protected arms under the Second Amendment. *Id.* at 419-420 (Alito, J., concurring).

*Requiring* the "common use" test to be used in the context of the possession of arms by citizens in the present day would fail the requirement of the first step of the test underscored by *Bruen,* which is to evaluate a restriction in view of the plain text of the Second Amendment, as "informed by history." *Bruen*, slip op. at 10 (emphasis added). However, if this "present-day" requirement was imposed, machineguns would still pass the test.

As of May 2021, there were more than 700,000 machineguns lawfully registered in the National Firearms Registration and Transfer Record (NFRTR).[3] The possession of a large percentage of those machineguns are restricted to certain manufacturers, importers, local law enforcement, and other non-private entities.[4] However, the BATFE defines a machinegun on the NFRTR as being "not in the possession or under the control of the U.S. Government."[5] 700,000 machineguns obviously exceed the 200,000 stun guns declared to be in "common use" by *Caetano*.

---

[3] BATFE, *Firearms Commerce in the United States – Annual Statistical Update 2021*. *See* Ex. B
[4] BATFE, *ATF National Firearms Act Handbook* – ATF E-Publication 5320.8 *See* Ex. C
[5] *Id.*

Using the most restrictive measure of transferrable machineguns, however, yields a conclusion in keeping with this theme. A "pre-86" machinegun is one that was registered on the NFRTR on the date the ban went into effect in 1986, and is freely transferrable amongst private citizens. Since transferrable machineguns can no longer be registered, and when such arms are naturally disposed of due to loss, theft, destruction, rendering inoperable, or other legitimate reasons, the total finite number of transferrable machineguns can only decrease. In 2012, there were approximately 183,500 transferrable machineguns on the NFRTR,[6] and four years later, in 2016, that number had decreased to 175,977.[7] Therefore, it can be presumed that the decrease of approximately 1,800 transferrable machineguns per year from the NFRTR is a result of the ban in section 922(o) prohibiting the total number of transferrable machineguns from increasing. The same math can be performed in reverse to calculate and presume that in 1986, the year when the ban was enacted, there would have been at least 230,000[8] "pre-86" machineguns on the NFRTR, which would exceed the 200,000 stun guns that were declared to be "widely owned" and in "common use" by *Caetano.* Plaintiff can validate this presumption with discovery.

The amount of "pre-86" machineguns currently in existence also does not consider the amount that *would* exist but for the ban. While this can be a challenging number to determine, it can at a minimum be measured by a simple count of all applications the Defendants have received to make a "post-86" machinegun since the enactment of the ban, such as the "Form 1" application submitted by the Plaintiff and disapproved by the Defendants. This measure could be used to

---

[6] NFATCA, *The Partisan*, Volume 4, Issue 3, Third Quarter, 2012 (taking the median of the range of transferable machine guns reported as 182,000-185,000) *See* Ex. D

[7] BATFE letter, dated February 24, 2016. *See* Ex. E

[8] In 2012, the ban had existed for 26 years. Multiplying a decrease of approximately 1,800 machineguns per year times 26 years equals 46,800 transferrable machineguns removed from the NFRTR since the enactment of the ban. Adding those removed machineguns to the 2012 transferrable count of 183,500 equals 230,300 transferrable machineguns presumably registered on the NFRTR in 1986.

bolster the number of machineguns that would be in common use today, but for the machinegun ban, and can be determined by the Plaintiff with discovery.

Additionally, information supplied by the ATF in 1985, less than a year prior to the enactment of the machinegun ban, could help theorize how many machineguns would exist today, but for the machinegun ban. The ATF's then chief weapons expert, Frank W. (Bill) Nickell, concurred with an estimate that there were 500,000 "assault weapons" in "American homes," more than 300,000 of which were AR-15s.[9] ATF records at the time consisted of an additional 116,000 "licensed automatic weapons."[10] Thus, a *minimum* of 18% of "assault weapons," which the ATF agreed included AR-15s, were registered as automatic in 1985.[11] Applying that figure to the amount of AR-15s[12] estimated to be owned today,[13] it could be presumed that there would currently be more than 4,300,000 registered automatic AR-15s *alone* in private ownership, but for the machinegun ban.[14] This would far exceed the 200,000 "common use" standard used in *Caetano*.

### D.  The Product of an Unconstitutional Law Cannot be Used to Justify Its Existence

"[I]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning… it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity." *Friedman v. City of Highland Park,* 784 F.3d 406 (7th Cir. 2015) (referring to the circular reasoning of solely relying on a banned arms' commonality at

---

[9] Tom Morganthau, et al., *Machine Gun U.S.A.*, Newsweek, Oct. 14, 1985 at 49. *See* Ex. F
[10] *Id.*
[11] 116,000 "licensed automatic weapons" divided by the sum of 500,000 "assault weapons" plus the additional 116,000 "licensed automatic weapons" (616,000) equals just over 18% of "assault weapons" being registered as automatic.
[12] The amount of AR-15s estimated to be in circulation in the U.S. today are tracked under the category of "Modern Sporting Rifles" (MSRs) by the National Shooting Sports Foundation as "AR-15 and AK-style rifles," which are functionally similar. *See Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (2022).
[13] *Id.* (updating the industry estimate of MSRs in circulation to 24,446,000 since 1990).
[14] A conservative estimate of 24 million MSRs in circulation multiplied by the 18% of such rifles that were registered as "licensed automatic weapons" in 1985 equals 4,320,000.

the time of litigation to determine if it is constitutionally protected). The circular reasoning rebuked

by the Seventh Circuit in *Friedman* is precisely the reasoning the Defendants use to say that

because "35 states and the District of Columbia generally ban machineguns," they are "not in

common use," and their rarity "shows that machineguns are not protected by the Second

Amendment." Def. Mem. at pp. 18-19. In addition to this logical fallacy, 22 of the 35 states

identified by the Defendants as generally banning machineguns have exceptions for machineguns

possessed lawfully pursuant to federal, state, or local laws.[15] Therefore, 37 states, the majority,

permit the lawful possession of machineguns. If this statistic supported any conclusion, it could

only be that machineguns are in common use and protected by the Second Amendment.

In any event, *Heller* did not *limit* the "common use" test to the present time, it *expanded* it.

Justice Breyer attempted to illustrate his understanding of the "common use" test as it was applied

in *Heller* to arms owned by civilians in the present time, as opposed to historically:

> On the majority's reasoning, if tomorrow someone invents a particularly useful, highly
> dangerous self-defense weapon, Congress and the States had better ban it immediately, for
> once it becomes popular Congress will no longer possess the constitutional authority to do
> so. In essence, the majority determines what regulations are permissible by looking to see
> what existing regulations permit. There is no basis for believing that the Framers intended
> such circular reasoning.

*Heller*, 554 U.S. at 721 (Breyer, J., dissenting). If Justice Breyer's interpretation of how the

"common use" test was *limited* by *Heller* is accurate, then his sentiment regarding the Framers'

---

[15] *See* Alaska Stat. § 11.61.200; Ariz. Rev. Stat. §§ 13-3101, 13-3102; Colo. Rev. Stat. § 18-12-102; Fla. Stat. § 790.221; Ga. Code Ann. § 16-11-122; Ind. Code § 35-47-5-8; Kan. Stat. § 21-6301; Me. Rev. Stat. Ann. tit. 17-A, § 1051; Mich. Comp. Laws § 750.224; Mo. Ann. Stat. § 571.020; N.C. Gen. Stat. § 14-409; N.D. Cent. Code § 62.1-05-01; Neb. Rev. Stat. § 28-1203; Nev. Rev. Stat. § 202.350; Ohio Rev. Code Ann. §§ 2923.11, 2923.17; Or. Rev. Stat. § 166.272; 18 Pa. Stat. and Cons. Stat. § 908; S.C. Code Ann. § 16-23-230; S.D. Codified Laws §§22-1-2, 22-14-6; Tenn. Code Ann. § 39-17-1302;Tex. Penal Code Ann. § 46.05; W. Va. Code § 61-7-9. These 22 statutes identify the machinegun bans for states having exceptions for possession of machineguns pursuant to federal, state, or local laws; the exceptions are identified in each statute, except for Georgia, Indiana, and South Carolina, where the exceptions are identified in separate statutes. *See* Ga. Code Ann. § 16-11-124; Ind. Code § 35-47-5-10(7); S.C. Code Ann. § 16-23-250.

intent should resonate emphatically. However, if his interpretation is erroneous, which is likely given that his opinion was in the dissent, then the only alternative is that the "common use" test may consider the context of historical traditions, such as the approach used by *Miller*. This latter approach also complies with *Bruen's* requirement to evaluate the Second Amendment, as "informed by history." *Bruen*, slip op. at 10. Either conclusion of Justice Breyer's analysis should support the application of the "common use" test in the instant case.

### E. *Bruen* Clarified That Dangerous and Unusual Refers to the Manner of Bearing Arms, Not Possession of a Class of Arms

Defendants place significant emphasis on *Heller*'s dicta regarding "dangerous and unusual weapons," using and citing the phrase 42 times in their memorandum and identifying it as a test that may preclude arms from having protection under the Second Amendment. *See generally* Def. Mem. *Bruen*'s clarification of *Heller*, however, completely forecloses Defendants' reading. *Bruen* studied the statutes regulating dangerous and unusual weapons and determined that their purpose was "[f]ar from banning… any class of firearms, they merely codified the existing common-law offense of bearing arms to terrorize the people[.]" *Bruen*, slip op. at 38. These "common-law offenses of 'affray' or going armed 'to the terror of the people'" referred to the *manner* in which arms were *carried*; they did not refer to a "class of firearms." *Id*; *see also* Daniel Page, *Dangerous and Unusual Misdirection* (2011) (*see* Ex. H)*.* Thus, machineguns may not be classified as "dangerous and unusual," because *Bruen* has clarified *Heller*'s dicta to refer to an offense of *affray*, not a "class of firearms." *Bruen*, slip op. at 38.

### F. Arms That Are in Common Use Are Protected, Even If They Are Dangerous and Unusual

If this Court chose to proceed with the pre-*Bruen* "dangerous and unusual" standards applying to arms rather than the manner of carry, *Bruen* specifically declared that arms in "common use" cannot be banned, even if they were found to be "dangerous and unusual":

> Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

*Id.* at 39 (internal citations omitted).

*Bruen* wrote this immediately after addressing and discounting the interpretation used by the government that "dangerous and unusual" referred to a class of arms, rather than the manner in which arms were carried. Plaintiff agrees with Defendants that this language "suggest[s] that the status of handguns may have changed since the 17th century," Def. Mem. at p. 20, but does not read the Courts' dicta to be *limited* to such a casual observation. The language is clear; it could be argued that *every* protected arm in the history of this Nation was at one point dangerous and unusual under Defendants' reading. Regardless, once the arm comes into "common use," it is protected. *Bruen*, slip op. at 39. *Bruen* determined that even if handguns *were* once classified as dangerous and unusual, their eventual common use granted them Second Amendment protection. Accordingly, since machineguns are in common use today, they could not be banned if they were found to be "dangerous and unusual."

### G. Machineguns Are Not Unusual

If this Court chose to move forward with the pre-*Bruen* understanding of the dangerous and unusual language, it should find support in *Caetano*'s pre-*Bruen* dicta of "unusual" criteria. The *per curiam* Court rejected a conclusion finding stun guns "'unusual' because they are a

thoroughly modern invention." *Caetano*, 577 U.S. 411. In Justice Alito's concurrence, he wrote that stun guns were used and useful in the U.S. armed services; acknowledged that the approximately 200,000 stun guns owned by civilians classified them as "widely owned" and in "common use"; and therefore, that stun guns are not unusual. *Id.* at 419-420 (Alito, J., concurring). Further, he reiterated that the "dangerous and unusual" test "is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Id.* at 417 (Alito, J., concurring) Accordingly, since machineguns are used and useful in the U.S. armed services, and commonly owned and used by civilians, they are not unusual; therefore, they do not meet the criteria to be classified as "dangerous and unusual" weapons.

Of the six courts of appeals decisions that the Defendants point to in Part II of their memorandum, they place most of their reliance on *Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016). *See* Def. Mem. at pp. 11-13. Specifically, Defendants identify *Hollis'* conclusion that "machineguns were 'unusual,' noting the low number of machineguns in circulation (with just '175,977 pre-1986 civilian-owned machineguns in existence')[.]" Def. Mem. at p. 13 (citing *Hollis*, 827 F.3d at 449). *Hollis* did not follow the majority opinion of *Caetano*. Instead, *Hollis* rewrote the majority opinion by relying on a misreading of Justice Alito's concurring opinion. Namely, *Hollis* inferred that Justice Alito required both a specific quantity of arms along with laws authorizing possession of such arms. *Caetano*'s holding includes no such requirement and, as a result, *Hollis* misapplied Caetano.

II.    **Arms Not in Common Use May Also be Protected Under the Plain Text of the Second Amendment**

Even if this Court determined that machineguns did not pass the "common use" test in either historical or modern context, they are still protected arms under the Second Amendment.

12

Amendment protection is whether it is commonly used by private individuals," but this claim is unfounded and conflicts with *Heller* and *Bruen*. Def. Mem. at p. 20. The *Heller* opinion derived the "common use" test from *Miller,* and determined that arms in common use were undeniably protected under the Second Amendment. However, the Court did not purport to *require* arms to be in common use by civilians to receive Second Amendment protection, as Defendants argue, *id.*; the test is just one of the methods that may be used to identify protected arms. *Bruen* also did not say that arms must be in common use by civilians. *Bruen* imposed *just one* requirement when attempting to determine if the conduct is covered by the plain text of the Second Amendment: it *must* be "informed by history." *Bruen*, slip op. at 10. Defendants' reading of the "common use" test fails this requirement. As such, the *strictly textual* question to ask to determine if machineguns are protected arms is as follows: is possession of the standard small-arms service rifle for the U.S. armed services, the M-16, protected by the plain text of the Second Amendment, as informed by history? The answer is yes, and it is found in both the prefatory clause and the operative clause of the Second Amendment.

In the prefatory clause, the purpose is announced, which is to "prevent elimination of the militia." *Heller*, 554 U.S. at 599. This is because the militia was expected to be capable of performing the same duties as a "disfavored standing arm[y]," *Miller,* 307 U.S. at 179, and is "necessary to the security of a free State[.]" U.S. Const. amend. II. These conclusions find further support in The Federalist Papers, where James Madison, the primary author of the Second Amendment, wrote to alleviate the concerns of the people regarding the creation of a standing army. He compared the proposed army's "twenty-five or thirty thousand men" to the "militia amounting to near half a million of citizens with arms in their hands… fighting for their common

13

liberties, and united and conducted by governments possessing their affections and confidence."[16] Madison continued by defending the belief that the militia would be a superior force that easily rivaled that of a standing army, saying that "[i]t may well be doubted, whether a militia thus circumstanced could ever be conquered by such a proportion of regular troops."[17] Madison emphasized this reassurance to the people, because it was commonly understood that the militia, consisting of citizens who were soldiers on occasion, was expected to be capable of opposing any standing army.

In the operative clause, that expectation is enabled by conferring an "individual right" to possess "all instruments that constitute bearable arms[.]" *Heller*, 554 U.S. at 582. This holding finds support in the manner in which George Washington expected citizens to arm themselves for militia service. Washington wrote "that a well regulated militia, composed of… freemen, is the natural strength and only staple security of a free government, and that such militia will… render it unnecessary to keep standing armies among us, ever dangerous to liberty."[18] In concurring with these principles, then Chairman Washington *recommended* that in order to ensure the capability of the militia to be organized and well regulated, these freemen should "provide *themselves* with good firelocks, and use their utmost endeavours to make *themselves* masters of the military exercise[.]"[19] General Washington did not recommend that *Fairfax County* procure arms for the militia; he recommended the *freemen* to procure arms *themselves,* and he made that recommendation with the complete understanding and knowledge that such arms were the typical and standard armament used by the standing British army that they needed to oppose.[20]

---

[16] The Federalist No. 46 (James Madison)
[17] *Id.*
[18] Resolutions of Fairfax County Committee, 17 January 1775
[19] *Id.* (emphasis added)
[20] *Id.* (emphasis added)

14

The Founders knew that bearable military arms were required for militia service, and no serious dispute could be made to the contrary; thus, they wrote the Second Amendment. Therefore, the plain text of the Second Amendment, as informed by history, protects the possession of the standard-issue bearable military arm of today, the M-16.

## III.   *Heller* Did Not Determine That Machineguns May be Banned

The Defendants point to two remarks in *Heller* (veritably, the *only* two occasions where the opinion even mentions machineguns), to conclude a holding that was not even argued or pled in *Heller. See generally* Def. Mem. The first remark, in *Heller*'s analysis of *Miller*, is a suggestion by Justice Scalia saying that it would be "startling" if the "National Firearms Act's *restrictions* on machineguns… *might* be unconstitutional." *Heller*, 554 U.S. at 624 (emphasis added). Such a supposition may indeed be startling, given that both *Heller* and *Bruen* held that the Second Amendment right is not unlimited. But the *restrictions* in the National Firearms Act do not constitute a *total ban*, and a *total ban* on machineguns was not at issue in *Miller* or *Heller.* Further, Justice Scalia did not say that judges could not find "startling" conclusions; to the contrary, Justice Scalia said that "the judge who always likes the results he reaches is a bad judge," which supported his viewpoint that "decisions should reflect the letter of the law."[21] The opinion in *Heller* acknowledged that they were "not undertak[ing] an exhaustive historical analysis… of the full scope of the Second Amendment," *Heller*, 554 U.S. at 626, and the Court reinforced this point by emphasizing that the issue of the *types of arms* that are protected was undecided, writing that "we will have to consider eventually[] *what* types of weapons *Miller* permits." *Id.* at 624.

---

[21] Tasha Tsiaperas, *Constitution a 'dead, dead, dead' document, Scalia tells SMU audience,* Dallas Morning News (January 28, 2013)

The second remark the Defendants place much reliance on is the only sentence in *Heller* that mentions an M-16 rifle. The sentence proposes a hypothetical objection, which contains distinct similarities to the instant case, and is followed by a defense to that hypothetical objection. When reading the sentence in full, it is obvious that it does not implicitly declare that machineguns may be banned:

> It *may be objected* that *if* weapons that are most useful in military service—M–16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause.

*Id.* at 627 (emphasis added).

The Defendants extract pieces of this excerpt to say that the Court "listed machineguns, and specifically the M-16 rifle, as paradigmatic examples of the type of unprotected dangerous and unusual weapons, finding it implicit that 'M-16 rifles and the like[] may be banned.'" Def. Mem. at p. 10 (citing *id.*). This reading, however, directly conflicts with the *actual* list of "longstanding prohibitions" *Heller* explicitly identified as "presumptively lawful" in the same part of the Court's opinion; notably absent from that list, which would have been the perfect vehicle for its endorsement, was the machinegun ban. *See Heller*, 554 U.S. at 626-627 (specifically listing "the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."). Defendants then point to the Tenth Circuit noting that Supreme Court dicta binds "almost as firmly as by the Courts' outright holdings[.]" Def. Mem. at p. 10 (citing *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015)). However, *Heller* rejected such conclusive readings of Supreme Court dicta, especially for the circumstance presented here, saying that "[it is inconceivable that we would rest our interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a... dictum in a case where the point

16

was not at issue and was not argued." *Heller*, 554 U.S. at 625, n.25. Thus, reading *Heller* to say that machineguns are implicitly unprotected directly contradicts the text of the opinion. Further, even if *Heller had* included the machinegun ban in its list of longstanding prohibitions, the ban would still be subject to the constitutional scrutiny required by *Bruen*.

Indeed, Plaintiff's challenge objects "that if weapons that are most useful in military service—M-16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause," *Heller*, 554 U.S. at 627, and *Heller*, anticipating arguments against such an objection comparing the effectiveness of the militia to modern armament and armies, defended Plaintiffs' objection by asserting "the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right." *Id.* at 627-628.

## IV.   Courts of Appeals Upholding § 922(o) Since *Heller* Did Not Meet the Standards of *Bruen*

In looking for support for the machinegun ban, the Defendants point to opinions in "[s]ix courts of appeals [that] have rejected Second Amendment challenges to § 922(o) since *Heller*." Def. Mem. at p. 11. *All* of these opinions, however, did not conduct the analysis under *Bruen*, and do not comply with the requirements of *Bruen*. Defendants argue that these decisions concluded machineguns were not protected "based on the Second Amendment's text and history, including *Heller's* analysis of text and history." *Id.* at p. 12. Defendants' argument is incorrect. Those decisions were based *only* on *Heller*'s analysis. *None* of the courts of appeals performed an independent analysis of the "Second Amendment's text, as informed by history," as *Bruen* requires. *Bruen*, slip op. at 10. Indeed, each of the six courts of appeals used the same approach that the Defendants use now in the instant case: they supposed that machineguns are not in common use, are dangerous and unusual, or a combination of both, and conclude that *Heller* implicitly

17

prohibits their possession. Plaintiff addresses each of these separately and demonstrates that their holdings do not comply with *Bruen*.

*Hollis*, 827 F.3d 436, *United States v. Fincher*, 538 F.3d 868 (8th Cir. 2008), *United States v. Henry*, 688 F.3d 637 (9th Cir. 2012), and *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804*, 822 F.3d 136, (3d Cir. 2016) determined that because machineguns were "dangerous and unusual" weapons as described in *Heller*, they did not receive Second Amendment protection. *See Hollis*, 827 F.3d at 451 ("Machineguns are dangerous and unusual and… [t]hey do not receive Second Amendment protection[.]"); *Fincher*, 538 F.3d at 874 ("Machine guns… fall within the category of dangerous and unusual weapons that the government can prohibit for individual use."); *Henry*, 688 F.3d at 638 ("machine guns are 'dangerous and unusual weapons' that are unprotected by the Second Amendment."); *Palmetto State Armory*, 822 F.3d at 143 ("'Machine guns… fall within the category of dangerous and unusual weapons that the government can prohibit for individual use.'") (citing *Fincher*, 538 F.3d at 874). In the most recent of these cases, the Fifth Circuit acknowledged a source submitted by Mr. Hollis, *see* Daniel Page, *Dangerous and Unusual Misdirection* (2011) (*see* Ex. H), that "advance[d] his view that dangerous and unusual refers *only* to the manner in which weapons are used," not a *class* of firearms. *Hollis*, 827 F.3d at 448 (emphasis added). Recognizing the compelling analysis by the source, the Fifth Circuit explained that accepting its conclusions would contradict Supreme Court dicta, saying "that very paper acknowledged this 'inaccurate definition of "dangerous and unusual weapons" [was] embraced in *Heller*….' We leave changes in Supreme Court caselaw to the Supreme Court." *Id.* Indeed, in *Bruen*, the Supreme Court clarified *Heller*'s dicta that the Fifth Circuit could not overrule, and affirmed that Mr. Hollis' source is correct, saying that "[f]ar from banning… any class of firearms," statutes prohibiting

18

dangerous and unusual weapons "merely codified the existing common-law offense of bearing arms to terrorize the people[.]" *Bruen*, slip op. at 38. Thus, these cases relying on *Heller*'s dangerous and unusual criteria would not comply with the dicta that was clarified by *Bruen*. Additionally, these decisions would incorrectly conflate the two prongs required by *Bruen*. *See infra*, Section VI.A.

*Hollis*, 827 F.3d 436, and *Fincher*, 538 F.3d 868 determined that because machineguns were not in common use as the test was applied in *Heller*, they were not protected under the Second Amendment. *See Hollis*, 827 F.3d at 451 ("Machineguns are… therefore not in common use. They do not receive Second Amendment protection[.]") (analyzing various *modern* measures to try to determine which standard delineates the common use threshold. *See id*. at 449-450); *Fincher*, 538 F.3d at 874 ("Machine guns are not in common use… and therefore fall within the category of… weapons that the government can prohibit[.]"). These narrow approaches to the "common use" test, however, improperly constrains the measure of arms to "civilian-owned arms" as described *supra*, pp. 5-10. In these opinions, the courts did not evaluate the plain-text of the Second Amendment, "as informed by history," *Bruen*, slip op. at 10, and their strict method of employing the "common use" test to arms owned by civilians in the present day would therefore not survive the requirements of *Bruen*.

*Palmetto State Armory*, 822 F.3d 136, *Hamblen v. United States*, 591 F.3d 471 (6th Cir. 2009), and *United States v. Zaleski*, 489 F. App'x 474 (2d Cir. 2012) read *Heller* to say that the ban on machineguns was implicitly constitutional. *See Palmetto State Armory*, 822 F.3d at 141 ("*Heller*… make[s] clear that the… ban on machine guns… does not impose a burden on conduct falling within the scope of the Second Amendment."); *Hamblen*, 591 F.3d at 474 ("[W]hatever the individual right to keep and bear arms might entail, it does not authorize an… individual to

possess… machine guns[.]") (drawing on *Heller*'s "startling" supposition); *Zaleski*, 489 F. App'x at 475 ("[T]he Second Amendment does not protect Zaleski's personal possession of machine guns.") (drawing on *Heller*, 554 U.S. at 624-625). But as explained *supra*, pp. 15-17, *Heller* did not determine that machineguns may be banned, saying that "[it is inconceivable that we would rest our interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a… dictum in a case where the point was not at issue and was not argued." *Heller*, 554 U.S. at 625, n.25. Importantly, neither *Palmetto State Armory, Hamblen*, nor *Zaleski* performed an independent analysis of the plain text of the Second Amendment, "as informed by history." *Bruen*, slip op. at 10. Thus, none of these cases comply with the first prong required by *Bruen*.

The analysis here of the six courts of appeals decisions upholding section 922(o) shows a common theme of pointing to *Heller* and "sister circuit courts" to subvert constitutional analysis. But *Bruen* "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, slip op. at 17. Accordingly, since these six decisions did not perform that analysis, they would not have been "resolved… at step one," Def. Mem. at p. 12, and are not "consistent with [the] reasoning[,]" Def. Mem. at p. 13, of *Bruen*.

## V.     District Courts Upholding § 922(o) Since *Bruen* Have Not Complied With *Bruen*

Looking for post-*Bruen* guidance, Defendants point to three district courts upholding § 922(o) and one district court upholding the NFA. Def. Mem. at p. 13. These decisions, despite their acknowledgement of the clarified *Bruen* standards, *still* did not comply with *Bruen*. The district courts simply relied on the pre-*Bruen* decisions explained *supra*, pp. 17-20, and did not consider the plain text of the Second Amendment, as informed by history, that *Bruen* requires.

In *United States v. Simien*, No. SA-22-cr-00379-JKP (W.D. Tex. Feb. 10, 2023), the court pointed to *Heller*'s "dangerous and unusual" dicta, *id.* at 17, disregarding *Bruen*'s clarification identified *supra*, p. 10, and then looked for support in *Hollis*, which would not comply with *Bruen* as explained *supra*, pp. 17-20. In Order, *United States v. Adamiak*, No. 2:22cr47, ECF No. 46 (E.D. Va. Sept. 22, 2022), the court determined that machineguns were not "in common use" and "thus fall outside of the Second Amendment's protection." *Id.* at 9-10. As explained *supra*, pp. 5-10, this conclusion fails to consider the plain text of the Second Amendment, "as informed by history." *Bruen*, slip op. at 10. In Order, *United States v. Hoover*, No. 3:21-cr-22(S3)-MMH-MCR, ECF No. 141 (M.D. Fla. Oct. 18, 2022) the court wrote that "*Bruen* did not overturn [*Heller*]," which acknowledged the tradition of prohibiting "'dangerous and unusual weapons.'" *Id.* at 33 (citing *Heller*, 554 U.S. at 627). This is similar to the Defendants' argument that "*Bruen*... was '[i]n keeping with *Heller*[,]'" when the Court "found it 'fairly supported by the historical tradition of prohibiting... "dangerous and unusual weapons[.]"'" Def. Mem. at p. 9 (citing *Bruen*, slip op. at 8; *Heller*, 554 U.S. at 627). As explained *supra*, p. 10, the "dangerous and unusual" dicta in *Heller* was *clarified* by *Bruen* to mean that "[f]ar from banning... any class of firearms," statutes prohibiting dangerous and unusual weapons "merely codified the existing common-law offense of bearing arms to terrorize the people," *Bruen*, slip op. at 38, which forecloses the reading used by the district court in *Hoover*. The district court holding in *United States v. Dixon*, No. 22-cr-140 (N. D. Ill. Mar. 28, 2023) was particularly capricious; after determining that § 922(o) was constitutional for the same erroneous reasons the district courts used *supra*, and failing to perform the historical analysis of the plain text of the Second Amendment as required by *Bruen*, the court proceeded to immediately evaluate the constitutionality of 18 U.S.C. § 922(g)(1) by analyzing the plain text of the Second Amendment. *See id.* at Part II.

*Bruen* did not clarify the holdings in *Heller* because they were being correctly applied; the Court clarified its holdings because lower courts for fourteen years incorrectly evaluated Second Amendment challenges. District court decisions that continue to simply point back to pre-*Bruen* decisions, despite the clarified holdings, only to find the same results in an effort to avoid "break[ing] new ground to uphold § 922(o)[,]" Def. Mem. at p. 15, cannot be considered instructive as to how to evaluate a Second Amendment challenge in compliance with *Bruen*. The test in *Bruen* "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, slip op. at 17.

## VI.    Section 922(o) Does Not Comport With *Bruen*

### A. Defendants Improperly Conflate the Two Prongs of *Bruen*

*Bruen* identified two distinct prongs to be used when evaluating a Second Amendment challenge. At the first, it must be determined if the "plain text" of the Second Amendment "covers an individual's conduct," *Bruen*, slip op. at 8, which should be "informed by history." *Id.* at 10. Then, second and separately, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 8. In the instant case, the Defendants improperly conflate *Bruen*'s two prongs into one, when in addressing the second prong they say that "[t]he key question" in identifying "'relevantly similar'" "historical prohibitions on the carriage of dangerous and unusual weapons" "is the same question underlying whether machineguns are covered by the Second Amendment's text: whether machineguns are 'dangerous and unusual weapons.'" Def. Mem. at p. 22 (citing *Bruen*, slip op. at 20). Put simply, Defendants argue at *Bruen*'s first prong that the plain text of the Second Amendment does not protect machineguns based on historical laws supposedly prohibiting dangerous and unusual weapons, and *then* attempt to satisfy *Bruen*'s second prong by providing *the same* historical laws supposedly

prohibiting dangerous and unusual weapons. *See* Def. Mem at pp. 16-22. This approach completely misapplies the two individual prongs of *Bruen* by conflating them into one.

*Bruen*'s first prong asks a strictly textual question. The "'textual analysis'" must "focus[] on the "'normal and ordinary'" meaning of the Second Amendment's language," *Bruen*, slip op. at 10-11 (citing *Heller*, 554 U.S. at 576-577, 578), as it was understood "*when the people adopted [it]*." *Id.* at 25 (citing *Heller*, 554 U.S. at 634-635 (emphasis added)). The first prong is *not* the step where *Bruen* requires the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation[s]" by providing historical analogues; that analysis is explicitly reserved for the second prong. *Id.* at 15. As such, Defendants improperly attempt to classify machineguns as dangerous and unusual at the first prong; the historical analysis to be conducted at the first prong must be in the context of the plain text of the Second Amendment.

**B. The Plain Text of the Second Amendment, as Informed by History, Protects the Possession of a Machinegun**

When evaluating Second Amendment challenges, the first prong prescribed in *Bruen* "is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* Courts must "ascertain the original scope of the right based on its historical meaning." *Id.* at 9. Even "if the historical evidence at this step is 'inconclusive or suggests that the regulated activity is *not* categorically unprotected,'" courts then proceed to the second step. *Id.* (citing *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019) (internal quotation marks omitted)). As explained *supra*, pp. 2-15, there are three independent confirmations that machineguns are protected arms under the Second Amendment: machineguns are in common use in the military, which grants them protection; machineguns are in common use amongst citizens,

which grants them protection; most importantly, machineguns are protected by the plain text of the Second Amendment, as informed by history.

While none of the post-*Bruen* holdings referenced by Defendants, when conducting analyses of challenges to Second Amendment conduct, have complied with *Bruen*'s requirement to consider the plain text of the Second Amendment, "as informed by history," *Bruen*, slip op. at 10, there have been several courts that *have* done so. Although the following three cases did not implicate section 922(o), they did implicate Second Amendment conduct, and are particularly instructive as to how courts should read and employ the first prong required by *Bruen*; indeed, there are conspicuous parallels to the instant case.

In *Firearms Policy Coalition, Inc. et al., v. McCraw*, No. 4:21-cv-1245-P (N.D. Tex., Aug 25, 2022), the district court found that a statute banning "18-to-20-year-olds from carrying handguns for self-defense outside the home based solely on their age… violates the Second Amendment[.]" *Id.* at 22. The court concluded that 18-to-20-year-olds were "a part of the militia" mentioned in the prefatory clause (*id.* at 10) and "a part of 'the people' mentioned in the [operative clause of the] Second Amendment[.]" *Id.* at 6. The court gleaned these conclusions from performing historical analysis of the actual plain text of the Second Amendment as well as Supreme Court dicta that analyzed that text in *Heller* and *Miller*. *Id.* at 5-13.

In *United States v. Price*, No. 2:22-cr-00097 (S.D. W. VA., Oct 12, 2022), particularly relevant to the instant case, the district court found that 18 U.S.C. § 922(k), prohibiting possession of firearms with altered, obliterated, or removed serial numbers, is unconstitutional under the Second Amendment. The government argued that section 922(k) was a constitutional commercial regulation, relying on language in *Heller, McDonald v. City of Chicago*, 561 U.S. 742 (2010)*, and Bruen. See id.* at 5. But the court determined that because the statute was "a blatant prohibition on

24

possession" of a type of arms, "[t]he conduct prohibited by Section 922(k) f[ell] squarely within the Second Amendment's plain text." *Id*. at 7.

In *United States v. Quiroz*, No. PE:22-CR-00104-DC (W.D. Tex., Sep 19, 2022), the district court found that 18 U.S.C. § 922(n), prohibiting persons under felony indictment from obtaining a firearm, is facially unconstitutional. The government quoted *Heller*, arguing "for a rigid, sterile reading of 'keep and bear arms,'" to mean it would only be permissible for such persons to "have weapons" or to "carry," and that "receiving a firearm falls outside the Second Amendment right[.]" *Id*. at 6. The court rejected the government's *sole* reliance on *Heller*, and after performing its own analysis of the plain text of the Second Amendment, as required by *Bruen*, concluded that "the Second Amendment's plain text cover[s] the conduct… [w]ithout a doubt," emphasizing that "*Bruen*'s first step asks a strictly textual question[.]" *Id*. at 7.

In the instant case, the Defendants' approach to *Bruen*'s first prong is comparable to the government's approach in *Quiroz*. "[F]rom the jump, the Government seems to misread *Bruen*[,]" *id*. at 5, when they say that "[t]he key question is the same question underlying whether machineguns are covered by the Second Amendment's text: whether machineguns are 'dangerous and unusual weapons.'" Def. Mem. at p. 22. By adding the "dangerous and unusual" criteria to the *conduct* in the first prong, the *possession of arms*, "the Government conflates *Bruen*'s first step with its second." *Quiroz*, No. PE:22-CR-00104-DC at 6. But "*Bruen*'s first step asks a strictly textual question: does the Second Amendment's plain text cover the conduct? Without a doubt the answer here is yes." *Id*. at 7. § 922(o)'s constitutionality *then* turns on whether prohibiting the possession of machineguns "is consistent with the Nation's historical tradition of firearm regulation." *Id*.

These district court holdings contain similar themes that have appeared in post-*Bruen* litigation. First, the government argues that a statute is constitutional based on "implicit dicta" in *Heller*, and disregards *Bruen*'s requirement to consider the plain text of the Second Amendment, "as informed by history." *Bruen*, slip op. at 10. Next, the courts apply the requirements of *Bruen*, analyzing the regulated conduct in view of the plain text of the Second Amendment, "as informed by history." *Id*. Resultingly, the courts determine that the conduct in question is protected under the plain text of the Second Amendment, and proceed to the second prong. Indeed, the Defendants in the instant case employ the same approach of relying on *Heller* to the extent that it avoids *Bruen*'s requirement to determine whether or not machineguns are protected by the plain text of the Second Amendment, "as informed by history." *Id*.

Plaintiff has identified three independent conclusions demonstrating that machineguns are protected; one conclusion complies with the "common use" test as *Heller* expanded it to permit the measure of modern civilian-owned arms; and two conclusions comply with *Bruen*'s requirement to consider the plain text of the Second Amendment, as informed by history. *See supra*, pp. 2-15.

## C. Section 922(o) is Not Consistent with This Nation's Historical Traditions of Regulating Arms

In *Bruen*, the Supreme Court reaffirmed that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" *Bruen*, slip op. at 25 (citing *Heller*, 554 U.S at 634-635). Detailing the framework for Second Amendment challenges to use, the court categorized "historical sources from the late 1200s to the early 1900s" into five time periods, "because, when it comes to interpreting the Constitution, not all history is created equal." *Id.* The court then elaborated on the weight and considerations that sources from each time period

26

should possess and provide. *Bruen* explained how courts must use analogical reasoning in the context of the Second Amendment to identify historical regulations that are acceptable as analogues to modern regulations. The "'central' considerations when engaging in an analogical inquiry" should be "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 20. When considering these metrics, the Defendants' examples do not sufficiently justify section 922(o).

In their only attempt to identify regulations historically analogous with the machinegun ban, the Defendants point to the authorities referenced by *Heller* to support "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" Def. Mem. at p. 21 (citing *Heller*, 554 U.S. at 627). These authorities, however, did not impose restrictions on the *types* of arms that may be owned by citizens, much less a *total ban*. As explained above, *see supra*, p. 10, *Bruen* determined that these references referred to the offense of "affray," and were "[f]ar from banning… any class of firearms, they merely codified the existing common-law offense of bearing arms to terrorize the people[.]" *Bruen*, slip op. at 38; *see also* Daniel Page, *Dangerous and Unusual Misdirection* (2011) (*see* Ex. H). The most fitting modern regulations analogous to Defendants' authorities referencing affray may be present-day offenses criminalizing the act of "brandishing." *See* 18 U.S.C. § 924(c)(4) ("'[B]randish' means, with respect to a firearm, to display all or part of the firearm, or otherwise make the presence of the firearm known to another person, in order to intimidate that person[.]"). Such modern regulations do not prohibit a class of firearms; they criminalize specific manners in which *protected* arms may be used.

In performing the historical analysis required by *Bruen*, one of the two metrics that must be used in comparing modern regulations to historical regulations is to identify *how* the "regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, slip op. at 20. The

27

*Heller* authorities referenced by Defendants easily fails this metric. The historical regulations burdened the *manner* in which persons could *bear* arms, but the modern regulation, the machinegun ban, burdens the *type* of arms that may be *kept* or *possessed*.

The other metric that must be considered is *why* the "regulations burden a law-abiding citizen's right to armed self-defense." *Id.* The *Heller* authorities referenced by Defendants fail this metric as well. The historical regulations burdened Second Amendment conduct to keep from "terroriz[ing] the people," but the intent of the machinegun ban is not evidenced by the Defendants, as their burden requires. *Id.* at 38. This lack of evidence is surely because the "legislative history surrounding § 922(o) is virtually nonexistent. The provision was a last minute floor amendment, no hearings were conducted, and no committee report refers to it." *United States v. Wilks*, 58 F.3d 1518, 1519 (10th Cir. 1995). There also was no recorded vote; the provision passed by a voice vote.[22] *Bruen* provides guidance for considering these circumstances:

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional.

*Bruen*, slip op. at 17-18.

Thus, the societal problem must be addressed by a "distinctly similar historical regulation addressing that problem." *Id.* If the challenge "implicat[es] unprecedented societal concerns or dramatic technological changes… a more nuanced approach" may be required. *Id.* at 18. However, Defendants have provided no evidence that the challenged regulation in the instant case was

---

[22] *See FOPA Hughes Amendment VOTE APRIL 10 1986* (25 Jan, 2011),
(https://www.youtube.com/watch?v=a6Mx2UcSEvQ) (video footage of the United States House of Representatives floor vote of the machinegun ban ("the Hughes Amendment")).

enacted by Congress to address any societal problem *whatsoever*. Therefore, the regulation falls far short of the bar established by *Bruen*.

*Bruen* established the standard and set the example to satisfy the requirement of identifying historical American traditions to justify a regulation affecting conduct protected under the Second Amendment. The court studiously evaluated various English regulations and laws from the 1200s through the 1700s; three colonial era restrictions; three late-18[th]-century and early-19[th]-century laws; various post-ratification common-law offenses; ten post-ratification statutory prohibitions along with eight court cases upholding those prohibitions; ten post-ratification surety statutes; three laws and two court cases from the reconstruction era; and six laws from the late-19[th]-century. *See Bruen*, slip op. at 30-62. In analyzing these historical restrictions that contained *actual* similarities to the protected conduct in question in that case, *Bruen* determined that they were not historical analogues, and did not justify a *total ban* on that conduct. In consideration of the analytical standard that *Bruen* established, the *Heller* authorities criminalizing the offense of affray, which have not been proven to be analogous to the machinegun ban, cannot be accepted as historical American traditions to justify such a ban.

## CONCLUSION

The Supreme Court has held that "the Second Amendment right is not unlimited." *Heller*, 554 U.S. at 571. To be sure, there are numerous federal, state, and local regulations and restrictions on machineguns, including purchase, transfer, registration, importation, manufacture, possession, and transportation regulations under the NFA; time and place restrictions; background check requirements; carry restrictions; and prohibited possession by felons, people convicted of domestic violence, fugitives, and unlawful users of controlled substances. Plaintiff does not challenge any

29

of these restrictions, and they would remain unaffected if the machinegun ban was found to be unconstitutional.

Nonetheless, a *total ban* on conduct protected under the Second Amendment does not pass constitutional muster. While acknowledging that the Second Amendment right is not unlimited, *Heller* and *Bruen* determined that the opposite extreme also is not permissible, and accordingly overturned *total bans* on protected arms and conduct. Since machineguns are a type of arm in common use and protected under the plain text of the Second Amendment, as informed by history, the "Constitution presumptively protects" the possession of machineguns, and "the government must demonstrate that" the machinegun ban "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, slip op at 8. The government has failed to make that demonstration, and section 922(o) therefore fails the requirements mandated by *Bruen*. As such, the machinegun ban must be found unconstitutional.

Plaintiff requests that the Court grant Plaintiffs' Motion for Summary Judgment; deny Defendants' Motion to Dismiss; and award Plaintiff any other relief he is entitled to.

DATED this 7th day of April, 2023.                Respectfully Submitted,


Jake S. DeWilde
PO Box 267
Wapiti, WY 82450
(307) 587-4524

30