**Exhibit A**

Veterans of Foreign Wars, *Veteran-Signers of the U.S. Constitution*

VFW Magazine, September 2010

Pages 28-29

# Veteran-Signers of the U.S. Constitution

**On Sept. 17, 1787,** 22 Revolutionary War veterans—men who had served in both Continental and state forces—signed the U.S. Constitution at a monumental convention in Philadelphia. Fully 56% of the 39 signers were veterans.

George Washington presided over and William Jackson was secretary of the Constitutional Convention.

These Founding Fathers ratified a "singular work of genius." But they did much more. "Veterans of the Revolutionary War," wrote the authors of *Soldier-Statesmen of the Constitution,* "formed a human bridge between the promise of independence and the realization of representative government."

Some 400 vets served in prominent executive, legislative and judicial positions and as governors before 1815.



George Washington

| VETERAN | STATE | SERVICE YEARS | UNITS | CAPACITY |
|---|---|---|---|---|
| Baldwin, Abraham | Connecticut | 1775-1783 | Continental Army Contingent, Connecticut | Chaplain |
| Bassett, Richard | Delaware | 1776-1777 | Dover Inf. and Horse (M), Haslet's Regt. (C) | Officer |
| Blount, William | North Carolina | 1777-1780 | 3rd North Carolina Regt. (C) | Paymaster |
| Brearly, David | New Jersey | 1776-1779 | 1st New Jersey Regt. (C), Van Cortlandt's Regt. (M) | Officer |
| Butler, Pierce | South Carolina | 1779-1782 | South Carolina Militia | State Adjt. Gen. |
| Dayton, Jonathan | New Jersey | 1776-1783 | 2nd and 3rd New Jersey Regts. (C) | Officer |
| Dickinson, John | Delaware | 1775-1778 | Associators (M) | Enlisted Man/Officer |
| Few, William | Georgia | 1778-1780 | Richmond County Regt. (M) | Officer |
| Fitzsimons, Thomas | Pennsylvania | 1776-1777 | Cadwalader's 3rd Battalion (M) | Officer |
| Gilman, Nicholas | New Hampshire | 1776-1783 | 3rd New Hampshire Regt. (C) | Officer |
| Hamilton, Alexander | New York | 1775-1781 | Continental Army, N.Y. Provincial Co. of Artillery (M) | Officer |
| Jackson, William* | South Carolina | 1776-1780 | 1st South Carolina Regt. (C) | Officer |
| King, Rufus | Massachusetts | 1778-1779 | Glover's Regt. (M) | Officer |
| Langdon, John | New Hampshire | 1777-1778 | Whipple's Eastern Brigade (M) | Officer |
| Livingston, William | New Jersey | 1775-1776 | New Jersey Militia | Head Officer |
| McHenry, James | Maryland | 1775-1781 | 5th Pennsylvania Battalion (C) | Surgeon |
| Mifflin, Thomas | Pennsylvania | 1775-1779 | Associators 3rd Battalion (M), Continental Army | Quartermaster General |
| Morris, Gouverneur | Pennsylvania | 1776-1777 | Pennsylvania Militia | Volunteer |
| Pinckney, Charles | South Carolina | 1779-1781 | Charleston Regiment (M) | Officer |
| Pinckney, Charles C. | South Carolina | 1776-1783 | 1st South Carolina Regt. (C) | Officer |
| Spaight, Richard | North Carolina | 1780-1781 | North Carolina Militia | Officer |
| Washington, George | Virginia | 1775-1783 | Continental Army | Commander-in-Chief |
| Williamson, Hugh | North Carolina | 1780-1781 | North Carolina Militia | Surgeon General |

**Source:** *Soldier-Statesmen of the Constitution* by Robert Wright and Morris MacGregor (Center of Military History, 1987).



Jonathan Dayton
Nicholas Gilman
William Jackson
Alexander Hamilton
David Brearly
James McHenry
Charles C. Pinckney

| BATTLES | CIVILIAN OCCUPATION |
|---|---|
| Unknown | Senator, Georgia Representative |
| Unknown | Senator and Governor |
| Brandywine Creek, Camden | Tenn. Territorial Governor, State Legislator |
| Germantown, Monmouth, New York City, Brandywine Creek | Jurist |
| Savannah, Charleston | Senator, State Legislator, Businessman |
| Germantown, Monmouth, Yorktown, N.Y. Frontier, Brandywine Creek | Congressman, State Legislator, Businessman |
| New York City | Congressman |
| Sunbury, Savannah, Guerrilla Warfare on Frontier | Congressman, State Legislator, Jurist |
| Princeton | Congressman, State Legislator, Businessman |
| Valley Forge, Monmouth, Yorktown, Fort Ticonderoga, Saratoga | Senator, Representative, State Legislator |
| Princeton, Monmouth, Yorktown, New York City, Trenton | Secretary of the Treasury, Attorney |
| Savannah, Charleston, Florida, Stono Ferry | Attorney, Civil Servant |
| Newport (R.I.) | Senator (N.Y.), State Legislator, Diplomat |
| Saratoga, Newport | Senator, Governor, State Legislator |
| None | Governor |
| Monmouth, Springfield, Yorktown, New York City, Valley Forge | Secretary of War, State Legislator |
| Boston, New York City, Princeton | Governor, State Legislator |
| New York City, Hudson Highlands | Congressman, Businessman, Diplomat |
| Savannah, Charleston | Congressman, Governor, State Legislator |
| Germantown, Florida, Savannah, Charleston, Brandywine Creek | Diplomat, State Legislator |
| Camden | Congressman, Governor, State Legislator |
| Boston to Yorktown | First U.S. President |
| Camden, Guerrilla Warfare on Frontier | Congressman, State Legislator |

* William Jackson authenticated the results of the sessions.   C=Continental Army   M=Militia

September 2010 • WWW.VFW.ORG • 39

Exhibit B

Bureau of Alcohol, Tobacco, Firearms, and Explosives, *Firearms Commerce in the*

*United States – Annual Statistical Update 2021*

Page 16

## Exhibit 8: National Firearms Act Registered Weapons by State (May 2021) — continued

| State | Any Other Weapon[1] | Destructive Device[2] | Machinegun[3] | Silencer[4] | Short Barreled Rifle[5] | Short Barreled Shotgun[6] | Total |
|---|---|---|---|---|---|---|---|
| North Carolina | 1,158 | 107,333 | 15,875 | 76,759 | 17,478 | 3,563 | 222,166 |
| North Dakota | 215 | 3,726 | 1,670 | 23,042 | 2,003 | 319 | 30,975 |
| Nebraska | 816 | 9,780 | 2,403 | 25,879 | 3,472 | 911 | 43,261 |
| New Hampshire | 534 | 5,834 | 20,817 | 36,954 | 7,613 | 681 | 72,433 |
| New Jersey | 534 | 47,080 | 44,422 | 3,889 | 3,775 | 2,528 | 102,228 |
| New Mexico | 404 | 93,029 | 4,233 | 19,873 | 4,590 | 839 | 122,968 |
| Nevada | 1,264 | 50,124 | 14,577 | 37,880 | 12,662 | 2,500 | 119,007 |
| New York | 1,848 | 54,148 | 13,554 | 7,406 | 7,622 | 7,613 | 92,191 |
| Ohio | 2,312 | 92,909 | 22,979 | 68,736 | 15,158 | 6,567 | 208,661 |
| Oklahoma | 1,253 | 19,174 | 9,776 | 62,404 | 8,738 | 2,023 | 103,368 |
| Oregon | 1,683 | 28,654 | 6,740 | 49,197 | 9,483 | 1,717 | 97,474 |
| Pennsylvania | 2,482 | 205,854 | 21,169 | 83,563 | 21,215 | 13,884 | 348,167 |
| Rhode Island | 46 | 3,663 | 630 | 96 | 338 | 114 | 4,887 |
| South Carolina | 733 | 44,017 | 10,997 | 50,422 | 9,088 | 3,948 | 119,205 |
| South Dakota | 388 | 4,559 | 2,176 | 55,666 | 1,612 | 265 | 64,666 |
| Tennessee | 1,803 | 54,554 | 14,683 | 60,573 | 13,350 | 6,573 | 151,536 |
| Texas | 7,517 | 332,208 | 46,318 | 529,150 | 81,000 | 10,362 | 1,006,555 |
| Utah | 578 | 19,648 | 7,745 | 79,557 | 9,212 | 1,668 | 118,408 |
| Virginia | 3,094 | 250,986 | 43,877 | 90,454 | 26,361 | 8,935 | 423,707 |
| Vermont | 238 | 3,106 | 1,465 | 3,528 | 904 | 210 | 9,451 |
| Washington | 1,981 | 62,633 | 4,673 | 78,279 | 16,919 | 1,049 | 165,534 |
| Wisconsin | 853 | 36,053 | 8,391 | 40,596 | 8,070 | 1,467 | 95,430 |
| West Virginia | 465 | 25,315 | 7,359 | 13,696 | 2,913 | 1,215 | 50,963 |
| Wyoming | 337 | 120,688 | 2,019 | 16,681 | 2,089 | 433 | 142,247 |
| Other US Territories | 6 | 323 | 408 | 20 | 12 | 103 | 872 |
| Total | 67,744 | 3,343,519 | 741,146 | 2,664,774 | 532,725 | 162,267 | 7,512,175 |

**Exhibit C**

Bureau of Alcohol, Tobacco, Firearms, and Explosives, *ATF National Firearms Act Handbook –*

ATF E-Publication 5320.8 – Revised: April 2009

Pages 23-25

# CHAPTER 3.  REGISTRATION OF NFA FIREARMS

## Section 3.1  The National Firearm Registration and Transfer Record (NFRTR)

The NFRTR is the central registry of all NFA firearms in the U.S. which are not in the possession or under the control of the U.S. Government. The registry includes (1) the identification of the firearm, (2) date of registration, and (3) identification and address of the person entitled to possession of the firearm (the person to whom the firearm is registered).[30]

## Section 3.2  Who may register NFA firearms

**3.2.1  Amnesty registration.**  When the NFA was amended in 1968, a 30-day amnesty period immediately following the law's effective date was established during which persons possessing unregistered firearms could register them in the NFRTR.[31]

The 1968 amendments also provided for the establishment of additional amnesty periods not exceeding 90 days per period.[32]  To date, no additional amnesty periods have been declared. Requests for further amnesty periods have been denied, principally because additional periods could jeopardize pending ATF investigations and prosecutions of NFA violations.

**3.2.2  Registration by State and local agencies**.  To be lawfully possessed by States and political subdivisions of the States (for example, local police departments), NFA firearms must be registered in the NFRTR. The regulations permit State and local police organizations acquiring unregistered NFA firearms for official use, by seizure, forfeiture, or abandonment, to register them in the NFRTR by filing ATF Forms 10. Appendix C contains a copy of the form. Firearms registered on Forms 10 are for official use only and subsequent transfers will be approved only to other government agencies for official use.[33]   For example, they may not be traded to an FFL/SOT in exchange for other firearms or police equipment.

**3.2.3  Registration by makers.**  Persons other than FFLs and SOTs desiring to make an NFA firearm are required to first register the firearm by filing Form 1 with ATF and obtaining approval of the form and registration of the firearm. Appendix C contains a copy of the form. ATF will approve a making application on Form 1 if the maker pays the $200 making tax required by the NFA, identifies the firearm as the form requires, includes his/her fingerprints and photographs if the maker is an individual, and if the making and the maker's possession of the firearm would not place the maker in violation of any Federal, State or local law.[34]  A law enforcement certification is also required if the maker is an individual. Note also that ATF will not approve the making of a machinegun it determines would violate 18 U.S.C. 922(o). Section 922(o) generally prohibits the possession of machineguns manufactured on or after May 19, 1986.

---

[30] 26 U.S.C. 5841(a)
[31] Section 207(b) of the Gun Control Act of 1968, Public Law 90-618, approved October 22, 1968
[32] Section 207(d), ibid
[33] 27 CFR 479.104
[34] 26 U.S.C 5822; 27 CFR 479.62, 479.63, 479.64

**3.2.4  Registration by importers.** FFLs/SOTs qualified as importers must register imported firearms by filing ATF Forms 2, Notice of Firearms Manufactured or Imported, no later than 15 days from the date the imported firearms were released by Customs.  Upon timely receipt by ATF of a Form 2 and a copy of Form 6A showing Customs' release of an imported firearm, ATF will register the firearm to the importer.[35]  Appendix C contains copies of Forms 2 and 6A. Note that the NFA prohibits importation of NFA firearms unless they are being imported for the use of the United States or a State agency, for scientific or research purposes, or for testing or use as a model by a registered importer or solely for use as a sales sample by a registered importer or registered dealer.[36]  In the case of an imported machinegun, Section 922(o) of the GCA would also apply.

**3.2.5  Registration by manufacturers.** FFLs/SOTs qualified as manufacturers must register manufactured firearms by filing ATF Form 2, Notice of Firearms Manufactured or Imported. All firearms manufactured during a single day must be listed on one Form 2. The form must be filed no later than the close of the next business day. Receipt of the form by ATF will serve to register the listed firearms to the manufacturer.[37]  Appendix C contains a copy of Form 2.

**3.2.6  Registration to transferees.**  Registered firearms may be transferred by their registered owners/possessors to transferees. Other than Form 10 registration, there is no mechanism in the NFA to lawfully transfer unregistered NFA firearms.

**3.2.6.1  Transfers by persons other than FFLs/SOTs to other such persons.** Transferors of registered firearms must file ATF Forms 4, Application for Tax Paid Transfer and Registration of a Firearm, to register the firearm to the transferee and pay the applicable transfer tax.[38]  Appendix C contains a copy of the form.  The form must be approved by ATF before the transfer may be made.[39]  ATF will not approve the form if the transfer, receipt, or possession of the firearm would place the transferee in violation of any Federal, State, or local law.[40]  A law enforcement certification is also required on ATF Form 4.

**3.2.6.2  Transfers by FFLs/SOTs to persons other than FFLs/SOTs.**  Transferors of registered firearms must file ATF Forms 4, Application for Tax Paid Transfer and Registration of a Firearm, to register the firearm to the transferee and pay the applicable transfer tax. Appendix C contains a copy of the form. The form must be approved by ATF before the transfer may be made.[41]  ATF will not approve the form if the transfer, receipt, or possession of the firearm would place the transferee in violation of any Federal, State, or local law.[42]

**3.2.6.3  Transfers by non-FFLs/SOTs to FFLs/SOTs.**  Transferors of registered firearms must file ATF Forms 4, Application for Tax Paid Transfer and Registration of a Firearm, to register the firearm to

---

[35] 27 CFR 479.112
[36] 26 U.S.C. 5844
[37] 27 CFR 479.103
[38] 26 U.S.C. 5812(a); 27 CFR 479.84
[39] 26 U.S.C. 5812(b); 27 CFR 479.86
[40] 26 U.S.C. 5812(a); 27 CFR 479.85
[41] 26 U.S.C. 5812(b); 27 CFR 479.86
[42] 26 U.S.C. 5812(a); 27 CFR 479.85

the transferee and pay the applicable transfer tax.[43]   Appendix C contains a copy of the form.  The form must be approved by ATF before the transfer may be made.[44]  ATF will not approve the form if the transfer, receipt, or possession of the firearm would place the transferee in violation of any Federal, State, or local law.

**3.2.6.4  Transfers by FFLs/SOTs to other FFLs/SOTs.**  Transferors must file ATF Forms 3, Application for Tax-Exempt Transfer of Firearm and Registration to Special Occupational Taxpayer, to register the firearm to the transferee.[45]  Appendix C contains a copy of the form.  In these transactions, the transferor has no liability for the transfer tax.  The form must be approved by ATF before the transfer may be made.[46]  ATF will not approve the form if the transfer, receipt, or possession of the firearm would place the transferee in violation of any Federal, State, or local law.

**3.2.6.5  Transfers to State and local government agencies**.  Transferors must file ATF Forms 5, Application for Tax Exempt Transfer and Registration of a Firearm, to register the firearm to such agency.[47]  Appendix C contains a copy of the form.  In these transactions, the transferor has no liability for the transfer tax.  The Form must be approved by ATF before the transfer may be made.[48]

**Section 3.3  Status of unregistered firearms**

Firearms not lawfully registered as required by the NFA may not be registered and legitimized by their possessors.  They are contraband and unlawful to possess.[49]  However, see Section 2.4 for information on removing NFA firearms from the scope of the NFA because of their status as collectors' items, modification, or elimination of certain component parts.

**Section 3.4  ATF disclosure of NFA registration information**

**3.4.1  Restrictive use of information.**  The NFA provides that no information or evidence obtained from an application, registration, or records required to be submitted or retained by a natural person (individual) in order to comply with the NFA or the NFA regulations shall be used directly or indirectly as evidence against the person in a criminal proceeding with respect to a violation of law occurring prior to or concurrently with the filing of the application or registration.[50]  Filing false information is an exception to this prohibition.[51]

**3.4.2  Prohibition on ATF's disclosure of tax returns or tax return information.**  NFA forms are treated as tax returns and registration information in the NFRTR is considered to be tax return

---

[43] 26 U.S.C. 5812(a); 27 CFR 479.84
[44] 26 U.S.C. 5812(b); 27 CFR 479.86
[45] 26 U.S.C. 5812(a); 27 CFR 479.88
[46] 26 U.S.C. 5812(b); 27 CFR 479.88(b)
[47] 26 U.S.C. 5812(a); 27 CFR 479.90
[48] 26 U.S.C. 5812(b); 27 CFR 479.90(b)
[49] U.S. v. Freed, 401 U.S. 601 (1971)
[50] 26 U.S.C. 5848(a)
[51] 26 U.S.C. 5848(b)

**Exhibit D**

National Firearms Act Trade & Collectors Association, *The Partisan*, Volume 4, Issue 3, Third

Quarter, 2012

Page 2



THE PARTISAN

## *Performance Anxiety (continued)*

includes minor, yet significant variation that ultimately affects the outcome and disposition of each and every Form. It would be a stretch, at the least, to assume that the new Research Assistants would be able to go from a starting point of zero knowledge to full-speed, meeting all the expectations of ATF and the NFA community. They haven't.

Some of you may have noticed unusual notices and "new" questions coming back on "old issues" that were never a problem before. Please be patient. Each and every Research Assistant is being trained, under live fire, as you read this article. Each of the NFA Examiners and Mr. Clutter, in his role as Area Supervisor, are working hand in hand with the contractors to bring them up to speed as fast as possible, while at the same time not negatively impacting the current production rates. A Herculean task, indeed.

Clutter is both confident and extremely optimistic about the prospects for this new arrangement in Martinsburg, West Virginia. As the training program progresses, he believes that we will start seeing real impact before the end of the summer. (The

timing of being able to handle all of your Knob Creek purchases has not gone unnoticed). In the mean time, please be aware that there will be a few bumps in the road and taking some extra time to make sure that your NFA Forms are correct and that proper payment is included (where appropriate) with each one will certainly be appreciated.

For your reference, the following states have been assigned to the following Examiners:

**Sandra Snook** - WA, OR, ID, AK, HI
**Ann Feltner** - CA, NV,AZ, NM
**Jason Frushour** - MT, WY, UT, CO ND, SD, MN, WI
**Jason Bowers** - NE, IA, KS, MO, OK, AR, LA
**Sara Jones** - TX

**Chris Farris** - MI, NY, VT, NH, MA, ME, NJ, CT, RI
**Nicole Dudash** - IL, IN, OH, PA
**Dana Pickles** - KY, TN,VA, WV, NC, MD, DE
**Shannon Siviero** - MS, AL, GA, SC
**Albert Lamberger** - FL



Suppressors and SBR's represent the fastest growing segments in terms of total NFA Forms.



## *Statistics (continued)*

This is an aspect of the registry that causes grief across the board. Firearms often become unserviceable for a variety of reasons. If a museum renders a machinegun inoperable and turns it into an attractive paperweight, the ATF would likely never be aware of the change and carry it on the NFRTR for decades or in perpetuity.

Other interesting numbers raise eyebrows. For instance, the report lists some 488,065 machine guns as active on the registry. That's a lot of machine guns and doesn't seem to jive with the number of

"transferable" machine guns that we are familiar with. The number is huge because it includes all of the machineguns registered, including transferable, pre-May samples, post-May samples and machine guns properly registered to law enforcement and military. ATF does not have a good way to regularly break out the sub groups of machine gun types, but does report outside of this publication that the number of fully transferable machine guns available to the general population is between 182,000 and 185,000. The number is a moving target because of unre-

ported destructions, deactivations, etc.

Surprisingly, the region with the lowest number of registered NFA items is not the District of Columbia (40,836), but rather the idyllic state of Rhode Island (3,592). And in what must be a nod to the fact that hunting all game animals with a suppressor is now legal for Texans, the Lone Star State leads in suppressor registration with 47,712. The entire report can be downloaded:

http://www.nfatca.org/pubs/2012Firearms.pdf

## Associate Memberships

The NFATCA now has $50 Associate Memberships available to provide an opportunity for even more folks to help keep NFA weapons available to all. Join now!

www.nfatca.org



**Can't get enough of your own NFA action?**
Be sure to check out NFATCA member Jeff Zimba on YouTube!

**www.youtube.com/ user/Bigshooterist**

NATIONAL FIREARMS ACT TRADE & COLLECTORS ASSOCIATION

POWER THROUGH EXPERIENCE

NFATCA
20603 Big Wells Drive
Katy, Texas 77449
281.492.8288
info@nfatca.org

Publisher: John K. Brown, III
Senior Editor: Jeff Folloder
Photography: Oleg Volk
NFATCA is a 501(c)(6) corp.
© Copyright 2012, NFATCA

**Exhibit E**

BATFE letter, dated February 24, 2016.

Document identifying the count of pre-86 machineguns to be 175,977.

**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_____

www.atf.gov

February 24, 2016                              REFER TO:  2016-0003 / AP-2015-05939

Mr. Jeffrey E. Folloder
NFATCA
20603 Big Wells Drive
Katy, TX  77449

Dear Mr. Folloder:

This is in response to your request for information that the Bureau of Alcohol, Tobacco,
Firearms and Explosives (ATF) initially withheld, pursuant to the reasons stated in our August
25, 2015 correspondence.  By letter dated September 16, 2015, you appealed our decision to
withhold the information requested to the Office of Information Policy (OIP).  By letter dated
December 9, 2015, OIP remanded the case for further processing.  Your request has been
assigned number 2016-0003.  Please refer to this number on any future correspondence.

The following information corresponds to your request for an exact count of transferrable pre 86
machineguns, post May 86 machineguns, and sale sample machineguns, registered in the
National Firearms Registration Transfer Record System (NFRTR).

| | |
|---|---|
| Restricted 922(o) | 297,667 |
| Sales Samples | 17,020 |
| Pre 86 | 175,977 |

Please note that ATF utilizes customized Standard Query Language (SQL) to collect information
from system databases.  In the instant case, an SQL query may not capture all methods in which
the requested information has been manually entered into system data fields.  Thus, while each
individual record is accurate, there is an inherent albeit wholly unintentional margin of error as to
the aggregate statistical information requested.

Sincerely,

*Stephanie M Boucher*

Stephanie M. Boucher
Chief, Disclosure Division

**Exhibit F**

Tom Morganthau, et al., *Machine Gun U.S.A.*, Newsweek, Oct. 14, 1985

Page 49

*Owner Paul Lavista, center, and two customers at the Bullet Stop in Marietta, Ga.: Rent-a-guns and 'rock and roll'*

going after dealers and manufacturers who neglect its requirements for record keeping on sales and serial numbers. As a result, ATF is the only federal agency that collects statistics on the sale of military weapons in the United States—but its statistics, which are predicated on the increasingly tenuous distinction between machine guns and other military guns, are suggestive at best. Over the last three years, the ATF reports, its seizures of illegal machine guns have more than tripled, from 871 guns and conversion kits in 1983 to 3,263 in 1985. (The number does not include weapons seized by other agencies, such as the FBI, the Drug Enforcement Administration or state and local police.) Over the last five years the number of persons licensed to sell machine guns also has tripled, and the number of machine guns being sold legally—ATF provides no actual numbers for this—has risen by about percent. American dealers are importing an average of 55,000 foreign-made machine guns each year; to judge by the number of inquiries from foreign governments for ATF's investigative assistance, the number of machine guns sold by Americans to overseas buyers is also rising sharply. ''We're kind of the 'Guns-R-Us' for a large part of the world,'' an ATF agent jokes.

Calculating the number of assault weapons in American homes is a complicated matter. The estimate of 500,000 comes from a gun-control lobbyist, Michael Hancock, who is general counsel for the National Coalition to Ban Handguns. Hancock guesses that perhaps 125,000 of those guns have been converted to full automatic. Sales figures collected by ATF indicate that more than 300,000 AR-15s have been sold as semiautomatics since the gun was approved for the civilian market. In addition, some 36,000 MAC-10s were sold between 1979 and 1982, when ATF at last restricted its sale. Add to those statistics about 5,000



*Shooter and target: 'Like a roller coaster'*

KG-9s and a genuinely incalculable number of UZI's, H&K's and other guns, and Hancock's cautiously ventured estimate is that about half a million such weapons are now in private hands. ATF's chief weapons expert, Frank W. (Bill) Nickell, concurs: ''I would accept that,'' Nickell says. (The 500,000 total does not include the number of *licensed* machine guns in private hands, which also is rising: currently, ATF records show 116,000 licensed automatic weapons of all types nationwide.)

The numbers underscore the fact that military guns have acquired a powerful allure for millions of Americans—and it is by no means true that all those who covet UZI's or AR-15s or H&K MP-5s have some secret wish to use them on other human beings. The Bullet Stop's owner, Paul Lavista, says his clientele includes a ''big cadre'' of solid citizens—lawyers, salesmen, airline pilots—who are simply intrigued by the novelty and glamour of automatic weapons; and he says that none of his customers are ''closet crazies.'' Other aficionados, such as Robert K. Brown, publisher of Soldier of Fortune magazine, stoutly defend their right to own and use such guns for sport or self-defense despite the disapproval of the gun-control lobby. The liberals have inflamed the public's fears about guns, the argument goes, and the media often ignores the fact that the vast majority of American gun owners are law-abiding, responsible citizens. And it is probably true, as Tulane

**Exhibit G**

Brian L. Frye, *The Peculiar Story of* United States v. Miller, 3 N.Y.U. J.L. & Liberty 48 (2008)



**NYU JOURNAL OF LAW & LIBERTY**

# THE PECULIAR STORY OF UNITED STATES V. MILLER

## Brian L. Frye[*]

INTRODUCTION .................................................................. 48
I.   THE HISTORIOGRAPHY OF UNITED STATES V.
     MILLER ................................................................... 50
II.  THE HISTORY OF UNITED STATES V. MILLER ................... 52
     A.   Jackson Miller and the O'Malley Gang ................. 52
     B.   Miller in the District Court ............................... 58
     C.   National Firearms Act ...................................... 60
     D.   Judge Ragon .................................................. 63
     E.   Miller in the Supreme Court .............................. 65
     F.   Postscript ..................................................... 68
III. INTERPRETING UNITED STATES V. MILLER ...................... 69
CONCLUSION .................................................................... 82

### INTRODUCTION

On April 18, 1938, the Arkansas and Oklahoma state police stopped Jack Miller and Frank Layton, two washed-up Oklahoma bank robbers. Miller and Layton had an unregistered sawed-off

[*] Associate, Sullivan & Cromwell LLP. J.D., New York University School of Law, 2005; M.F.A., San Francisco Art Institute, 1997; B.A., University of California, Berkeley, 1995. Research funded in part by the Institute for Humane Studies.

48

shotgun, so the police arrested them for violating the National Fire-arms Act ("NFA"). Surprisingly, the district court dismissed the charges, holding the NFA violates the Second Amendment.[1] The Supreme Court reversed in *United States v. Miller*,[2] holding the Second Amendment does not guarantee the right to keep and bear a sawed-off shotgun as a matter of law.

Seventy years later, *Miller* remains the only Supreme Court opinion construing the Second Amendment.[3] But courts struggle to decipher its holding. Some find *Miller* adopted an individual right theory of the Second Amendment, some find it adopted a collective right theory, and some find it adopted a hybrid theory, protecting the right to possess a firearm in connection with militia service.[4] Most recently, in *Parker v. District of Columbia*, the D.C. Circuit concluded *Miller* assumed the Second Amendment protects an individual right to possess and use weapons "'of the kind in common use at the time,'" including handguns.[5]

Oddly, Second Amendment scholars have largely ignored *Miller*. While individual and collective right theorists alike claim *Miller* supports their position, most provide only a perfunctory account of the case. The few exceptions focus on the text of the opinion, rather than the history of the case, and the context in which it was decided.[6] All conclude *Miller* is an impenetrable mess.

---

[1] United States v. Miller, 26 F. Supp. 1002 (W.D. Ark. 1939), *rev'd*, 307 U.S. 174 (1939).

[2] United States v. Miller, 307 U.S. 174 (1939).

[3] Of course, other cases mention or allude to the Second Amendment. *See, e.g.*, David B. Kopel, *The Supreme Court's Thirty-Five Other Gun Cases: What the Supreme Court Has Said About the Second Amendment*, 18 ST. LOUIS U. PUB. L. REV. 99 (1999).

[4] For the individual right theory, *see* Parker v. District of Columbia, 478 F.3d 370 (D.C. Cir. 2007); United States v. Emerson, 270 F.3d 203, 260 (5th Cir. 2001). For the collective right theory, *see* Silveira v. Lockyer, 312 F.3d 1052, 1086-87 (9th Cir. 2003); Hickman v. Block, 81 F.3d 98, 102 (9th Cir. 1996); United States v. Warin, 530 F.2d 103, 106 (6th Cir. 1976). For the hybrid theory, *see* Gillespie v. City of Indianapolis, 185 F.3d 693, 710-11 (7th Cir. 1999); United States v. Wright, 117 F.3d 1265, 1274 & n.18 (11th Cir. 1997); United States v. Rybar, 103 F.3d 273, 286 (3d Cir. 1996); Love v. Pepersack, 47 F.3d 120, 124 (4th Cir. 1995); United States v. Hale, 978 F.2d 1016, 1019-20 (8th Cir. 1992); United States v. Oakes, 564 F.2d 384, 387 (10th Cir. 1977); Cases v. United States, 131 F.2d 916, 922 (1st Cir. 1942).

[5] Parker v. District of Columbia, 478 F.3d 370, 394 (D.C. Cir. 2007) (quoting *Miller*, 307 U.S. at 179) (emphasis omitted), *cert. granted*, 128 S. Ct. 645 (2007).

[6] *See, e.g.*, Brannon P. Denning & Glenn H. Reynolds, *Telling Miller's Tale: A Reply to David Yassky*, 65 LAW & CONTEMP. PROBS. 113 (2002).

*N.Y.U. Journal of Law & Liberty* [Vol. 3:48]

This essay suggests the conventional wisdom is only half-right, because *Miller* did less than generally supposed. Part I presents a brief historiography of *Miller*. It argues scholars have not provided an entirely convincing account of the Supreme Court's holding in Miller, largely because they focus on the original meaning of the Second Amendment. Part II recounts the history of the case. It shows Jack Miller was a career criminal and government informant. It finds *Miller* was a Second Amendment test case arranged by the government and designed to support the constitutionality of federal gun control. And Part III analyzes *Miller* in light of this history.

This essay concludes that *Miller* is coherent, but largely irrelevant to the contemporary debate over the meaning of the Second Amendment. *Miller* was a Second Amendment test case, teed up with a nominal defendant by a district judge sympathetic to New Deal gun control measures. But the Supreme Court issued a surprisingly narrow decision. Essentially, it held that the Second Amendment permits Congress to tax firearms used by criminals. While dicta suggest the Second Amendment guarantees an individual right to possess and use a weapon suitable for militia service, dicta are not precedent.[7] In other words, *Miller* did not adopt a theory of the Second Amendment guarantee, because it did not need one.

## I. THE HISTORIOGRAPHY OF UNITED STATES V. MILLER

Originally, courts and commentators alike found Miller inscrutable,[8] or maybe just unremarkable. In any case, they basically ignored it. In 1939, legal scholars were uninterested in anachronisms like the right to keep and bear arms. But as gun control became increasingly controversial, scholars began to debate the meaning of the Second Amendment and the nature of the right to keep and bear arms. Eventually, they produced remarkably sophisticated

---

[7] *See, e.g.,* Carey v. Musladin, 127 S. Ct. 649, 653 (2006).
[8] *See, e.g., Cases,* 131 F.2d at 922 ("However, we do not feel that the Supreme Court in this case was attempting to formulate a general rule applicable to all cases. The rule which it laid down was adequate to dispose of the case before it and that we think was as far as the Supreme Court intended to go.").

and comprehensive competing accounts of its origins and ratification.

Second Amendment scholarship reflects the bitterly partisan politics of gun control. Opponents of gun control generally endorse an individual right theory, claiming the Second Amendment protects an individual right to possess and use firearms. Advocates generally endorse a collective right theory, claiming it protects a collective right to form a militia. Both theories find substantial support in the text and history of the Second Amendment.

Unusually, for Second Amendment scholars, text and history are everything. Individual and collective right theorists alike focus on the original meaning of the Second Amendment, carefully parsing its origins, drafting, ratification, and implementation in the early republic. Indeed, originalism uniquely dominates Second Amendment scholarship.[9]

Why? Maybe the focus on originalism is tactical. Maybe it is strategic. Collective right theorists, in particular, may find originalist arguments less "embarrassing" than the alternatives.[10] Second Amendment scholarship does highlight the Talmudic niceties of constitutional law: Why is this right different from every other right? And maybe it is just circumstantial. After all, without clear precedents, what is left but original meaning? Regardless, courts are obliged to follow *Miller*, as far as it goes, whatever the Second Amendment originally meant.

Of course, both individual and collective right theorists still claim *Miller* supports their position. Individual right theorists generally emphasize that the Court addressed the merits of Miller's Second Amendment claim, rather than dismissing it for lack of standing.[11] Some go further, and argue *Miller* simply failed to show

---

[9] "For some reason, virtually everyone on both sides of the pro- and anti-gun Second Amendment debate tends to focus on text and history." Glenn Harlan Reynolds, *The Second Amendment as a Window on the Framers' Worldview*, 48 J. LEGAL EDUC. 597, 599 (1998).

[10] *See generally* Sanford Levinson, *The Embarrassing Second Amendment*, 99 YALE L.J. 637 (1989) (noting Hobson's choice Second Amendment presents gun control supporters committed to the Bill of Rights).

[11] *See, e.g.*, Denning & Reynolds, *supra* note 6, at 2.

*N.Y.U. Journal of Law & Liberty* [Vol. 3:48]

short-barreled shotguns have military uses.[12] Collective right theorists highlight the Court's conclusion the Second Amendment "must be interpreted and applied" with the end of preserving the militia in view and argue the Second Amendment simply protects the right to serve in the militia.[13] Many note the absurd consequences of holding the Second Amendment protects only military firearms, rather than those actually used by civilians.[14] In the end, it's a stalemate. On its face, *Miller* does not clearly adopt either theory of the Second Amendment.

## II. THE HISTORY OF UNITED STATES V. MILLER

### A.  JACKSON MILLER AND THE O'MALLEY GANG

Jackson "Jack" Miller[15] was a gambler, roadhouse owner, and small-time hood from Claremore, Oklahoma.[16] Born in about 1900, he grew into a hulking, 240-pound thug.[17] By 1921, he was in trouble with the law.[18] His troubles worsened on August 14, 1924, when he accidentally killed H.A. Secrest, a young court reporter from Tulsa, while working as a bouncer at the Oak Cliff Resort near Claremore.[19] Secrest was plastered and roughing up his date, so Miller decked him, breaking his jaw.[20] Unfortunately, Secrest died

---

[12] *See, e.g.*, Nelson Lund, *The Second Amendment, Political Liberty, and the Right to Self-Preservation*, 39 ALA. L. REV. 103, 109 (1987).

[13] *See, e.g.*, H. Richard Uviller & William G. Merkel, *The Second Amendment in Context: The Case of the Vanishing Predicate*, 76 CHI.-KENT L. REV. 403, 420 (2000); and David Yassky, *The Second Amendment: Structure, History, and Constitutional Change*, 99 MICH. L. REV. 588 (2000).

[14] *See, e.g.*, Michael C. Dorf, *What Does the Second Amendment Mean Today?*, *in* THE SECOND AMENDMENT IN LAW AND HISTORY 247, 250 (Carl T. Bogus ed., 2000).

[15] Also known as "J. J. Miller." Gilmore v. United States, 124 F.2d 537, 538 (10th Cir. 1942).

[16] *O'Malley Gang Trial Witness Slain*, MUSKOGEE DAILY PHOENIX, April 6, 1939, at 1.

[17] Miller was one-eighth Cherokee, and Oklahoma police called him a "big, yellow punk." *Officers Continue Without Clues In O'Malley Gang Witness Slaying*, MUSKOGEE DAILY PHOENIX, Apr. 7, 1939, at 1. *See also Claremore Man is Found Slain in Gang Killing*, TULSA DAILY WORLD, Apr. 6, 1939, at 1; *Robber Suspect to Get Immunity*, TULSA DAILY WORLD, Nov. 26, 1935, at 20.

[18] *See* State v. Miller, CR-21-03077B (D. Okla. Nov. 23, 1921).

[19] *Blow on Jaw Caused Death of Tulsa Man*, OKLAHOMAN, Aug. 29, 1924, at 18.

[20] *Id.*

of septicemia a couple of weeks later.[21] Miller turned himself in on September 11, 1924, and immediately posted $5,000 bail.[22]

But Miller did not hit the major leagues until he joined the O'Malley Gang in 1934. The Depression was the golden age of Midwestern bank robbery, and the O'Malleys executed some of the era's most daring and successful heists. From 1932 to 1935 they claimed "most of the major bank robberies in the Southwest," hitting banks in Missouri, Arkansas, Kansas, and Illinois.[23] Originally known as the Ozark Mountain Boys, the gang consisted of a score of hoods, most of whom met in the Missouri State Penitentiary. A reporter christened them the O'Malley Gang after the dashing Leo "Irish" O'Malley, notorious for his sensational but remarkably inept kidnapping of August Luer. In fact, O'Malley was only a bit player.[24] The gang's real leaders were Dewey Gilmore, Daniel "Dapper Dan" Heady, and George Leonard "Shock" Short.[25]

In the summer of 1934, Short moved to a rented farmhouse outside of Claremore.[26] The rest of the gang soon followed. Heady recruited Miller as a "follow-up man" (lookout) and "wheelman" (getaway driver).[27] Then the O'Malleys got to work. On September 14, 1934, they hit the McElroy Bank and Trust in downtown Fayetteville, the oldest bank in Arkansas. While Miller and Art Austin circled the block, Gilmore, Heady, Virgil "Red" Melton, and Fred Reese broke into the bank before it opened, shanghaied the employees as they arrived, and made off with about $5,700.[28]

Then, on December 22, 1934, the O'Malleys robbed two Okemah, Oklahoma banks at the same time, one of the few success-

---

[21] *Id.*

[22] *Alleged Oak Cliff Guard Surrenders*, OKLAHOMAN, Sept. 12, 1924, at 1.

[23] Robert E. Bates, *Irish O'Malley and the Okemah Caper*, 12 OKLAHOMBRES 1, 3-6 (2001).

[24] What's more, "Leo O'Malley" was the alias of Walter Holland, who was born Walter Riley and adopted his foster parents' surname. *See* R.D. Morgan, Irish O'Malley and the Ozark Mountain Boys (unpublished manuscript, on file with the NYU Journal of Law and Liberty).

[25] Short was the wayward son of a prominent Galena, Missouri family and the brother of Missouri Congressman Dewey Short.

[26] *See* Morgan, *supra* note 24.

[27] *Robber Suspect to Get Immunity*, *supra* note 17.

[28] *See* Morgan, *supra* note 24. $5,700 in 1934 dollars is the equivalent of about $88,686 in 2007 dollars. *See* U.S. Department of Labor, The Inflation Calculator, http://data.bls.gov/cgi-bin/cpicalc.pl (last visited Sept. 6, 2007).

ful double heists in American history.[29] They drove a Plymouth and a Ford into Okemah at dawn, wore bandages concealing their faces, and struck shortly before the banks opened.[30] Gilmore, O'Malley, Short, and Russell Land Cooper hit the Okemah National Bank, while Heady, Melton, and Reese hit the First National Bank of Okemah.[31] Miller "was stationed at the Okemah city limits to guard against possible breakdowns and to pick up members of the gang if their autos failed."[32] Armed with pistols and machineguns, the O'Malleys bound and gagged the unsuspecting bank employees as they arrived, then forced a bank officer to open the safe. The Okemah National Bank yielded $13,186 and the First National Bank of Okemah yielded $5,491.25.[33] The police pursued, to no avail.

Miller returned to Claremore with his $2,100 share of the Okemah job, half of which he kicked back to Gilmore on the sly.[34] But he soon grew restless. On the night of January 11, 1935, he and some friends decided to rob Joe Lewis's gas station and café in Salina, Oklahoma. Nineteen-year-old Percy Bolinger was alone behind the counter when Miller, Earnest Tennyson, Ray Anderson, Norman Hoch, Howard Bridwell, Cap Ellis, Bill Meyers, and Blue Culver sauntered in at about 2 a.m. They ordered coffee and started playing the slot machines. When they got unruly and started tilting the machines, Bolinger asked them to leave. The hoods returned a few hours later, accompanied by Jeff Armstrong, who promptly pistol-whipped Bolinger. They stole $23.71 from the till and $120 from four slot machines, which they dumped in Lake Cherokee.[35] A week later, the police arrested the whole crew in Claremore.[36] It was the beginning of the end for the O'Malleys.

---

[29] *Five Bank Bandits to Trial Monday*, TULSA DAILY WORLD, Nov. 24, 1935, at 6; *Five to Face Trial in Raid*, OKLAHOMAN, Nov. 24, 1935, at 22. Today, Okemah is best known as Woody Guthrie's hometown.

[30] *See* Morgan, *supra* note 24.

[31] Gilmore v. United States, 124 F.2d 537, 538 (10th Cir 1942).

[32] *O'Malley Gang Trial Witness Slain, supra* note 16, at 4.

[33] *Gilmore*, 124 F.2d at 538.

[34] *Robber Suspect to Get Immunity, supra* note 17; *O'Malley Gang Trial Witness Slain, supra* note 16, at 4.

[35] Armstrong v. State, 68 P.2d 114, 114-17 (Okla. Crim. App. 1937).

[36] Id. at 115.

On May 3, 1935, the O'Malleys hit the City National Bank of Fort Smith, Arkansas, stealing about $22,000.[37] It was their last big job. The police arrested Cooper as a likely suspect and struck gold. Cooper ratted out Gilmore, who was already on the lam. The police caught up with Gilmore on May 22, outside of Lancaster, Texas.[38] Gilmore sang too, fingering the rest of the gang. The police pinched O'Malley and Heady in Kansas City, where they'd rented a swanky pad from James Maroon.[39] O'Malley immediately confessed to the Luer kidnapping and was extradited to Illinois.[40] But the FBI took Heady to Muskogee, Oklahoma, to face federal charges on the Okemah job.[41] A couple of weeks later, the police nabbed Short in Galena, Missouri.[42] And on August 8, they caught up with Melton and Reese at a fishing camp in Taney County, Missouri.[43] The FBI took all three to Muskogee for trial.[44]

In the meantime, federal prosecutors indicted the O'Malleys in the Eastern District of Oklahoma.[45] The Oklahoma trial came first. Federal prosecutors charged Gilmore, Cooper, O'Malley, and Short with robbing the Okemah National Bank and Heady, Melton, and Reese with robbing the National Bank of Okemah.[46] All seven pleaded not guilty and the trial was set for October 16. But on October 2, the United States re-indicted the lot of them, added Jack Miller to both counts, and postponed the trial to November 25.[47] Miller soon flipped, confessing to his role in the Okemah job and turning state's evidence.

---

[37] *Five Bank Bandits to Trial Monday*, *supra* note 29, at 6; *Five to Face Trial in Raid*, *supra* note 29, at 22; *Robber Suspect to Get Immunity*, *supra* note 17; *Luer Kidnapping Leader is Seized in Kansas City*, CHI. DAILY TRIB., June 1, 1935, at 3; *Federal Officers Will Attend Trial*, TULSA DAILY WORLD, November 24, 1935, at 6; *Irish O'Malley and the Okemah Caper*, *supra* note 23; *see also* Morgan, *supra* note 24.

[38] *Five Bank Bandits to Trial Monday*, *supra* note 29, at 6; Morgan, supra note 24.

[39] *Luer Kidnapping Leader is Seized in Kansas City*, *supra* note 37; Morgan, *supra* note 24.

[40] *See* Morgan, *supra* note 24.

[41] *See id.*

[42] *Federal Officers Will Attend Trial*, *supra* note 37, at 6.

[43] Morgan, *supra* note 24.

[44] *Federal Officers Will Attend Trial*, *supra* note 37, at 6.

[45] Gilmore v. United States, 124 F.2d 537, 538 (10th Cir. 1942); Gilmore v. United States, 129 F.2d 199, 201 (10th Cir. 1942).

[46] *Gilmore*, 124 F.2d at 538; *Gilmore*, 129 F.2d at 201.

[47] *Gilmore*, 129 F.2d at 201; *Okemah Bank Holdup Trial Begins Today*, OKLAHOMAN, Nov. 25, 1935, at 9.

*N.Y.U. Journal of Law & Liberty* [Vol. 3:48

Miller was the government's ace in the hole. To preserve the surprise, federal prosecutors sequestered him in the county jail until trial.[48] As soon as the trial began, Miller's lawyer H. Tom Kight announced, "Jack Miller, my client, will testify only on condition that he be granted complete immunity."[49] Judge Robert L. Williams agreed, on the condition Miller "gives a complete and truthful account of the crime."[50]

He did, and then some. "Miller, placed on the witness stand, identified the defendants as coconspirators and testified Dan Heady, charged with participation in the robbery of the First National bank approached him 'regarding robbery of some banks.' He testified the plan of robbing the Okemah banks was agreed upon and he was employed as a 'follow-up man.' He said he received $2,100 as his share of the loot taken from the banks."[51] Miller's erstwhile companions branded him a "squealer," Cooper even requesting to leave the courtroom while Miller testified.[52]

The trial was over almost as soon as it started. On November 27, the jury convicted the seven defendants on all counts.[53] Williams acquitted Miller as promised, but added an admonishment. "You had a narrow escape this time . . . and you won't be so lucky again. Get into something honest and quit this gambling business."[54] Miller immediately returned to Claremore.[55]

Williams set a sentencing date of December 9, 1935. But on December 3, Heady's wife "Pretty Betty" slipped him a pistol during a visit. Heady used the pistol to break out of prison, escaping

---

[48] *Five Bank Bandits to Trial Monday*, *supra* note 29, at 6; *O'Malley Gang Trial Witness Slain*, *supra* note 16, at 4.

[49] *Robber Suspect to Get Immunity*, *supra* note 17. Kight was a sometime state legislator from Claremore, elected as a Democrat to represent Rogers County in 1919, 1927, 1929, 1931, 1933, 1937, 1939, 1943. *See* Simpson v. Hill, 263 P. 635 (Okla. 1927).

[50] *Robber Suspect to Get Immunity*, *supra* note 17; *Okemah Bank Hearing Ends*, OKLAHOMAN, Nov. 27, 1935, at 2.

[51] *Robber Suspect to Get Immunity*, *supra* note 17.

[52] *O'Malley Gang Trial Witness Slain*, *supra* note 16, at 4.

[53] Gilmore v. United States, 124 F.2d 537, 538 (10th Cir. 1942); *O'Malley Gang Trial Witness Slain*, *supra* note 16, at 4.

[54] *Okemah Bank Convictions Heard*, OKLAHOMAN, Nov. 28, 1935, at 23; *O'Malley Gang Trial Witness Slain*, *supra* note 16, at 4.

[55] *Three Convicted of Bank Robbery*, TULSA DAILY WORLD, Nov. 28, 1935, at 8; *O'Malley Gang Trial Witness Slain*, *supra* note 16, at 4.

with Gilmore, Short, and Cooper, among others. During the jail-break, Heady shot Muskogee Chief of Detectives Ben Bolton, who died a couple of days later.[56] A huge posse of Oklahoma police and federal agents, aided by bloodhounds and observers in airplanes, tracked the fugitives to Pushmataha County into the Kiamachi Mountains near Clayton, Oklahoma.

On December 5, the posse caught Cooper while he was walking down a country road twelve miles north of Clayton.[57] And the next day, they found Heady and Gilmore in a farmhouse near Weathers, Oklahoma. When Heady and Gilmore refused to surrender, the police opened fire, killing Heady. Gilmore quickly gave up and led the police to Short, about a mile and a half away. Short was already dying, having been critically burned in an accidental fire the night before, and he drowned when a boat used to evacuate him accidentally capsized.[58] On December 9, Williams sentenced Gilmore, Cooper, O'Malley, Melton, and Reese to 25 years.[59]

Miller was terrified of the fugitive O'Malleys, so the FBI held him in a county jail during the manhunt.[60] They needed their snitch alive for the Arkansas trial. On January 10, 1936, federal prosecutors charged Dewey Gilmore, Russell Cooper, Otto Jackson, and Floyd Y. Henderson with robbing the McElroy Bank and Trust Company of Fayetteville and the City National Bank of Fort Smith, Arkansas.[61] At first, all four pleaded not guilty, but Gilmore flipped when Miller implicated him in the Fayetteville job, and the others quickly folded.[62] On January 14, Judge Hiram Heartsill Ragon sentenced Gilmore, Cooper, and Jackson to 25 years, and Smith to

---

[56] *Four Are Slain in Day's Toll of Prison Escapes*, CHICAGO DAILY TRIBUNE, Dec. 4, 1935, at 1; *Tenn. Fugitive Captured After Mountain Chase*, CHICAGO DAILY TRIBUNE, Dec. 6, 1935, at 11.

[57] *Tenn. Fugitive Captured After Mountain Chase,*, supra note 56; *Kill Fugitive, Shoot Another; Find One Dying*, CHICAGO DAILY TRIBUNE, Dec. 7, 1935, at 12.

[58] *Kill Fugitive, Shoot Another; Find One Dying*, CHICAGO DAILY TRIBUNE, supra note 57. Short was very popular in Galena - over 1,000 people attended his funeral - and his death was controversial. The police denied shooting him, but a Galena undertaker insisted he found several buckshot wounds in the corpse. *See* Morgan, supra note 24.

[59] Gilmore v. United States, 124 F.2d 537, 538 (10th Cir. 1942); Gilmore v. United States, 129 F.2d 199, 201 (10th Cir. 1942).

[60] *Claremore Man is Found Slain in Gang Killing*, supra note 17, at 1.

[61] Gilmore v. United States, 131 F.2d 873, 873-74 (8th Cir. 1942).

[62] *Officers Continue Without Clues In O'Malley Gang Witness Slaying*, supra note 17, at 4.

twelve.[63] And on February 14, Gilmore and Cooper got another 99 years for murdering Bolton.[64]

That was the end of the O'Malleys. Melton, Cooper, Gilmore, and Reese started in Leavenworth and ended up in Alcatraz.[65] O'Malley did his time in Illinois, but soon went mad and died in 1944. And Miller returned to his penny-ante ways. In 1937, the United States Fidelity and Guarantee Company sued him for the proceeds of the Okemah job, to little effect.[66] Eventually, he fell in with Frank Layton, another small-time Claremore hood.[67]

On April 18, 1938, the Arkansas and Oklahoma state police stopped Miller and Layton outside of Siloam Springs, Arkansas, en route from Claremore.[68] They had an unregistered, short-barreled shotgun in the car and apparently were "making preparation for armed robbery."[69] So the police arrested them.[70]

## B.   MILLER IN THE DISTRICT COURT

Miller and Layton ended up in Fort Smith, Arkansas, where United States Attorney for the Western District of Arkansas Clinton R. Barry charged them with violating the National Firearms Act. Barry knew all about Miller, as he had attended the O'Malley trials

---

[63] *Crime*, CHIC. DAILY TRIB., Jan. 19, 1936, at A8; *O'Malley Gang is Sentenced*, OKLAHOMAN, Jan. 15, 1936, at 16.

[64] *Two of O'Malley Gang Get 99 Year Sentences*, CHIC. DAILY TRIB., Feb. 16, 1936, at 18.

[65] Several members of the O'Malley Gang ultimately served time in Alcatraz: Dewey E. Gilmore # 301, Russell Land Cooper # 304, Donnie Garrett # 314, Fred Reese # 321, Virgil Melton # 381. Letter from R.D. Morgan to author (May 10, 2005) (on file with author).

[66] *Return of $11,647 In Loot is Sought*, OKLAHOMAN, Feb. 12, 1937, at 21.

[67] Layton was affiliated with Robert Trollinger of the Cookson Hills Gang and did time in the 1920s for helping the Henry Starr Gang rob a bank in Maize, Oklahoma. *See* Morgan, *supra* note 24.

[68] *Firearms Test Case Probable at Ft. Smith*, ARK. DEMOCRAT, Jan. 4, 1939, at 2; Telegram from Clinton R. Barry, United States Attorney for the Western District of Arkansas, to the Attorney General of the United States (Apr. 23, 1938) (National Archives and Records Administration),

[69] Telegram from Clinton R. Barry, United States Attorney for the Western District of Arkansas, to the Attorney General of the United States (Apr. 23, 1938) (National Archives and Records Administration),

[70] Indictment, United States v. Miller, 26 F. Supp. 1002, No. 3926 (W.D. Ark. June 2, 1938); Indictment, United States v. Miller, 26 F. Supp. 1002, No. 3926 (W.D. Ark. Sept. 21, 1938).

and seen Miller testify.[71] Barry was eager to ensure the government could prove an NFA violation. It is "[e]xtremely important this case be investigated by competent federal officers quickly before these parties released on bond to prove possession this weapon in Oklahoma immediately before arrest in Arkansas to show transportation." [72]   The United States Attorney's office forwarded Barry's request to the F.B.I. for investigation. [73]

Miller was scheduled to appear before the district court in Fort Smith during its next term, which began June 6, 1938.[74] While in prison, Miller returned to form, ratting out Joel Carson for murdering a hospital security guard in Little Rock, Arkansas.[75] On May 3, 1938, District Judge for the Western District of Arkansas Hiram Heartsill Ragon set Miller's bail at $2,000,[76] which D.A. Blackburn of Clarksville, Arkansas posted on May 16, 1938.[77]

On June 2, 1938, Miller and Layton were both indicted on one count of violating 26 U.S.C. § 1132(c) by transporting an untaxed short-barreled shotgun in interstate commerce.[78] Both Miller and Layton pleaded guilty, but Ragon refused to accept their plea and appointed Paul E. Gutensohn as counsel.[79] On June 11, 1938,

---

[71] *Robber Suspect to Get Immunity, supra* note 17.

[72] Telegram from Clinton R. Barry, United States Attorney for the Western District of Arkansas, to the Attorney General of the United States (Apr. 23, 1938) (National Archives and Records Administration).

[73] Memorandum for the Director, Federal Bureau of Investigation, Brian McMahon, Assistant Attorney General (Apr. 23, 1938) (National Archives and Records Administration).

[74] Recognizance, United States v. Miller, 26 F. Supp. 1002, No. 3926 (W.D. Ark. 1938).

[75] *Officers Continue Without Clues In O'Malley Gang Witness Slaying, supra* note 17, at 4; *Gangland Death Mystery Deepens,* TULSA DAILY WORLD, Apr. 7, 1939, at 1.

[76] Minutes, United States v. Miller, 26 F. Supp. 1002 (W.D. Ark. 1938).

[77] Recognizance, United States v. Miller, 26 F. Supp. 1002, No. 3926 (W.D. Ark. 1938).

[78] Indictment, United States v. Miller, 26 F. Supp. 1002, No. 3926 (W.D. Ark. June 2, 1938).

[79] *See Firearms Test Case Probable at Ft. Smith, supra* note 68; Murrey v. United States, 138 F.2d 94, 99 (8th Cir. 1943) (noting "it was the practice of Judge Ragon to decline to accept a plea on a felony charge from a defendant until the Judge had ascertained whether or not the defendant desired counsel, and . . . it was the Judge's custom to appoint counsel for defendants in criminal cases who were not represented by counsel and who desired counsel"). A member of the Fort Smith firm of Warner & Warner, Gutensohn graduated from the University of Oklahoma Law School in 1929 and joined the Arkansas Bar in February 1934. *See, e.g., Law Class of '29 Plans Reunion,* OKLAHOMAN, Sept. 17, 1939, at 25; Richard W. Stevens & Aaron Zelman, *The U.S. v.*

*N.Y.U. Journal of Law & Liberty* [Vol. 3:48]

Miller and Layton demurred to the indictment, claiming that it presented insufficient evidence of a transfer requiring payment of a tax and challenging the constitutionality of the NFA under the Second and Tenth Amendments.[80] Surprisingly, Ragon immediately issued a memorandum opinion sustaining the demurrer and quashing the indictment. He held that the NFA violates the Second Amendment by prohibiting the transportation of unregistered covered firearms in interstate commerce.[81]

*United States v. Miller* immediately became the first Second Amendment test case.[82] On September 21, 1938, Miller and Layton were both re-indicted on one count of violating 26 U.S.C. § 1132(j) for transporting an unregistered short-barreled shotgun in interstate commerce.[83] On January 3, 1939, Miller and Layton demurred again, claiming the NFA registration and taxation provisions violate the Second Amendment.[84] Ragon immediately re-issued the same memorandum opinion.[85] Miller and Layton were free men and promptly disappeared. The next day, Governor Bailey appointed Gutensohn to finish the term of State Senator Fred Armstrong, who had died on December 10, 1938.[86] The appointment sparked a political firestorm.[87]

## C.   NATIONAL FIREARMS ACT

Enacted in 1934, the National Firearms Act taxed the manufacture, sale, and transfer of short-barreled rifles and shotguns, machine guns, and silencers; required registration of covered firearms;

---

*Miller Revisited*, FIREARMS SENTINEL, Fall/Winter 1995, available at http://www.jpfo.org/miller.htm (last visited Sept. 6, 2007).
[80] Demurrer to Indictment, United States v. Miller, 26 F. Supp. 1002 (W.D. Ark. 1938).
[81] Memorandum Opinion, United States v. Miller, 26 F. Supp. 1002 (W.D. Ark. 1938).
[82] *Firearms Test Case Probable at Ft. Smith*, *supra* note 68; *National Firearms Act May Be Attacked as Invalid*, ARK. GAZETTE, January 5, 1939, at 2.
[83] Indictment, United States v. Miller, 26 F. Supp. 1002, No. 3926 (W.D. Ark. Sept. 21, 1938).
[84] Demurrer to Indictment, United States v. Miller, 26 F. Supp. 1002 (W.D. Ark. 1939).
[85] United States v. Miller, 26 F. Supp. 1002 (W.D. Ark.), *rev'd*, 307 U.S. 174 (1939).
[86] Matthews v. Bailey, 131 S.W.2d 425, 430 (Ark. 1939); *see also* Charles Aikin, *State Constitutional Law in 1939-1940*, 34 AM. POL. SCI. REV. 700, 701-02 (1940).
[87] *No Governor Should Name a Legislator*, ARK. GAZETTE, Jan. 6, 1939 at 4 (arguing Arkansas Constitution prohibits appointment of legislators, requiring special elections instead).

and prohibited interstate transportation of unregistered covered firearms.[88] Nominally, it was a revenue act, levying a $200 transfer tax on all covered firearms, as well as an annual license tax of $200 on dealers, $300 on pawnbrokers, and $500 on manufacturers. In practice, it produced little revenue because it imposed prohibitive rates, often many times the value of the covered firearms.[89]

Of course, the NFA was really a ban disguised as a tax, intended to discourage the possession and use of covered firearms. "The gangster as a law violator must be deprived of his most dangerous weapon, the machine gun."[90] Modeled on the Harrison Narcotics Act, the NFA made covered firearms risky and expensive.[91] "We certainly don't expect gangsters to come forward to register their weapons and be fingerprinted, and a $200 tax is frankly prohibitive to private citizens."[92] The Act was quite successful. While many people registered NFA firearms,[93] few legitimate dealers could afford to pay the license tax and even fewer legitimate buyers were willing to pay the transfer tax.[94] For example, Oklahoma po-

---

[88] Act of June 26, 1934, Ch. 757, 48 Stat. 1236, currently codified as amended at 26 U.S.C. §§ 5801-72. The House Ways and Means Committee held hearings on the NFA in the spring of 1934. *See National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. of Ways and Means*, 73rd Cong. 1-2 (1934).

[89] Apparently, the $200 transfer tax was based on the average price of a machine gun. *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. of Ways and Means*, *supra* note 88, at 12. A typical shotgun cost about $30 new or $10 used. Adjusted for inflation, the $200 transfer tax would amount to roughly $3000 today. *See* U.S. Department of Labor, The Inflation Calculator, *supra* note 28.

[90] H.R. REP. NO. 73-1780, at 1 (1934).

[91] John Brabner-Smith, *Firearms Regulation*, 1 LAW. & CONTEMP. PROBS. 400, 406-07 (1934); Note, *Federal Legislation: National Firearms Act*, 98 U. PA. L. REV. 917, 918 (1950).

[92] *Registry of One Weapon Purchase in Year Shows Gangsters Flouting Firearms Tax*, N.Y. TIMES, Nov. 6, 1936, at 52.

[93] By 1937, about 16,000 short-barreled rifles and shotguns, 18,000 machine guns, and 700 silencers were registered under the NFA. *Urges Firearms Act to Include All Kinds*, N.Y. TIMES, May 5, 1937, at 13.

[94] In 1935, 25 manufacturers and dealers paid the license tax, but only one person paid the transfer tax. *Registry of One Weapon Purchase in Year Shows Gangsters Flouting Firearms Tax*, *supra* note 92, at 52.

lice saw dealers search for ways to get rid of NFA firearms.[95] The Tommy Gun Era was soon over.[96]

The NFA was a product of a long-standing push toward federal regulation of firearms. In 1927, Congress prohibited mailing most handguns, with limited success.[97] Several bills introduced in 1930 would have prohibited the transportation of certain firearms in interstate commerce.[98] But Attorney General Homer Cummings supported the NFA because it relied primarily on the tax power, ensuring its constitutionality.[99]

As originally proposed, the NFA also applied to pistols and levied a $1000 tax on manufacturers and importers. However, after the NRA and other firearms associations opposed the inclusion of pistols at the public hearings, the restrictions on pistols were eliminated.[100] The Ways and Means Committee approved the bill without reservation, and the Finance Committee recommended amending the tax on manufacturers and importers to $500, which the House accepted.[101] Congress explicitly disclaimed any intention to include "pistols and revolvers and sporting arms" because "there is justification for permitting the citizen to keep a pistol or revolver for his own protection without any restriction."[102]

Some gun control opponents suggested that the NFA was "sponsored by people who wish to compel all sportsmen to register their firearms and store them in armories when they are not being used for hunting or target purposes."[103] But even they generally conceded the Second Amendment permits federal regulation of ma-

---

[95] *Rigid Act on Firearms Put in Force Here*, OKLAHOMAN, Sept. 7, 1934, at 5; *New Federal Act Discloses Arms Bristle in State*, OKLAHOMAN, Sept. 17, 1934, at 9.

[96] Note, *supra* note 91, at 918.

[97] 18 U.S.C. § 1715 (2000).

[98] See Stephen P. Halbrook, Congress Interprets Second Amendment, 62 TENN. L. REV. 597, 604-05 (1995); *see also Firearms: Hearing on H.R. 2569, H.R. 6606, H.R. 6607, and H.R. 11325 Before a Subcomm. of the H. Comm. on Interstate and Foreign Commerce*, 71st Cong. 1-3, 7 (1930).

[99] *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. of Ways and Means*, *supra* note 88, at 6-8.

[100] Brabner-Smith, *supra* note 91, at 406; Note, *supra* note 91, at 917.

[101] S. REP. NO. 73-1444, at 1 (1934).

[102] H.R. REP. NO. 73-1780, at 1 (1934).

[103] G.A. Nelson, Letter to the Editor, *Objections Made to Firearms Act: Proposed Bill Viewed As Likely to Aid Our Criminals*, N.Y. TIMES, June 3, 1934, at E5.

chine guns and other 'gangster weapons.'[104] "No person outside our
national defense units and police has any legal use for such weap-
ons because they have no sporting or hunting value, being made for
the sole purpose of taking human life."[105]

But Cummings was not content with the NFA. The New
York Times reported that he considered federal regulation of pistols
"the national government's next step in the war against crime,"so in
1936 he circulated a proposed bill imposing a $1 transfer tax on pis-
tols and requiring registration.[106] The gradual expansion of federal
gun control met with growing opposition. Thousands of gun own-
ers wrote to the Ways and Means Committee objecting to the Fed-
eral Firearms Act, some invoking the Second Amendment.[107] Never-
theless, on June 30, 1938, Congress passed the Federal Firearms Act,
regulating interstate commerce in firearms.[108]

### D.  JUDGE RAGON

The newspapers assumed Miller was a "test case of the Na-
tional Firearms Act."[109] They were probably right. The government
needed a Supreme Court precedent holding that federal gun control
does not violate the Second Amendment. Ragon teed up the case.

Ragon did not really think the NFA violated the Second
Amendment, and probably colluded with the government to create
the ideal test case. His opinion is peculiar on its face, begging for an
appeal. A memorandum disposition is appropriate when deciding a
routine case, but not when holding a law facially unconstitutional.

---

[104] *See* Michael A. Bellesiles, *Firearms Regulation: A Historical Overview*, 28 CRIME &
JUST. 137, 168-70 (2001); Nelson, *supra* note 103.
[105] Nelson, *supra* note 103.
[106] *Pistol Control Sought*, N.Y. TIMES, Jan. 12, 1936, at E11; *Urges Firearms Act to Include
All Kinds*, *supra* note 93, at 13.
[107] John W. Rankin, Letter to the Editor, WASH. POST, Apr. 9, 1938, at X6 (suggesting
more than 20,000 people wrote the Ways & Means Committee in opposition). *See also*
Raymond R. Camp, Op-Ed., *Wood, Field and Stream*, N.Y. TIMES, Mar. 10, 1938, at 25
(indicating that "rod and gun clubs are circulating petitions and drawing up resolu-
tions to oppose" the act); Raymond R. Camp, Op-Ed., *Wood, Field and Stream*, N.Y.
TIMES, Mar. 17, 1938, at 27.
[108] Federal Firearms Act, ch. 850, 52 Stat. 1250 (1938) (codified as amended at 15
U.S.C. §§ 901-909 (2007)) (repealed in 1968); Alfred M. Ascione, *Federal Firearms Act*,
13 ST. JOHN'S L. REV. 437, 438 (1939).
[109] *State Men Force Test of Arms Law*, OKLAHOMAN, Jan. 5, 1939, at 4.

*N.Y.U. Journal of Law & Liberty* [Vol. 3:48

And Ragon was the first judge to hold that a federal law violates the Second Amendment, even disagreeing with a Florida district court that had dismissed a Second Amendment challenge to the NFA.[110]

Before he became a judge, Ragon represented the Fifth District of Arkansas in Congress from 1923 to 1933.[111] As a congressman, he was a vocal advocate of federal gun control. In 1924, Ragon introduced an unsuccessful bill prohibiting the importation of guns in violation of state law,[112] and vigorously supported another bill prohibiting the mailing of most pistols, which eventually passed in 1927.[113]

Basically, Ragon wanted to prohibit firearms used by criminals, including pistols.[114] "I want to say that I am unequivocally opposed to pistols in any connection whatever. If you want something in the home for defense, there is the shotgun and the rifle, but a pistol is primarily for the purpose of killing somebody."[115] And he specifically dismissed Second Amendment objections to federal gun control. "I cannot see that violence to the Constitution which my friend from Texas sees in this bill."[116] If Arkansas could prohibit pistols, so could the United States.[117]

A prominent Democrat, Ragon endorsed Roosevelt in 1932 and helped push the New Deal through the Ways and Means

---

[110] *See* United States v. Adams, 11 F. Supp. 216, 218-19 (S.D. Fla. 1935) ("The Constitution does not grant the privilege to racketeers and desperadoes to carry weapons of the character dealt with in the act. It refers to the militia, a protective force of government; to the collective body and not individual rights." (holding Second Amendment "has no application" to NFA)).

[111] *Shadow of Ku Klux Klan Grows Larger in Congress and Nation*, N.Y. TIMES, Dec. 10, 1922, at 116 (Ragon was endorsed by the Ku Klux Klan and succeeded H.M. Jacoway). Apparently, he was a bit hotheaded, starting a fistfight with a man who called him a liar. *Telegraphic Dispatches*, WASH. POST, July 16, 1932, at 3.

[112] H.R. 6868, 68th Cong., 66 CONG. REC. 2282 (1924) ("a bill for the prevention of the shipment and transportation of certain firearms into a State, Territory, or District of the United States in violation of any law thereof").

[113] 18 U.S.C. § 1715 (2000).

[114] 66 CONG. REC. 725, 734 (Dec. 17, 1924).

[115] *Id.* at 729.

[116] *Id.* at 734.

[117] *Id.* at 728-29 ("In the State of Arkansas, it is a violation of the law for a man to sell a pistol within that State. . . . This law has been, by the Supreme Court of the State of Arkansas, held constitutional, and you can not lawfully sell a pistol in the State of Arkansas.").

Committee.[118] In return, Roosevelt made him a district judge.[119] The NFA was part of Roosevelt's New Deal program, enacted with broad support shortly after Ragon took the bench.[120] But the Federal Firearms Act of 1938 was stirring up popular opposition, much of it based on the Second Amendment.[121] The government needed to silence the complaints, and Miller was the perfect vehicle. Ragon had presided in an O'Malley prosecution, so he knew Miller was a crooked, pliable snitch, who wouldn't cause any trouble. And Gutensohn was a comer who knew the game and got his due. Ragon's memorandum opinion presented no facts and no argument. With no defense muddying the waters, it was the government's ideal test case.

E.   MILLER IN THE SUPREME COURT

The test came quickly. On January 30, 1939, Barry appealed *Miller* directly to the Supreme Court.[122] Embroiled in the controversy concerning his contested appointment to the Arkansas State Senate,[123] Gutensohn did not object.[124] The Supreme Court accepted the government's appeal.[125]

───────────────

[118] *Ragon is Appointed to District Bench*, N.Y. TIMES, May 13, 1933, at 5; *Heartsill Ragon, Judge, Dies at 55*, N.Y. TIMES, Sept. 16, 1940, at 24.

[119] *See* John Kyle Day, *Bargain and Corruption, Arkansas Style: The Theft of the 1933 Special Congressional Election*, 2 CENT. ARK. HIST. REV. 1 (1999).

[120] *See,* N. Y. TIMES, March 21, 1932, at 4; *New Deal Victor in Court Tests*, N.Y. TIMES, May 30, 1937, at 39 (including Sonzinsky in list of victories). *See also* David Yassky, *The Second Amendment: Structure, History, and Constitutional Change*, 99 MICH. L. REV. 588, 664 (2000).

[121] Raymond R. Camp, Editorial, *Wood, Field and Stream*, N.Y. TIMES, Mar. 20, 1938, at 74. *See also* Camp, Op-Ed., *Wood, Field and Stream*, N.Y. TIMES, Mar. 17, 1938, at 27; Camp, Op-Ed., *Wood, Field and Stream*, N.Y. TIMES, Mar. 10, 1938, at 25; Rankin, *supra* note 107, at X6.

[122] Assignments of Error, United States v. Miller, 26 F. Supp. 1002, No. 3926 (W.D. Ark. Jan. 30, 1939); Petition for Appeal, United States v. Miller, 26 F. Supp. 1002, No. 3926 (W.D. Ark. Jan. 30, 1939). At that time, the United States could appeal criminal cases implicating a constitutional question directly to the Supreme Court under the Criminal Appeals Act, 18 U.S.C. § 682 (1907) and 28 U.S.C. § 345 (1940).

[123] Matthews v. Bailey, 131 S.W.2d 425, 430 (Ark. 1939); *see also* Aikin, *supra* note 18, at 701-02.

[124] Notice of Service, United States v. Miller, 26 F. Supp. 1002, No. 3926 (W.D. Ark. Jan. 30, 1939).

[125] United States v. Miller, 307 U.S. 174 (1939).

*N.Y.U. Journal of Law & Liberty* [Vol. 3:48]

As usual, the Solicitor General's office drafted the government's brief.[126] In the absence of precedent, the government could not anticipate what theory the Court would adopt. Accordingly, it offered several reasonable but inconsistent arguments supporting the constitutionality of the NFA.

The government began by claiming the Second Amendment does not grant a new right, but prohibits Congress from infringing a common law right.[127] So what common law right does the Second Amendment protect? The government argued the Second Amendment "refers to the militia, a protective force of government; to the collective body and not individual rights."[128] In any case, it only guarantees the right to keep and bear arms "for lawful purposes," and certainly does not protect weapons used by criminals.[129] The NFA affects "weapons which form the arsenal of the gangster and desperado," and the Second Amendment "does not, we submit, guarantee to the criminal the right to maintain and utilize arms which are particularly adaptable to his purposes."[130]

Supreme Court Clerk Charles Cropley wrote to Gutensohn on March 15, informing him the Supreme Court had accepted the appeal and expected to hear oral argument on March 31.[131] Gutensohn wrote back on March 22, asking why he had not received the record or the government's brief and emphasizing that he represented Miller and Layton pro bono.[132] Cropley replied on March 25, informing Gutensohn that the government had submitted a typewritten brief and he could do the same. In the alternative, Cropley suggested the court could postpone oral argument until April 17.

---

[126] *See* Warner W. Gardner, *Pebbles From The Path Behind, reprinted in* 9 GREEN BAG 2d 271, 273 (2006) (noting the Solicitor General's office generally had to draft briefs from scratch in appeals from the criminal division).

[127] Brief for the United States at 8-9, United States v. Miller, 307 U.S. 174 (1939) (No. 696) ("The Second Amendment does not confer upon the people the right to keep and bear arms; it is one of the provisions of the Constitution which, recognizing the prior existence of a certain right, declares that it shall not be infringed by Congress. Thus the right to keep and bear arms is not a right granted by the Constitution and therefore is not dependant [sic] upon that instrument for its source.").

[128] Id. at 21.

[129] Id. at 20.

[130] Id. at 7, 8.

[131] Letter from Charles Elmore Cropley to Paul E. Gutensohn (March 15, 1939).

[132] Letter from Paul E. Gutensohn to Charles Elmore Cropley (March 22, 1939).

But on March 28, Gutensohn replied by telegram: "Suggest case be submitted on Appellants brief. Unable to obtain any money from clients to be present and argue case = Paul E Gutensohn."[133] He was probably relieved to be rid of Miller and Layton.

On March 30, 1939, seven justices of the Supreme Court heard oral argument in *United States v. Miller*. Chief Justice Hughes was ill,[134] and the newly appointed Justice Douglas was not confirmed until April 4. Gordon Dean represented the United States and no one represented Miller or Layton.[135] Two days later, Gutensohn finally received four copies of the government's brief.[136]

The decision came quickly. On May 15, 1939, Justice James Clark McReynolds "drawled from the bench: 'We construe the amendment as having relation to military service and we are unable to say that a sawed-off shotgun has any relation to the militia.'"[137] The unanimous vote was 8-0, as Justice Douglas was recused.

The papers were bemusedly pleased. The New York Times noted, "The record in the case of Miller and Dayton [sic] does not show for what purpose they were taking the sawed-off shotgun across State lines. Government officials felt, today, however, that the McReynolds decision had given them a new instrument with which to fight bank robbers, gangsters and other criminals, whose favorite arm is the sawed-off shotgun."[138] And Jackson soon asked Congress to enact legislation requiring the registration of all firearms, in order to foil subversives:[139] "'It is to be particularly noted that the legislation, the enactment of which I recommend, would in nowise improperly limit the freedom of action of peaceful, law abiding persons. The contemplated legislation would not hamper or hinder any person from purchasing or possessing a firearm. It

---

[133] Telegram from Paul E. Gutensohn to Charles Elmore Cropley (March 28, 1939).
[134] Paul A. Freund, *Charles Evan Hughes as Chief Justice*, 81 HARV. L. REV. 4, 39 (1967).
[135] *United States Supreme Court*, N.Y. TIMES, Mar. 31, 1939, at 42; United States v. Miller, 307 U.S. 174, 175 (1939).
[136] Notice of Service, United States v. Miller, 307 U.S. 174, No. 696 (Apr. 3, 1939).
[137] *Supreme Court Bars Sawed-Off Shotgun*, N.Y. TIMES, May 16, 1939, at 15.
[138] *Id.*
[139] *Proposes a Law to Register All Firearms in U.S.*, CHI. DAILY TRIB., May 30, 1940, at 5.

would merely require him to register the firearm and to record any transfer of the weapon.'"[140]

## F.   POSTSCRIPT

In the meantime, Miller resurfaced. On April 3, 1939, Miller, Robert Drake "Major" Taylor, and an unidentified accomplice robbed the Route 66 Club, a Miami, Oklahoma dive.[141] Armed with shotguns, they stole about $80, superficially wounding two by-standers in the process.[142] Apparently, it was an inside job. Earl "Woodenfoot" Clanton, the uncle of notorious bank robbers Her-man and Ed "Newt" Clanton, owned the bar.[143] Taylor was a for-mer associate of Newt Clanton's,[144] and a peripheral member of the O'Malley Gang.[145]

At about 9 a.m. on April 3, two or three men in a car picked up Miller at his home in Ketchum, Oklahoma.[146] The next day, around noon, a farmhand named Fisher discovered Miller's bullet-ridden corpse on the bank of the "nearly dry" Little Spencer Creek, nine miles southwest of Chelsea, Oklahoma.[147] Miller was shot four times with a .38, twice in the chest, once under the left arm, and once through the left arm. The .45 automatic next to him had been fired three times.[148] On April 6, someone found Miller's torched 1934 sedan off a dirt road in the Verdigris River bottoms, about four

---

[140] *Id.*

[141] Morgan, *supra* note 24. *See also Claremore Slayer Suspect Captured*, OKLAHOMAN, Oct. 9, 1939, at 13; *Prisoner is Halted in Flight Attempt*, OKLAHOMAN, Sept. 20, 1932, at 9 (recounting Taylor's unsuccessful attempt to escape from custody in Missouri).

[142] *Former O'Malley Gangster to Start 10-Year Sentence*, OKLAHOMAN, Oct. 20, 1939, at 26.

[143] *See* Morgan, *supra* note 24.

[144] Taylor was sentenced to a 75-year term in McAlester Prison for first degree rob-bery. Taylor escaped on November 26, 1938. *Aide of O'Malleys Arrested in Texas*, MUSKOGEE DAILY PHOENIX, Oct. 9, 1939, at 1.

[145] *Id.*

[146] *Auto of Slain Gang Member Found Burned*, OKLAHOMAN, Apr. 7, 1939, at 4; *Officers Continue Without Clues In O'Malley Gang Witness Slaying*, *supra* note 17.

[147] *Claremore Man is Found Slain in Gang Killing*, *supra* note 17, at 1; *O'Malley Gang Trial Witness Slain*, *supra* note 16.

[148] *Claremore Man is Found Slain in Gang Killing*, *supra* note 17, at 1.

miles southeast of Nowata.[149] It was stripped and still smoldering. A farmer said he saw it burning shortly before noon on April 3.[150]

Taylor was a suspect in the investigation.[151] On October 8, 1939, Sheriff Ellis Summers arrested him in Kermit, Texas, after he got in a "fight with an oil field worker over a dice game."[152] Ultimately, what happened on April 4 is unclear. Maybe Miller and Taylor disputed the proceeds of the robbery.[153] Maybe Taylor shot Miller for snitching on the O'Malleys.[154] In any case, Oklahoma charged Taylor with murder, but eventually dropped the charges for lack of evidence. Still, he pleaded guilty to armed robbery and got ten years in McAlester.[155]

On January 8, 1940, Layton pleaded guilty to the reinstated NFA charge and Ragon sentenced him to five years probation.[156] Ragon expected an appointment to the Eighth Circuit, but died suddenly of a heart attack on September 15, 1940.[157] Layton's probation ended on January 29, 1944.[158] He died in 1967. Both Miller and Layton were buried at Woodlawn Cemetery in Claremore, Oklahoma.[159]

## III. Interpreting United States v. Miller

Both individual and collective rights theorists claim Miller adopted their position. But few Second Amendment scholars spend much time analyzing Miller, because few take it seriously. Most

---

[149] *Officers Continue Without Clues In O'Malley Gang Witness Slaying*, *supra* note 17.

[150] *Auto of Slain Gang Member Found Burned*, *supra* note 146.

[151] *See Missouri Convict Sought in Slaying*, OKLAHOMAN, Apr. 20, 1939, at 15.

[152] *Claremore Slayer Suspect Captured*, *supra* note 141; *see also Aide of O'Malleys Arrested in Texas*, *supra* note 144.

[153] *See generally Missouri Convict Sought in Slaying*, *supra* note 151; *Claremore Slayer Suspect Captured*, *supra* note 141.

[154] *See Claremore Man is Found Slain in Gang Killing*, *supra* note 17, at 1; *Aide of O'Malleys Arrested in Texas*, *supra* note 144.

[155] *Former O'Malley Gangster to Start 10-Year Sentence*, *supra* note 142. Taylor later won a wild-cow milking award in the McAlester rodeo. *See Crowd of 24,000 Sees Rodeo in McAlester Prison*, OKLAHOMAN, Oct. 14, 1940, at 4.

[156] Probation Document, United States v. Layton, C-3917 (W.D. Ark. 1944).

[157] *Heartsill Ragon, Federal Judge in Arkansas, Dies*, OKLAHOMAN, Sept. 16, 1940, at 1; *Judge Heartsill Ragon*, ARK. DEMOCRAT, Sept. 16, 1940, at 8; *Ragon Rites Wednesday at Fort Smith*, ARK. DEMOCRAT, Sept. 16, 1940 at 1.

[158] Probation Document, *supra* note 156.

[159] *See Morgan*, *supra* note 24.

*N.Y.U. Journal of Law & Liberty*          [Vol. 3:48

assume Justice McReynolds was either uninterested in, or incapable of drafting a competent opinion, and dismiss Miller as hopelessly opaque.[160] However, this consensus reflects the identity of the author as much as the quality of his opinion.[161] Many justices were poor draftsmen, but none are as universally despised as McReynolds.[162] The last of the "Four Horsemen," he is remembered only as a cranky bigot, notorious for shunning Justice Brandeis[163] and referring to blacks as "darkies."[164] Even his own, lone biographer characterized him as "an easy man to dislike . . . on occasion intolerant, cantankerous, and rude."[165]

And yet, McReynolds's peers were far more charitable.[166] Holmes considered him "acute."[167] Taft described him as "a man of real ability, and great sharpness of intellect." [168] Frankfurter despised him, but respected his abilities.[169] Even Brandeis conceded that McReynolds "is capable of effective writing."[170] The problem was "his studied avoidance of obiter, even when there may have been an alluring temptation to catch the public eye by some spectacular utterance."[171] Or rather, his "curious notion that opinions

---

[160] David Yassky, *The Second Amendment: Structure, History, and Constitutional Change*, 99 MICH. L. REV. 588, 665 (2000) (claiming "the opinion itself says very little").

[161]   *See* Robert W. Langran, *Why Are Some Supreme Court Justices Rated As "Failures"?*, 1985 SUP. CT. HIST. SOC'Y Y.B. 8, 10 (arguing many judges are ranked failures for ideological reasons).

[162] *See* Timothy S. Huebner, Book Review, 45 AM. J. LEGAL HIST. 346 (2001) (reviewing JOHN KNOX, THE FORGOTTEN MEMOIR OF JOHN KNOX (Dennis J. Hutchinson & David J. Garrow eds., 2002)) (noting that McReynolds "routinely ranks among the least effective or 'worst' justices in the Court's history").

[163] 9 ALEXANDER M. BICKEL, A HISTORY OF THE UNITED STATES SUPREME COURT: THE JUDICIARY AND RESPONSIBLE GOVERNMENT, 1910-21 354 (1984).

[164] *See* JOHN KNOX, THE FORGOTTEN MEMOIR OF JOHN KNOX 51 (Hutchinson & Garrow eds., 2002).

[165] JAMES E. BOND, I DISSENT: THE LEGACY OF CHIEF JUSTICE JAMES CLARK MCREYNOLDS 135 (1992).

[166] R.V. Fletcher, *Mr. Justice McReynolds – An Appreciation*, 2 VAND. L. REV. 35, 45 (1948).

[167] BICKEL, *supra* note 163, at 355 (quoting Holmes-Laski Letters, I, 413).

[168] *Id.* (quoting letter from W.H. Taft to R.A. Taft, Feb. 1, 1925, Taft Papers).

[169] *Id.* at 356 (quoting Phillips ed, Felix Frankfurter Reminisces 101).

[170] Melvin I. Urofsky, *The Brandeis-Frankfurter Conversations*, 1985 SUP. CT. REV. 299, 309.

[171] R.V. Fletcher, *supra* note 166, at 45.

were essentially superfluities anyway, and that the less said, the better."[172]

True to form, Miller is quite terse. The nine-page opinion consists primarily of lengthy quotations and string cites, anchored by a few paragraphs of crabbed analysis. Still, it was not an afterthought. Chief Justice Hughes usually assigned opinions at the Saturday conference after argument.[173] But Hughes fell ill in mid-March 1939 and did not return to the bench for several weeks, after Miller was argued and assigned.[174] As the most senior associate, McReynolds assigned cases in Hughes's absence. Apparently, he assigned Miller to himself, presumably because he considered it important.

The NFA found an unlikely champion in McReynolds, erstwhile foe of federal regulation. While McReynolds was a Democrat, he was no New Dealer. On the contrary, he was a Gold Democrat[175] who detested Roosevelt and the New Deal alike.[176] And he hated Attorney General Cummings, too. As the architect of Roosevelt's court-packing plan, Cummings added insult to injury by citing a superficially similar proposal McReynolds himself advanced in 1913.[177]

McReynolds knew gun control was part of the New Deal program. He knew Miller and Layton were gangsters. And he knew Miller was a Second Amendment test case. But he barely addressed the Second Amendment. Instead, he discussed the nature of the militia and the history of its governance. And he concluded the Second

---

[172] Bickel, *supra* note 163, at 355.

[173] Edwin McElwain, *The Business of the Supreme Court as Conducted by Chief Justice Hughes*, 63 HARV. L. REV. 5, 17-18 (1949).

[174] Freund, *supra* note 134.

[175] OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 630 (Kermit Hall ed., 1992). Gold Democrats supported the gold standard in opposition to William Jennings Bryan's Free Silver movement.

[176] McReynolds considered Roosevelt "utterly incompetent," pointed to farm relief as "evidence of his mental infirmity and lack of stability," and attributed the New Deal to "the forces which control" Roosevelt, who "probably lacks brains to understand what he is doing." Freund, *supra* note 134, at 12 (quoting letters from Justice McReynolds to Robert P. McReynolds (Mar. 20, 1933 & Jan. 10, 1936) (on file with the University of Virginia Library)); Roosevelt reciprocated by snubbing McReynolds when he retired. R.V. Fletcher, *supra* note 166, at 45-46 (citing JAMES FARLEY, JIM FARLEY'S STORY: THE ROOSEVELT YEARS 83 (1948)).

[177] Knox, *supra* note 164, at 108 n.8.

*N.Y.U. Journal of Law & Liberty* [Vol. 3:48

Amendment does not protect short-barreled shotguns because they aren't militia weapons.

Oddly, McReynolds began by holding that the NFA does not violate the Tenth Amendment by infringing state police power. "Considering *Sonzinsky v. United States*, and what was ruled in sundry causes arising under the Harrison Narcotic Act[,] the objection that the Act usurps police power reserved to the States is plainly untenable."[178] But Ragon did not reach Miller's Tenth Amendment claim and the government did not brief it, so it was not properly before the court. Of course, Sonzinsky did indeed foreclose most Tenth Amendment objections to the NFA.[179] But McReynolds was notoriously punctilious about jurisdiction.[180] It is surprising he addressed the issue at all.

In fact, McReynolds alone thought the NFA does violate the Tenth Amendment. Today, Congress can regulate virtually anything under the Commerce Clause. But when Congress drafted the NFA in 1934, the Court prohibited federal regulation of intrastate commerce under the Commerce Clause.[181] Because Congress could not regulate directly under the Commerce Clause, it regulated indirectly under the Tax Clause. For example, the Harrison Narcotics Act effectively regulated narcotics by taxing them and enforcing the tax. The Supreme Court held such regulatory taxation did not infringe state police power, so long as it produced some revenue.[182]

The Four Horsemen and their predecessors disagreed.[183] They conceded Congress can both tax narcotics and punish tax evasion, but argued the Harrison Act is "beyond the constitutional power of Congress to enact because to such extent the statute was a mere attempt by Congress to exert a power not delegated, that is,

---

[178] United States v. Miller, 307 U.S. 174, 177-78 (1939) (citations and footnote omitted).
[179] Some contemporary commentators noted that the NFA transfer tax and registration requirements were arguably more regulatory than the sales tax at issue in *Sonzinsky*. *See Recent Decisions*, 38 MICH. L. REV. 391, 403-04 (1939).
[180] According to Brandeis, "McR[eynolds] care[d] more about jurisdictional restraints than any of them…" Melvin I. Urofsky, *supra* note 170, at 317.
[181] *See* Hammer v. Dagenhart, 247 U.S. 251, 272-74 (1918).
[182] United States v. Doremus, 249 U.S. 86, 94 (1919).
[183] Barry Cushman, *The Secret Lives of the Four Horsemen*, 83 VA. L. REV. 559, 574 (1997).

the reserved police power of the States."[184] In other words, they thought regulatory taxes violate the Tenth Amendment.

For years, McReynolds continued to object to regulatory taxes on Tenth Amendment and due process grounds, gradually getting lonelier and lonelier.[185] Eventually, even he threw in the towel. In 1937, Max Sonzinsky, "a notorious East St. Louis fence," challenged the NFA under the Tenth Amendment.[186] McReynolds joined the unanimous opinion upholding the law.[187] And in *Miller*, he relied on *United States v. Jin Fuey Moy*,[188] *United States v. Doremus*,[189] *Linder v. United States*,[190] *Alston v. United States*,[191] and *Nigro v. United States*,[192] the very cases in which he resisted the Harrison Act.

In any case, McReynolds began Miller by emphasizing the NFA satisfies the Tenth Amendment only because it is at least nominally a tax, rather than a regulation.[193] As the government pointed out, "even as to this class of firearms there is not a word in the National Firearms Act which expressly prohibits the obtaining, ownership, possession or transportation thereof by anyone if compliance is had with the provisions relating to registration, the payment of taxes, and the possession of stamp-affixed orders."[194] So,

---

[184] Doremus, 249 U.S. at 95 (White, C.J., dissenting).

[185] *See, e.g.*, Casey v. United States, 276 U.S. 413, 420 (McReynolds, J., dissenting) (" The provision under which we are told that one may be presumed unlawfully to have purchased an unstamped package of morphine within the district where he is found in possession of it conflicts with those constitutional guaranties heretofore supposed to protect all against arbitrary conviction and punishment. The suggested rational connection between the fact proved and the ultimate fact presumed is imaginary.").

[186] Carl R. Baldwin, *The Impact of Judge Fred L. Wham*, SAINT LOUIS POST-DISPATCH, Feb. 16, 1967, at 3H.

[187] Sonzinsky v. United States, 300 U.S. 506 (1937). A couple of months later, McReynolds relied on the 10th Amendment again in his last-ditch dissent to *Steward Machine Co. v. Davis.* 301 U.S. 548, 598-99 (1937) (McReynolds, J., dissenting).

[188] 241 U.S. 394 (1916).

[189] 249 U.S. at 86.

[190] 268 U.S. 5 (1925).

[191] 274 U.S. 289 (1927).

[192] 276 U.S. 332 (1928).

[193] United States v. Miller, 307 U.S. 174, 176-78 (1939).

[194] Brief for the United States at 6-7, United States v. Miller, 307 U.S. 174 (1939) (No. 696).

whatever it holds, *Miller* does not hold that Congress can regulate firearms directly.

The rejection of Miller's Tenth Amendment claim highlights the implausibility of his Second Amendment claim. Miller could not just argue that the Second Amendment guarantees the right to possess and use NFA firearms. He had to claim it prohibits taxation of NFA firearms. Unsurprisingly, McReynolds found this claim unconvincing. Whether or not the Second Amendment guarantees an individual right to keep and bear arms, it hardly prohibits Congress from taxing particular weapons.

McReynolds assumed the Second Amendment guarantees the right to keep and bear arms in order to ensure an effective militia exists. "With obvious purpose to assure the continuation and render possible the effectiveness of such forces the declaration and guarantee of the Second Amendment were made. It must be interpreted and applied with that end in view."[195] In other words, the Militia Clause empowers Congress to regulate the militia,[196] and the Second Amendment ensures it is armed.

Accordingly, McReynolds devoted most of Miller to analyzing the composition of the militia and the duties of militia service. After consulting "the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators," he concluded the militia consists of "all males physically capable of acting in concert for the common defense."[197] Essentially, everyone subject to conscription.[198] "And further, that ordinarily when called for service these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time."[199] Like the Cooley treatise on which he relied, McReynolds assumed the militia "cannot exist unless the people are

---

[195] *Miller*, 307 U.S. at 178.
[196] U.S. CONST. art I, § 8.
[197] *Miller*, 307 U.S. at 179.
[198] Today, the "organized militia" consists of the National Guard and Naval Militia and the "unorganized militia" consists of all current or prospective male citizens between 17 and 45. *See* 10 U.S.C. § 311 (2000).
[199] *Miller*, 307 U.S. at 179.

trained to bearing arms."[200] A militiaman may own a firearm because he must know how to use one.

In other words, McReynolds assumed the Second Amendment guarantee ensures those subject to conscription may possess weapons suitable for militia service. And he held it does not protect NFA firearms as a matter of law, because they aren't suitable for militia service. "In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense."[201] A short-barreled shotgun is a weapon, but it is not a militia weapon, and the Second Amendment only protects militia weapons.

Essentially, McReynolds adopted the government's fallback argument: the Second Amendment does not protect weapons used by criminals.[202] McReynolds often worked directly from the briefs, incorporating elements from them into his opinions.[203] In support of his holding in *Miller*, he cited only *Aymette v. State*, a Tennessee case holding the right "to keep and bear arms" doesn't guarantee the right to carry a concealed bowie knife.[204] The government cited *Aymette* for the proposition that "the term 'arms' as used in constitutional provisions refers only to those weapons which are ordinarily used for military or public defense purposes and does not relate to those weapons which are commonly used by criminals." [205] McReynolds agreed, concluding the Second Amendment only protects weapons reasonably related to militia service, not including

---

[200] Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 429 (5th ed. 1883), *cited in* United States v. Miller, 307 U.S. 174, 182 n.3 (1939).
[201] *Miller*, 307 U.S. at 178.
[202] Brief for the United States, United States v. Miller, 307 U.S. 174 (1939) (No. 696).
[203] Knox, *supra* note 164, at 142.
[204] Aymette v. State, 21 Tenn. (1 Hum.) 154 (1840).
[205] Brief for the United States at 18, United States v. Miller, 307 U.S. 174 (1939) (No. 696).

short-barreled shotguns. But he did not specify which weapons the Second Amendment does protect or how it protects them.

McReynolds also adopted the government's argument that the Second Amendment did not create a right, but guaranteed a pre-constitutional common law right. "The Second Amendment does not *confer* upon the people the right to keep and bear arms; it is one of the provisions of the Constitution which, recognizing the prior existence of a certain right, declares that it shall not be infringed by Congress."[206] Notably, McReynolds's analysis of the militia relied exclusively on pre-ratification sources.[207] And he closed by linking the Second Amendment guarantee to state constitutional guarantees. "Most if not all of the States have adopted provisions touching the right to keep and bear arms. Differences in the language employed in these have naturally led to somewhat variant conclusions concerning the scope of the right guaranteed. But none of them seem to afford any material support for the challenged ruling of the court below."[208] Apparently, McReynolds assumed the scope of the Second Amendment guarantee depends upon the relevant state constitution. Or at the very least, the guarantees incorporated into the state constitutions illuminate the scope of the right guaranteed by the Second Amendment.

Of course, McReynolds generally assumed the Constitution simply protects common law rights. As he memorably put it in *Meyer v. Nebraska*, the Constitution guarantees "not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law

---

[206] *Id.* at 9-10 (emphasis in original).
[207] *See* United States v. Miller, 307 U.S. 174, 179-82 (1939) (citing WILLIAM BLACSTONE, 1 COMMENTARIES *410; ADAM SMITH, 2 WEALTH OF NATIONS 186-202 (Edwin Cannan ed., Methuen 1904) (1776); 1 HERBERT L. OSGOOD, THE AMERICAN COLONIES IN THE 17TH CENTURY, 498-526 (The MacMillan Company 1904); The General Court of Massachusetts, January Session 1784 (Laws and Resolves 1784, c. 55, pp. 140, 142); Act to Regulate the Militia, ch. 25, 1786 N.Y. Laws 220; Militia Act of 1785, ch. 1, 1785 Va. Acts 1.
[208] *Miller*, 307 U.S. at 182.

as essential to the orderly pursuit of happiness by free men."[209] And it protects those common law rights against federal and state governments alike. "As often heretofore pointed out, rights guaranteed by the Constitution may not be abridged by legislation which has no reasonable relation to some purpose within the competency of the State."[210] And "liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the State to effect."[211]

Basically, McReynolds believed in a reasonable Constitution. And a reasonable Constitution permits reasonable regulation. So the Second Amendment protects a weapon only if its possession and use "has some reasonable relationship to the preservation or efficiency of a well regulated militia."[212] In other words, *Miller* held the common law right to keep and bear arms only protects weapons related to militia service, not including NFA firearms.[213] Congress can tax NFA firearms because the Second Amendment doesn't protect them. But *Miller* did not explain what makes a weapon related to militia service. Nor did it explicitly adopt an individual or collective right theory of the Second Amendment. It did not have to. The NFA was reasonable on either theory, as it affected only unprotected weapons.

Some individual right theorists argue *Miller* held the Second Amendment guarantees an individual right to keep and bear any weapon with a military use. They claim the Court upheld the NFA only because Miller failed to present any evidence of the many military uses of short-barreled shotguns, including trench and jungle warfare.[214] But machine guns obviously had military uses. Surely *Miller* did not invalidate the NFA tax on machine guns sub

---

[209] Meyer v. Nebraska, 262 U.S. 390, 399 (1923) (internal citations omitted).

[210] Pierce v. Society of Sisters of the Holy Names of Jesus and Mary, 268 U.S. 510, 535 (1925).

[211] *Meyer*, 262 U.S. at 399–400 (1923).

[212] *Miller*, 307 U.S. at 178.

[213] *Id.*

[214] *See, e.g.,* Nelson Lund, *The Second Amendment, Political Liberty, and the Right to Self-Preservation*, 39 ALA. L. REV. 103, 109 (1987).

silentio.[215] As the First Circuit recognized three years later in *Cases v. United States*, "the rule of the Miller case . . . would seem to be already outdated . . . because of the well known fact that in the so-called 'Commando Units' some sort of military use seems to have been found for almost any modern lethal weapon," including short-barreled shotguns.[216]

Indeed, the government implicitly conceded NFA firearms have military uses. "It may be assumed that Congress, in inserting these provisions in the National Firearms Act, intended, through the exercise of its taxing power and its power to regulate interstate and foreign commerce, to discourage, except for military and law enforcement purposes, the traffic in and utilization of the weapons to which the Act refers." [217] It nevertheless argued the Second Amendment does not protect NFA firearms because they "form the arsenal of the gangster and desperado."[218]

The *Miller* Court agreed, concluding "it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense."[219] While short-barreled shotguns, machine guns, and silencers may have military uses, they aren't appropriate for militia service. Nor will civilian use help preserve the peace. Relying on *Aynette*, the *Miller* Court assumed the Second Amendment only protects the right to possess weapons "usually employed in civilized warfare," not "those weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin."[220]

Of course, short-barreled shotguns do have legitimate civilian uses, primarily protection and hunting small game. Pre-NFA, firearms manufacturers had long produced short-barreled shot-

---

[215] *See* David Yassky, *The Second Amendment:Structure, History, and Constitutional Change*, 99 MICH. L. REV. 588, 666 (2000).

[216] Cases v. United States, 131 F.2d 916, 922 (1st Cir. 1942), *cert. denied*, 319 U.S. 770 (1943).

[217] Brief for the United States at 7, United States v. Miller, 307 U.S. 174 (No. 696).

[218] *Id.*

[219] United States v. Miller, 307 U.S. 174, 178 (1939) (emphasis added).

[220] Aymette v. State, 21 Tenn. (1 Hum.) 154, 158 (1840).

guns, or their functional equivalent.[221] However, Miller's gun was homemade, as Stevens never produced a shotgun with a barrel shorter than 18 inches. And in any case, *Miller* assumed taxation, regulation, or even prohibition of NFA firearms is reasonable whether or not they have legitimate civilian uses. As is taxation, regulation, and prohibition of many other varieties of firearm. *Miller* assumed the Second Amendment only guarantees the right to possess and use a firearm suitable for militia service, not any particular firearm.

Some collective right theorists argue *Miller* held the Second Amendment only protects a collective right to form a militia, or even a state's right to maintain a militia.[222] Many courts have agreed.[223] But this reading is plainly untenable, because the Miller Court assumed Miller and Layton had standing to assert an individual right of some kind.

Arguably, an individual could assert a collective right to participate in militia service.[224] But Miller did not challenge the NFA as a limitation on his right to participate in militia service. He challenged his indictment for transporting an untaxed NFA firearm in interstate commerce. And the Court evaluated Miller's right to possess and use a particular firearm, not his right to join the militia. Everyone knew Miller and Layton were criminals, and unlikely militiamen. They certainly were not pinched during a muster. But the Court did not ask whether Miller and Layton intended to partici-

---

[221] Commercial short-barreled shotguns were often marketed as "handy guns." One company sold the "Game Getter" – a single-shot short-barrel shotgun with a wire stock – to bicyclists.

[222] *See generally* H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT (Duke University Press 2002).

[223] For the collective right theory: *see* Silveira v. Lockyer, 312 F.3d 1052, 1086-87 (9th Cir. 2003); Hickman v. Block, 81 F.3d 98, 102 (9th Cir. 1996); United States v. Warin, 530 F.2d 103, 106 (6th Cir. 1976). For the hybrid theory, protecting the right to own firearms in connection with militia membership: Gillespie v. City of Indianapolis, 185 F.3d 693, 710-11 (7th Cir. 1999); United States v. Wright, 117 F.3d 1265, 1274 & n.18 (11th Cir. 1997); United States v. Rybar, 103 F.3d 273, 286 (3d Cir. 1996); Love v. Pepersack, 47 F.3d 120, 124 (4th Cir. 1995); United States v. Hale, 978 F.2d 1016, 1019-20 (8th Cir. 1992); United States v. Oakes, 564 F.2d 384, 387 (10th Cir. 1977); Cases v. United States, 131 F.2d 916, 922 (1st Cir. 1942).

[224] *See generally* David Yassky, *The Second Amendment: Structure, History, and Constitutional Change*, 99 MICH. L. REV. 588 (2000).

*N.Y.U. Journal of Law & Liberty*  [Vol. 3:48]

pate in militia service. It only asked whether the Second Amendment protects NFA firearms.

Furthermore, McReynolds adopted a colloquial reading of the Second Amendment guarantee. Second Amendment scholars dispute the original meaning of the terms "keep" and "bear." Individual right theorists claim "keep" meant private ownership.[225] Collective right theorists claim both terms meant military use.[226] But McReynolds assumed "keep" means "possess" and "bear" means "use."[227] And "to possess and use" a weapon implies private ownership. Basically, McReynolds adopted a traditional, commonsense interpretation of the Second Amendment, assuming it guarantees an individual right to possess and use firearms, subject to reasonable regulation of time, place, and manner.[228]

Alternatively, a cynic could dismiss *Miller* as simply holding the Constitution doesn't protect criminals. When the Supreme Court upheld the NFA in Sonzinsky, "Government attorneys hailed the decision as a material aid in the war against gangsters and gunmen."[229] And as a former Attorney General, McReynolds surely appreciated the convenience of laws like the NFA. After all, everyone knew Miller and Layton were gangsters, and "a right exercised in morality" cannot "sustain a right to be exercised in immorality."[230]

But McReynolds would not have gone along. Sure, he was a bigot. But he was a principled bigot. And his principles demanded neutrality. "That the State may do much, go very far, indeed, in or-

---

[225] Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 140 (2007).
[226] *See generally* Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. KY. L. REV. 657, 657-668 (2002); UVILLER & MERKEL, *supra* note 222; David Thomas Konig, *The Second Amendment: A Missing Transatlantic Context for the Historical Meaning of "the Right of the People to Keep and Bear Arms*," 22 LAW & HIST. REV. 119 (2004):.
[227] "In the absence of any evidence tending to show that *possession* or *use* of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to *keep* and *bear* such an instrument." United States v. Miller, 307 U.S. 174, 178 (1939) (emphasis added).
[228] *See, id.* at 178-83
[229] *Court Takes Suits on Security Taxes; Test Cases on Alabama and Federal Acts Before High Tribunal Next Week*, N. Y. TIMES, Mar. 30, 1937, at 17.
[230] Hoke v. United States, 227 U.S. 308, 321 (1913).

der to improve the quality of its citizens, physically, mentally and morally, is clear; but the individual has certain fundamental rights which must be respected."[231] For instance, he objected to the Harrison Act not only because he thought it infringed state police power, but also because he thought it violated due process by shifting the burden of proof to the accused.[232] While the government generally prosecuted only junkies and dealers, the Harrison Act permitted it to prosecute anyone it liked. And lots of people owned narcotics they purchased before Congress passed the Harrison Act.[233]

Ultimately, the *Miller* Court's reading of the Second Amendment simply reflected popular sentiment and conventional wisdom. In 1939, the federal government promoted widespread firearms ownership, providing surplus military rifles to the public in order to ensure civilians knew how to use firearms.[234] And most scholars assumed the Second Amendment guarantees an individual right to possess and use firearms, subject to reasonable regulation.[235]

---

[231] Meyer v. Nebraska, 262 U.S. 390, 401 (1923).

[232] *See* Linder v. United States, 268 U.S. 5 (1925); Casey v. United States, 276 U.S. 413, 420-21 (1928) (McReynolds, J., dissenting).

[233] Casey, 276 U.S. at 421 (McReynolds, J., dissenting) ("Probably most of those accelerated to prison under the present Act will be unfortunate addicts and their abettors; but even they live under the Constitution. And where will the next step take us? When the Harrison Anti-Narcotic Law became effective, probably some drug containing opium could have been found in a million or more households within the Union. Paregoric, laudanum, Dover's Powders, were common remedies. Did every man and woman who possessed one of these instantly become a presumptive criminal and liable to imprisonment unless he could explain to the satisfaction of a jury when and where he got the stuff? Certainly, I cannot assent to any such notion, and it seems worthwhile to say so.").

[234] *See* Bellesiles, *supra* note 104, at 168-170. The United States Army administered this program from 1916 to 1996. It is currently administered by the Civilian Marksmanship Program, a non-profit corporation created by Congress.

[235] *But see* Robert J. Spitzer, *Lost and Found: Researching the Second Amendment, in* THE SECOND AMENDMENT IN LAW AND HISTORY 16, 24 (Carl T. Bogus ed., 2000). While Spitzer claims legal scholars uniformly accepted the collective right theory until 1960, most of the articles he cites simply conclude the right to possess firearms is subject to reasonable regulation.

*N.Y.U. Journal of Law & Liberty* [Vol. 3:48

### Conclusion

So what did *Miller* hold? At a minimum, it held the Second Amendment permits Congress to tax firearms used by criminals. At the maximum, dicta suggest the Second Amendment protects an individual right to possess and use a weapon suitable for militia service. And in general, it implies the Second Amendment permits reasonable regulation of firearms. In any event, the Court left legislators a lot of wiggle room.

But what does Miller tell us about the meaning of the Second Amendment? Maybe nothing. Some believe precedent cannot bind the Constitution of a sovereign people.[236] Others believe the original meaning of a constitutional provision always trumps precedent.[237] Still others believe in an instrumental Constitution, to which precedent supplies only the contingent value of stability.[238] Nevertheless, faint-hearted originalists [239] and incrementalists [240] alike might find Miller useful, or even appealing. After all, it anticipates the status quo: federal, state, and local governments may reasonably regulate firearms, but may not prohibit them altogether. In other words, maybe McReynolds got it right, at least this once.

---

[236] *See* Larry D. Kramer, The People Themselves: Popular Constitutionalism and Judicial Review 247 (2004).

[237] *See* Randy E. Barnett, Restoring the Lost Constitution: The Presumption of Liberty 112 (2004).

[238] *See generally* Richard A. Posner, Law, Pragmatism, and Democracy 62 (Harvard University Press 2003).

[239] *See generally* Antonin Scalia, *Originalism: The Lesser Evil*, 57 U. Cinn. L. Rev. 849 (1989).

[240] *See generally* Stephen Breyer, Active Liberty: Interpreting Our Democratic Constitution (2005).

**Exhibit H**

Daniel Page, *Dangerous and Unusual Misdirection* (4 May 2011)

# Dangerous and Unusual Misdirection

**A look at the common law tradition of prohibiting going armed with dangerous and unusual weapons to the terror of the people as cited in District of Columbia v. Heller**

by
Daniel Page*

## Abstract

In dicta, the Supreme Court in Heller cited the historical ban on "Dangerous and Unusual Weapons" to support a common use test on statutes that ban certain types of weapons considered to be "dangerous and unusual". This paper examines the historical use and definition of the phrase "Dangerous and Unusual Weapons" and concludes that it refers not to a class of weapons, but to a class of behavior.

D. Page, pg 1

Electronic copy available at: http://ssrn.com/abstract=1859395

*Not a blacksmith could be found in the whole land of Israel, because the Philistines had said, "Otherwise the Hebrews will make swords or spears!"[1]*

In District of Columbia v. Heller, Justice Scalia wrote,

We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." 307 U.S., at 179, 59 S.Ct. 816. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons." See 4 Blackstone 148-149 (1769); 3 B. Wilson, Works of the Honourable James Wilson 79 (1804); J. Dunlap, The New-York Justice 8 (1815); C. Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822); 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271-272 (1831); H. Stephen, Summary of the Criminal Law 48 (1840); E. Lewis, An Abridgment of the Criminal Law of the United States 64 (1847); F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852). See also State v. Langford, 10 N.C. 381, 383-384 (1824); O'Neill v. State, 16 Ala. 65, 67 (1849); English v. State, 35 Tex. 473, 476 (1871); State v. Lanier, 71 N.C. 288, 289 (1874).[2]

This paper seeks to review the tradition to which Justice Scalia refers. This paper will examine each of the sources the Court cites in the portion quoted above, and will then examine other sources to attempt to determine the nature and extent of the historical tradition to which the court refers. Finally, this paper will examine what, if any, impact that tradition will have on future firearms litigation.

As will be shown later in this paper, most of the Court's cited case law is in the context of a common law crime known as the affray.

## I.      Affrays and the English Common Law

Timothy Cunningham's 1789 law dictionary defines an affray as follows.

Affray, Is derived from the French word *effrayer*, to *affright*, and it formerly meant no more, as where persons appeared with armour or weapons not usually worn, to the terror

---

\* Daniel Page can be reached at 208.870.3820 or at drpage@email.wm.edu or at 25145 CheRanda Ln Middleton, Id 83644

[1] 1 Samuel 13:19, New International Version.

[2] Dist. of Columbia v. Heller, 554 U.S. 570, 627, 128 S. Ct. 2783, 2817, 171 L. Ed. 2d 637 (2008).

Electronic copy available at: http://ssrn.com/abstract=1859395

of others; and so is the word used in the statute of Northampton, 2 Ed. 3 c 3. It is now commonly taken for a skirmish, or fighting between two or more. … Yet, as it is there said, they differ in this, that where an assault is but a wrong to the party, an affray is wrong to the commonwealth, and therefore both inquirable and punishable in a leet. … Beside this signification, it may be taken for a terror wrought in the subject by an unlawful fight or violence, &c. as if a man shew himself furnished with armour or weapons not usually worn, it may strike a fear into others unarmed; and so it is used in flat 2 Ed 3 c 3. But altho' no bare words, in the judgement of law, carry in them so much terror as to amount to an affray, yet it seems certain, than in some cases there may be an affray, where there is no actual violence, as where a man arms himself with dangerous and unusual weapons in such a manner as will naturally cause a terror to the people; which is said to have been always an offence at the Common law and is strictly prohibited by Statute. [3]

It is clear from the sources above that an affray is a crime against the public peace. [4]  One possible way to commit this crime against the public peace is by "riding armed with dangerous and unusual weapons, to the terror of the public." However, sometimes riding armed with dangerous and unusual weapons to the terror of the public is listed as an offense in of itself, separate from an affray.  Whether the two are separate offenses or whether riding armed is a crime unto itself is unclear.  What is clear is that both terms cite back to 2 Edw. 3 Stat. Northampt. c. 3 (1328).  At least three of the sources cited by the Court in Heller to support a common use test, Blackstone, Wharton, and Stephen, referenced the same statute, enacted in 1328 by King Edward III which reads as follows:

> ITEM, it is enacted, That no Man great nor small, of what Condition soever he be, except the King's Servants in his presence, and his Ministers in executing of the King's Precepts, or of their Office, and such as be in their Company assisting them, and also upon a Cry made for Arms to keep the Peace, and the same in such places where Acts happen, (footnote omitted) be so hardy to come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part

---

[3] Timothy Cunningham A new and complete law-dictionary, or, General abridgment of the law: on a more extensive plan than any law-dictionary hitherto published: containing not only the explanation of the terms, but also the law itself, both with regard to theory and practice.  Very useSul to barristers, justices of the peace, attornies, solicitors, &c. Affray, 1789.
[4] See 2 Blackstone 145 (1803).

D. Page, pg 3

Electronic copy available at: http://ssrn.com/abstract=1859395

elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure.[5]

This appears to be the origin of the law against affrays, to which the Supreme Court's sources cite.

Cunningham defines Riding Armed, with dangerous and unusual weapons as

an offense at Common law. [citation omitted] By the stat. 2 Ed. 3. Cap. 3. None shall ride armed by day or night to the terror of the people; or come with force and arms before the King's justices...but men may wear common arms according to their quality and fashion, and have attendants with them armed agreeable to their characters; all persons may ride or go armed take felons, suppress riots, execute the King's process...[6]

Unfortunately, this definition merely states the name of the law, followed by the origins. The name of the law is filled with contestable definitions. Which weapons are dangerous and unusual? What does the word, "terror" mean?

### A. Dangerous and Unusual Weapons

The term dangerous weapons, in the English common law, is a legal term of art[7] that usually included weapons designed to kill human beings.[8]

The term, "unusual weapons" does not mean, contrary to the Heller court's opinion, "weapons not in common use". As it was used in the time of the founding fathers, the term, "unusual weapons" appears to mean "surprising or uncommon force". In an English case called Baron Snigge v. Shirton, a long term tenant was in a dispute with his landlord, and "kept the possession [of the house he rented] with drum, guns, and halberts".[9] This was considered

---

[5] 2 Edw. 3 Stat. Northampt. c. 3 (1328).
[6] Cunningham, supra, Riding.
[7] See The King v. Hutchinson and Others 168 E.R. 273 (1784).
[8] "[S]howing weapons calculated to take life, such as pistols or dirks, putting [the victim] in fear of his life...is...the use of dangerous weapons" United States v. Hare, 26 F. Cas. 148, 163-64 (C.C.D. Md. 1818). See also The King v. Oneby 92 E.R. 465 (Court of the King's Bench 1727) "any dangerous weapon, as a pistol, hammer, large stone, &c. which in probability might kill B. or do him some great bodily hurt".
[9] See Generally Baron Snigge v. Shirton 79 E.R. 173 (1607).

D. Page, pg 4

keeping "his house with unusual weapons against a purchaser".[10]  In another English case, a

sailor was firing warning shots with a "musqet and ball" across the bow of another ship as a

signal, and killed a man.[11]  This firing was not done with unusual weapons.[12]  In both cases, the

weapons were in common use at the time.  However, in one case, the weapon was unusual, while

in the other case, it was not.  The main difference between the cases is whether the use of force

was a reasonable one.

Other, stricter laws outlawed specific types of weapons for certain individuals. "The

keeping or carrying any gun-powder, shot, club, or other weapon, whatsoever, offensive or

defensive, by any negroe or mulatto whatsoever (except in certain special cases) is an offence,

for which the gun or other weapon may be seized, and the offender whipped, by order of a justice

of the peace."[13] if these weapons were dangerous and unusual, within the meaning of the term,

why did the legislators exhibit such verbosity? Why not simply save paper and ink and time and

say, "The keeping of dangerous or unusual weapons by any negroe or mulatto is an offence"?  It

seems unlikely that the legislature would find this proposed language outlawed certain types of

weapons that they wanted black people to be able to keep.  After all, the legislature outlawed

possession of "any weapon whatsoever" by black people.   Similarly, King George III issued a

statute outlawing the possession of "pistol, hanger, cutlass, bludgeon, or other offensive weapon

with intent feloniously"[14] and declared, "such a person shall be deemed a rogue and a vagabond".

[15] Why didn't the lawmakers use the term dangerous and unusual weapons in this case?  There

are three options.  The first is that the terms mean the same, but the lawmakers simply preferred

---

[10] Id.
[11] See generally Rex v. Rowland Phillips 98 E.R. 1385
[12] Id.
[13] 4 Blackstone 175 (1803).
[14] 5 Blackstone 169 (1803).
[15] Id.

other language.  The second option is that the term, "dangerous and unusual weapons" did not describe enough weapons to suit the lawmakers' desires.  The third option is that the term, "dangerous and unusual weapons" does not describe a class of weapons, but rather describes a class of behavior.

This last option appears to make the most sense when one examines the way the word "unusual" is used in other legal contexts.

When discussing forcible entry or detainer, Blackstone states, "so that the entry now allowed by law is a peaceable one; that forbidden is such as is carried on and maintained, with force, with violence, and unusual weapons."[16] It would make little sense to think that the distinction was being drawn between peaceable entry and entry with weapons that are difficult to purchase or hard to find.  Instead, the term "unusual weapons" means weapons that are being used in a threatening or shocking manner, or weapons that are being used to facilitate an unlawful endeavor.

This definition of unusual is supported by Blackstone's discussion of forfeited recognizance.  "A recognizance for the good behavior may be forfeited … by going armed with unusual attendance, to the terror of the people."[17] In other words, terrifying people with gangs constitutes unusual attendance.  Presumably, just as people may own weapons, large people may gather together, so long as their purpose is lawful.  It is when those groups of people become threatening (or  terrifying), that those groups are labeled as unusual attendance to the terror of the public.  Similarly, when the manner in which one carries a weapon becomes threatening, it is labeled an unusual weapon to the terror of the public.

---

[16] 5 Blackstone 148 (1803).
[17] 5 Blackstone 256 (1803).

When used to describe weapons, the word, "unusual" is not being used in a different way than when it is being used to describe attendance.  Blackstone states, "Any justice of the peace may… bind all those… who make any affray; or threaten to kill or beat another ; or contend together with hot and angry words ; or go about with unusual weapons or attendance, to the terror of the people"[18].  Just as the common law is not outlawing the assembly of misfits or strange people, the common law is not referring to the type of weapon involved when it mentions unusual weapons.  Therefore, when the historical phrase, "dangerous and unusual weapons" is used to justify a ban on a class of weapons, it is a misuse, and an abuse of the historical definition.

Does Timothy Cunningham's definition contradict this analysis? "Beside this signification, it may be taken for a terror wrought in the subject by an unlawful fight or violence, &c. as if a man shew himself furnished with armour or weapons not usually worn, it may strike a fear into others unarmed; and so it is used in stat 2 Ed 3 c 3." One might argue that this definition supports the Supreme Court's contention that the weapons protected by the second amendment are those in common use at the time.  However, this does not seem to make rational sense.  Would Timothy Cunningham have argued that a rare pistol was more frightening than a common pistol?   Perhaps a less common weapon, such as an intricate morning star would be more` frightening than a normal club, but the crime described as an affray is essentially a breach of the peace.  People used to wear ornamental and defensive weapons as part of their everyday dress[19] or as a necessary accessory to their vehicle[20], and this, more likely, is to what Timothy

---

[18] 5 Blackstone 254 (1803).
[19] George Neumann, The History of Weapons of the American Revolution 150 Harper & Row 1967.  "It was considered normal for civilians to carry pocket pistols for protection while traveling."
[20] John George, English Pistols and Revolvers 47 Wheaton and Co. 1938. "Travelers…went heavily armed, and had to be prepared to use their weapons at any moment. … [N]o gentleman would dream of starting upon a journey without a pair of pistols in the pockets of his carriage.

D. Page, pg 7

Cunningham referred when he wrote, "weapons not usually worn". With this in mind, a lance-wielding knight in shining armor would be in great contrast to (and much more frightening than) a man in shirt and pantaloons with a rapier.

The mention of armor in Edward III's law[21], and in Blackstone's commentary on it[22] suggests the prohibition is primarily upon the types of armament that the military would use, not upon the small, concealable weapons that were in more common use by the people.[23] Clearly, the English and the Americans know how to outlaw weapons, whether they wish to outlaw all types, or only weapons of a certain class. The term, "dangerous and unusual weapons" did not describe a class of weapons. Rather it described a class of behavior with weapons.

### B. Terror of the People

A 1675 dictionary defines terror as, "dread, great fear or fright"[24]

An affray may not be committed in private,[25] presumably because then, the public would not be terrified.

Another plain English dictionary from 1768 describes the word, "Bo" (which, I assume, is an older equivalent to the modern day "Boo!") as "A word of terror".[26]

Unfortunately, for our purposes, the oldest legal dictionaries that I could find with a definition of the word, "terror" come from the turn of the twentieth century. The cyclopedia Law Dictionary from 1922 defines terror as

---

[21] 2 Edw. 3 Stat. Northampt. c. 3 (1328).
[22] 2 St. George Tucker Blackstone's Commentaries with of Reference to the Constitution and Laws of the Government of the United States and of the of Virginia 145 1803.
[23] The Complete Encyclopedia of Arms & Weapons, Leonid Tarrassuk and Clause Blair, 369 Simon and Schuster 1982. "Among civilians the pistol became the weapon most commonly used for personal attack and defense." See also George Neumann supra.
[24] An Universal Etymological Dictionary (R. Ware, W. Innys and J. Richardson, J. Knapton (and twelve others)) (1675).
[25] F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852).
[26] Samuel Johnson, A Dictionary of the English Language (1768).

That state of mind which arises from the event or phenomenon that may serve as a prognostic of some catastrophe; affright from apparent danger.  One of the constituents of the offense of riot is that the acts of the persons engaged in it should be to the terror of the people, as a show of arms, threatening speeches, or turbulent gestures; but it is not requisite, in order to constitute this crime, that personal violence should be committed. [27]

The Collegiate Law Dictionary from 1925 defines terror as "1. The state of mind which arises from the event or phenomenon that may serve as a prognostic of some catastrophe. 2. Affright from apparent danger."[28]

It seems as though the gravamen of the word, "terror" is an apprehension of harm to come.  In describing a mugging, James Wilson writes, "If one assault another with such circumstances of terror as to put him in fear, and he, in consequence of his fear, deliver his money; this is a sufficient degree of violence".[29] Later, Wilson describes arson as "a crime of deep malignity … The confusion and terror which attend arson, and the continued apprehension which follows it, are mischiefs frequently more distressing than even the loss of the property."[30] In describing an ideal judge, Wilson writes, "He ought, indeed, to be a terror to evil doers".[31] Wilson writes, in describing interrogation methods, "terror is frequently added to fraud.  The practice… is said… to have been derived its origin from the customs of the inquisition."[32]  Giles Jacob's law dictionary states, when describing a legal device known as a Surety of the Peace (which appears to be a promise not to harm), "the demand of the Surety of the Peace ought to be soon after the cause of fear; for the suffering much time to pass before it is demanded, shews that

---

[27] The Cyclopedia Law Dictionary (Walter a. Shumaker and George Foster Longsdorf, ed. Callaghan and Company 1922) (1901).
[28] The Collegiate Law Dictionary (James John Lewis ed., The American Law Book Company 1925) (1925). See also Bouvier's law Dictionary (Francis Rawle, ed., Vernon Law Book Company and West Publishing Company 1914) (1839).
[29] 3 Wilson 59 (1804).
[30] Id. At 63.
[31] 2 Wilson 300 (1804).
[32] 3 Wilson 155 (1804).

the party has been under no great terror."[33] Jacob further describes the difference between mere fear and terror while defining the word, "robbery". Jacob writes, "[a]nd when it is laid to be done by putting in fear, this does not imply any great degree of terror, or affright in the party robbed. It is enough that so much force, or threatening by word or gesture, be used, as might create an apprehension of danger, or induce a man to part with his property without or against his consent."[34] From these sources, terror, is more than mere apprehension of danger; it might more aptly be described as the apprehension of an extreme danger, or a catastrophe.

Some American case law comports with the above view. A 1795 case describes "a defence based upon the ground of duress and terror".[35] Another 1795 case states, "raising a body of men to …oppose and prevent by force and terror, the execution of a law, is an act of levying war."[36]

However, other old American case-law treats the word, "terror" as if it were synonymous with the word, "threat". One case mentions people "armed with all the terrors of forfeiture"[37]. Another case mentions "the terror of public censure"[38]. A third case mentions "the terrors of a law-suit"[39].

Clearly, it will be difficult to determine what the word terror means in the context of the common law tradition that the court in Heller describes, as "terror" has varying levels of severity, ranging from the feeling one gets when someone says, "bo" to the anticipation of a great catastrophe.

---

[33] Giles Jacob, The law-dictionary : explaining the rise, progress, and present state of the English law; defining and interpreting the terms or words of art; and comprising copious information on the subjects of law, trade, and government. 149(P. Bryne 1811 first American from the second London edition) (1811).
[34] Id at 546.
[35] U.S. v. Vigol 2 U.S. 346 (1795).
[36] U.S. v. Mitchel 2 U.S. 348 (Pennsylvania circuit court 1795).
[37] Warder v. Arell 2 Va. 282 (1796).
[38] State v. Norris 2 N.C. 429 (1796).
[39] Neilson & Sarrazin v. Dickenson 1 Des. 133 (1785).

## II.    Heller's secondary sources

### A. Blackstone

Justice Scalia first cites Blackstone who, in his commentaries, lists the following

offense:

> The offence of *riding* or *going armed* with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the statute of Northampton, 2 Edw. III, c. 3 upon pain of forfeiture of the arms, and imprisonment during the king's pleasure: in like manner, as by the laws of Solon, every Athenian was finable who walked about the city in armour.[40]

Notice that this is a crime against the public peace.  Presumably, if the public peace was

not harmed, or if the peace was disturbed through a means that did not terrify the good people of

the land[41], this crime would not be charged. Furthermore, this crime appears to be a crime one

cannot commit while alone in the privacy of one's own home.  However, as we will see, modern

courts use this common law history to uphold laws banning private, solitary possession of certain

classes of weapons, such as fully automatic rifles.   Blackstone does not mention any way of

classifying different types of weapons, unless the fallacious definition of dangerous and unusual

weapons is applied.  In no way does this source fairly support a prohibition based on which

weapons are presently in common use.

### B. James Wilson

Justice Scalia then cites the James Wilson's explanation of an affray.  James Wilson

wrote,

> Affrays are crimes against the personal safety of the citizens; for in their personal safety, their personal security and peace are undoubtedly comprehended.  An affray is a fighting

---

[40] 2 St. George Tucker Blackstone's Commentaries with of Reference to the Constitution and Laws of the Government of the United States and of the of Virginia 145 1803

[41] For example, if one were to disturb the peace by playing a minstrel tune with a very loud trumpet, while carrying a concealed knife, that behavior would probably not terrify anyone and would presumably not constitute a violation of the common law rule against riding with dangerous and unusual weapons to the terror of the public.

of persons in a publick place, to the terror of the citizens. They are considered as common nuisances. They may, and ought to be suppressed by every person present; and the law, as it gives authority, so it gives protection, to those who obey its authority in suppressing them, and in apprehending such as are engaged in them ; if by every person present ; then still more strongly by the officers of peace and justice (footnote omitted). In some cases, there may be an affray, where there is no actual violence ; as where a man arms himself with dangerous and unusual weapons, in such a manner, as will naturally diffuse a terror among the people.[42]

Again, we see that an affray is a crime committed only in the presence of others. The exception listed at the end of the quoted section is not an exception to the public requirement, but is rather an exception to the actual violence requirement. Heller cites this as part of the common law tradition that supports a test of whether a class of weapon was in common use.[43] However, the only possible class of weapons in this quote comes a fallacious definition of the term "dangerous and unusual". To say that this source fairly supports a restriction based on which weapons were in common usage at the time is dubious.

### C.  John A. Dunlap

Justice Scalia next points us to John A. Dunlap's The New-York Justice, which discusses the crime of affray,

> An affray is the fighting of two or more persons in some public place to the terror of the people; for if the fighting be in private it is not an affray, but an assault ; neither will threatening words amount to an affray, although it seems that the constable may, at the request of the party threatened, carry the person using the threats before a justice of the peace, in order that he may find sureties. ... As where two persons coolly and deliberately engage in a duel; this being attended with an apparent intention and danger of murder, and being a high contempt of justice, is a strong aggravation of the affray, though no mischief has actually ensued.  It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, in such manner as will naturally cause terror to the people. [44]

---

[42] 3 James Wilson, Works of the Honourable James Wilson 79 (1804).
[43] D.C. v. Heller, 554 U.S. at 627.
[44] John Dunlap, The New-York Justice; or, a Digest of the Law Relative to Justices of the Peace in the State of New-York 8 Isaac Riley 1815.

Dunlap's description of an affray also includes the public place requirement, as well as the terror of the people requirement.  Here, Dunlap compares carrying dangerous and unusual weapons with dueling people, with the intention and danger of murder.[45]  This is once again an exception to the Affray's element of actual violence.  Dunlap's exception to actual violence includes a manner element.  The manner in which these arms are carried is what is being compared to dueling.  The manner that is outlawed is the manner that would naturally cause terror to the people.   Dunlap does not support a restriction on the type of weapons being used, but rather on the manner in which they are used.

### D.  C. Humphrey

The court then refers to C. Humphrey's  <u>A Compendium of the Common Law in Force in Kentucky</u>,[46] which says,

> Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land, which is punishable by forfeiture of the arms, and fine and imprisonment.  But here it should be remembered, that in this country the constitution guaranties to all person the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily. We have a statute on the subject, relating to concealed weapons.[47]

The crime mentioned by Humphry is a public one that involves terrifying the people.  Notice that it is the manner that the right is exercised, not the type of weapon that is carried that constitutes the crime.   Humphrey makes it explicit that one may carry weapons so long as it is not in a manner that excites people to unnecessary terror. The unnecessary terror of the people appears to be an essential element.   At no point does Humphrey refer to a test of whether the

---

[45] Dueling often resulted in no harm to either party.  "If a duel should lead to the death of one of the principals, an event which was by no means so common as the reader of modern historical novels might be led to suppose". John George, English Pistols and Revolvers 74 Wheaton and Co. 1938. See also "A duel could be declared ended with honor without a wound's being inflicted… a number of duelists pointedly chose to miss their targets." Jack Williams, Dueling in the Old South: Vignettes of Social History 58 Texas A&M University Press 1980.
[46] D.C. v. Heller 554 U.S. at 627.
[47] H. Stephen, Summary of the Criminal Law 48 (1840).

arms mentioned were in common use at the time, unless one uses the fallacious definition of "dangerous or unusual".

### E.  W. Russell

The court then refers to <u>A Treatise on Crimes and Indictable Misdemeanors</u> by W. Russell,[48] which states in relevant part,

> [Y]et it seems certain that in some cases there may be an affray where there is no actual violence; as where persons arm themselves with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people; which is said to have been always an offence at the common law, and is strictly prohibited by several statutes. (citation omitted.)[49]

Russell is providing an exception to the violence requirement of the affray.  Notice again that there is a manner requirement.  Presumably, if one were to arm himself with dangerous and unusual weapons in a manner that did not naturally cause a terror to the people, one would not be guilty.  One might do this in several ways.  First, one could do it out of sight, in private.  One might conceal the weapon from public view.  One might carry the weapon in a peaceable manner that did not excite anyone to terror.  From the plain meaning of the text, those manners of carrying dangerous and unusual weapons were not outlawed.  It is worth noting that it is the manner that is the essential element, not the type of weapon involved, unless one applies the fallacious definition of dangerous and unusual weapons.

### F.  H. Stephen

The court then refers to H. Stephen's  Summary of the Criminal Law, which states, "Riding or going armed with dangerous or unusual weapons. By statute of Northampton, 2 Edw.

---

[48] D.C. v. Heller 554 U.S. at 627.
[49] Sir William Oldnall Russell, A Treatise on Crimes and Indictable Misdemeanors 271-272 (1831).

D. Page, pg 14

III c. 3, this is a misdemeanor, punishable by forfeiture of the arms and imprisonment during the King's pleasure."[50]

This source was rather bare.  However, it uses the same language and cites the same statute as Blackstone.   It should be noted that in the statute that Stephens cites, the crime of riding armed was conditioned on being in a public place or before a public official.[51]  Because Stephen uses the same language and cites the same sources as the other authors listed by the Heller court, one should not take the bareness of the language to mean that, according to Stephen, the exceptions and restrictions on the common law are not present.  All Stephen does is name the offense, cite to Statutes of the Realm, and then state the punishment.  It does not investigate the intricacies of what constitutes a violation of the law, nor does it define the law.  Rather than read into the bareness of the language, one should assume Stephen simply declines to investigate the details of the common law.

### G.  F. Wharton

The Supreme Court then refers to F. Wharton's A Treatise on the Criminal Law of the United States.

> An affray, as has been noticed, is the fighting of two or more persons in some public place, to the terror of the citizens. (footnote omitted) There is a difference between a sudden affray and a sudden attack.  An affray means something like a mutual contest, suddenly excited, without any apparent intention to do any great bodily harm. (footnote omitted). … yet it seems certain that in some cases there may be an affray where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people, which is said to have been always an offence at common law, and is strictly prohibited by the statute.  For by statute 2 Edw. 3., s. 3, in force in several of the United States, it is enacted…[52]

---

[50] Henry John Stephen, Summary of the Criminal Law, 1840.
[51] See 2 Edw. 3 Stat. Northampt. c. 3 (1328).
[52] F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852).

Wharton describes the affray as a crime committed in public, to the terror of the citizens. Wharton includes a restriction on the affray that other sources do not. Namely, Wharton distinguishes between a sudden attack and a sudden affray. Supposedly, people committing an affray do not wish to do any great bodily harm. Notice that Wharton seems to contradict Dunlap, where Dunlap discusses dueling with the intent to commit murder as an aggravation of an affray.

In addition, Wharton includes in his definition of the affray a requirement that the affray be committed in public. If the fight takes place in private, rather than in public, the fighters may be charged with assault, but not an affray.

Wharton also includes a manner requirement to the rule against dangerous and unusual weapons. The text appears to suggest that if a man armed himself with a dangerous and unusual weapon in such a manner that did not naturally cause a terror to the people, he would not be guilty of an affray.

Once again, a manner restriction as to where and how someone can carry weapons will later be used, by modern courts, to justify a complete prohibition on certain classes of weapons.

After discussing the King's statute, Wharton continues,

In Tennessee, however, it was ruled, that the act of 1837-8 c. 137 s. 2, which prohibits any person from wearing any bowie-knife, or Arkansas tooth-pick[53], or any knife or weapon in form, shape or size resembling a bowie-knife or Arkansas tooth-pick, under his clothes, concealed about his person, conflicts with the 26th section of the first article of the bill of rights, securing to the free white citizens the right to keep and bear arms for their common defence. (Aymette v. State, 2 Hum. 154). The contrary rule, it would seem, has been laid down in Indiana, where it was held that a similar statute was in conformity with the federal and state constitutions (State v. Mitchell, 3 Blackf. 229). An act of the same character is in force in Virginia. (footnote omitted). If a person, not being a traveler, carry a pistol concealed on his person, he is guilty of an indictable offence, under the revised statutes of Indiana, of 1843, and his motive for carrying the pistol is immaterial (rev. stat. page 982; Walls v. State, 7 Blackf. 572). It has been said generally, that the public and open exhibition of dangerous weapons by an armed man, to the terror of good citizens, is a misdemeanor at common law. (State v. Huntley, 3 Iredell, 418; but see State

[53] An Arkansas toothpick is a type of Bowie knife with a blade that can be as large as one foot long. See Robert E. Hunt, Randell Military Models: Fighters, Bowies, and Full Tang Knives, 208, Turner Publishing Company 2003).

D. Page, pg 16

v. Simpson, 5 Yerger 356). On the same general reasoning, it has been held indictable to drive a carriage through a crowded street, in such a way as to endanger the lives of the passers-by ; (footnote omitted) to disturb a congregation when at religious worship; (footnote omitted) to beset a house, with intent to wound, tar and feather ; (footnote omitted) to raise a liberty-pole, in the year 1794, as a notorious and riotous expression of ill-will to the government ; (footnote omitted) to tear down forcibly and contemptuously an advertisement set up by the commissioners of a sale of land for county taxes ; (footnote omitted) to break into a house in the day-time, and disturb its inhabitants ; (footnote omitted) and to violently disturb a town-meeting, though the parties engaged were not sufficient in number to amount to a riot.'[54]

While Wharton does describe restrictions on certain classes of weapons, all of those restrictions occurred after the constitution was ratified. If this is the common law to which the Heller court refers, it is common law that would have been subject to the bounds of the constitution. Normally, when common law is persuasive, it is the common law that came before the constitution was ratified. That common law speaks to what was considered normal at the time. Common law that arises after the constitutional amendment was adopted and conflicts with the constitution should not be cited as support for a particular interpretation of the constitution. In a first amendment setting, this would be comparable with citing the Alien and Sedition Acts as speaking to the founders' views on the freedom of speech. The constitution has been violated on numerous occasions, many of them shortly after the document was ratified. Simply pointing to a tradition of violating the constitution does not make a statute that is in line with that tradition constitutional. It is therefore puzzling to see references to cases from the 1870s in an originalist opinion.

Wharton goes on to describe the reasoning behind the rule against "open exhibition of dangerous weapons by an armed man, to the terror of good citizens". The first thing to which

---

[54] F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852). It should be noted that Aymette v. State, 2 Hum. 154 actually upheld the ban, rather than striking it down. In Bliss v. Commonwealth 12 Ky. 90, 13 Am. Dec. 251 (Ky. Ct. App. 1822), a Kentucky court held that a similar statute conflicted with the portion of its state constitution that is analogous to the second amendment. (Special thanks to Robert Dowlut, who alerted me to this error).

Wharton compares carrying dangerous weapons is to reckless driving and reckless endangerment. This makes sense as a manner restriction based upon the terror of the people element. Presumably, just as one may drive a carriage through a crowded street with due care, one could carry a dangerous weapon in a nonthreatening and careful manner without violating a law. Wharton then compares carrying dangerous weapons with disturbing a congregation when at religious worship. This comparison is a little more puzzling. Perhaps if one were to disturb a religious congregation (by, say, entering a church during the middle of Easter mass and screaming that there is no god), it would excite them to violence or to such a state of uproar that the interruption should be illegal. The next comparison makes more sense. To beset a house is to "surround and harass" it or to assail the house on all sides.[55] Tar and feathering was not a pleasant practice, and any reasonable person would raise a general hullaballoo if such a performance would save him from this practice.[56] Therefore, to "beset a house with intent to wound, tar, and feather", is to have an angry mob surround a house with the desire to wound and assault and humiliate the occupants. Wharton is saying that the same reasoning used to outlaw besetting a house with intent to wound, tar, and feather is being used to outlaw riding armed with dangerous weapons to the terror of the people.

The next two examples have to do with insurrection. Raising a liberty pole[57] as a riotous expression of ill-will toward the government and contemptuously tearing down advertisements

---

[55] The New Oxford American Dictionary 156 Erin McKean, 2nd ed (2005).
[56] "When heated, tar would blister the skin, but there is little evidence to suggest it regularly was... Yet even when tar was applied cool, it made for a painful experience. Once dry, tar clung tenaciously to the skin and could be removed only with a tremendous amount of scrubbing, possibly with the aid of turpentine or other chemical solvents that would further irritate the skin. Presumably, most victims lost a good deal of body hair; others may have developed tar acne, a skin condition..." Benjamin Ervin, Tar, Feathers, and the Enemies of American Liberties, pg. 204 New England Quarterly, Vol.76 No.2 Jun. 2003.
[57] "Liberty poles originated as large wooden columns--often fashioned out of ship masts--erected in public squares as part of the "rites of resistance" to British authority during the American Revolution. Simon P. Newman, Parades and the Politics of the Street: Festive Culture in the Early American Republic 25-29 (1997). After the revolution, they were used as symbols of resistance during the Whiskey Rebellion. Id. at 172-73; see In re Fries, 9 F. Cas. 826,

meant to alert people to an auction meant to finance the government were both activities outlawed primarily to curb active resistance against the government.  Wharton says that same reasoning being used to outlaw those two activities is used to outlaw carrying dangerous weapons to the terror of the people.  This suggests that there is an element of curbing insurrection present in the prohibition against carrying dangerous weapons to the terror of the people.  It seems doubtful that the government was outlawing people carrying weapons for self defense.  Instead, the government had an interest in outlawing the type of show of force that could help encourage insurrection the same way a liberty pole could encourage insurrection.  The government also had an interest in outlawing the type of armed presence that would undermine the rule of law in a similar way that hindering tax auctions would undermine the rule of law.

Next, Wharton compares the reasoning behind outlawing the carrying of dangerous weapons to the terror of the people with the reasoning behind outlawing breaking and entering in the middle of the day to disturb the home's inhabitants.  When one imagines the kind of uproar that would happen when one engages in breaking and entering a home to disturb its inhabitants, it speaks to the kind of uproar that might happen if one were to parade down the middle of the street, firing guns into the air, waiving weapons at the population.  It also speaks to the level of danger that is discussed.  If someone suddenly bursts into a man's home, there is at least some likelihood that the occupant will fear for his life or his family members' lives and will attack the

---

862, 864, 870 (C.C.D. Pa. 1799) (No. 5,126) (describing the erection of a liberty pole during the Whiskey Rebellion); Respublica v. Montgomery, 1 Yeates 419, 421 (Pa. 1795) (referring to liberty poles as one of the "avowed standards of rebellion"). They were also adopted by Jeffersonian Republicans as "prominent and easily recognizable symbols of liberty, equality, and republicanism," and as symbols of opposition to the Federalist government and to the Sedition Act. Newman, supra at 80, 97, 170-76. By the middle of the nineteenth century, the erection of liberty poles "on highways and public squares" by "each political party of the country to express its greater devotion to the rights of the people" had come to be viewed as "a custom sanctioned by a hundred years and interwoven with the traditions, memories and conceded rights of a free people." City of Allegheny v. Zimmerman, 95 Pa. 287, 294 (1880). The custom apparently disappeared at the end of the nineteenth century." Seth F. Kreimer, Technologies of Protest: Insurgent Social Movements and the First Amendment in the Era of the Internet, 150 U. Pa. L. Rev. 119, 171 (2001)

intruder.  Even if the intruder meant no violence, but only meant to disturb the inhabitants of the home, there was a risk of violence.  Perhaps, in the same way, the common law outlaws such provocative and public use of weapons in the hopes of avoiding violence when none was intended.

Finally, Wharton compares the reasoning behind outlawing riding with dangerous weapons to the terror of the public with the reasoning behind outlawing the violent disruption of a town-hall meaning, even if it does not amount to a riot.

In order to be charged with rioting, a certain number of people had to be involved.

Blackstone defines a riot as follows,

> Riots, routs, and unlawful assemblies, must have three persons at least to constitute them (footnote omitted). … A riot is where three or more actually do an unlawful act of violence, either with or without a common cause or quarrel (footnote omitted): as if they beat a man; or hunt and kill game in another's park, chase, warren, or liberty; or do any other unlawful act with force and violence; or even do a lawful act, as removing a nuisance, in a violent and tumultuous manner. [58]

Here, it is clear that the link between the reasoning behind the two common law rules is clear. In a riot, the situation can spiral out of control.  The rule against riots is meant to help preserve the public peace and to avoid unruly mobs. Similarly, to preserve the peace, the common law has outlawed reckless displays of firearms in public.

III.     Heller's cited caselaw

A.  State v. Langford

In Heller, the Supreme Court also directs the reader to three cases concerning what the court calls "the historical tradition of prohibiting the carrying of 'dangerous and unusual

---

[58] 5 St. George Tucker, Blackstone's Commentaries: with Notes of Reference, to the Constitution and the Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia 146 1803.

weapons'".[59] The first of these, <u>State v. Langford</u>, is a case discussing the sufficiency and clarity of an indictment.  Here, the defendant and several other men armed with guns fired at an elderly woman's house and killed her dog, "thus exciting her alarm for the safety of her person and her property".[60]

During the opinion, the court discusses whether the actions that led to the indictment were a private trespass or a forcible breach of the public peace.  The court wrote,

> For the counsel for the prosecution, in arguing, say, 'one man may commit a breach of the peace, though not a riot; he might be armed with pistols for aught that appears, and this might be, possibly, proved.' To this the Court answers, "coming with a pistol, though possible, is not to be supposed;' thereby implying, that if the fact of coming with a pistol had been laid in the indictment, it would have been a circumstance in itself naturally implying such a degree of force as was indictable.

One who wishes to interpret this in a manner unfavorable to the civil right to the means to self-defense could suppose that this is an example of presuming anyone armed with a pistol to be an aggressor. The anti-civil rights argument would be that the common law made negative assumptions about people armed with pistols.  If this is the case, it is unclear whether the court would make a distinction between loaded and unloaded pistols, holstered or unholstered pistols. It seems as though one who is armed "for aught that appears" is ready to shoot anything that moves.  However, it seems less than likely that "being armed with pistols for aught that appears" could describe an unloaded or holstered weapon.

Furthermore, a passage later on in the case would contradict the argument that there was a negative presumption against people armed with pistols, "[l]aying the offence to have been committed vi et armis[61] does not itself show … as applied to forcible entry … that a breach of

---

[59] D.C. v. Heller 554 U.S. at 627.
[60] State v. Langford 3 Hawks 281, 10 N.C. 381 (N.C.), 1824 WL 380 (N.C. 1824),
[61] Latin for with force of arms, See Walter Shumaker and George Longsdorf, The Cyclopedic Law Dictionary, 1058 Chicago Callaghan and Company (1922).

the peace had been committed in the cases"[62].   That is to say that just because someone behaved while armed does not show that a breach of the peace has been committed.  Here, it is the manner in which the person with the arms behaved that is the gravamen of the crime.  If, instead of shooting at an old woman's house and killing her dog, the defendant had politely knocked on the old woman's door, with his rifle slung over his shoulder, there would have been much less cause for the old woman to fear for her life, her property, and her dog.

Here, the gravamen of the crime seems to be the breach of the peace.  The court said, "All the law requires in an indictment of this kind is, that the facts shall be so charged, as to show that a breach of the peace had been committed, and not merely a civil trespass."[63]  Here, it seems like the offense was not based on how unusual the weapons were (the court simply said they were armed with guns[64]).  It might be argued that the dangerousness of the weapons was the gravamen of the crime.  However, the death of the dog (the result of the dangerous weapons) was a matter of aggravation, not the "corpus delicti" or body of the crime. Instead, it was the frightening and threatening behavior of the defendant that constituted the crime.  The defendant terrified the victim, and it is the actions that made her feel threatened and fear for her safety and the safety of her property that seem to be the focus of the court, not the type of weapons used.

In any case, it is unclear how the Supreme Court in Heller did or would place significance on this opinion.

## B.  O'Neill v. State

Justice Scalia then references O'Neill v. State, where a man insulted a second man, who then beat the first man with a cane.  The first man did not resist, and the question before the court

---

[62] Id

[63] Id.

[64] Id. "These men were armed with guns, which they fired at the house of an unprotected female, thus exciting her alarm for the safety of her person and her property."

was whether the first man was also guilty of the affray.  The Court states, "[i]t is probable,

however, that if persons arm themselves with deadly or unusual weapons *for the purpose of an*

*affray*, and in such a manner as to strike terror to the people, they may be guilty of this offence,

without coming to actual blows."[65]  With this language, the judge seems to suggest that if the

persons had armed themselves for a reason other than an affray, and did not actually come to

blows, they might not be guilty of the offense.  If we were to apply this rule to modern day

statutes, laws that prohibit people arming themselves with intent to engage a public fight would

probably fall under the limitation on the second amendment to which Justice Scalia referred. [66]

### C.  English v. State

The next case Justice Scalia mentions is English v. State.  In this 1872 Texas case, Judge

Walker, says the following concerning the second amendment, "Arms of what kind? Certainly

such as are useful and proper to an armed militia. The deadly weapons spoken of in the statute

are pistols, dirks[67], daggers, slungshots,[68] swordcanes,[69] spears, brass-knuckles and bowie

knives." [70]  Judge Walker continues,

> If we look to this question in the light of judicial reason, without the aid of specific
> authority, we shall be led to the conclusion that the provision protects only the right to
> 'keep' such 'arms' as are used for purposes of war, in distinction from those which are
> employed in quarrels and broils, and fights between maddened individuals, since such are

---

[65] 16 Ala. 65, 1849 WL 407 (Ala.) Emphasis added.
[66] See D.C. v. Heller 554 U.S. at 627.
[67] "Dirk and dagger are used synonymously and consist of any straight stabbing weapon, as a dirk, stiletto, etc. (Century Dict.) They may consist of any weapon fitted primarily for stabbing. The word dagger is a generic term covering the dirk, stiletto, poniard, etc. (Standard Dict.)'" People v. Bain, 5 Cal. 3d 839, 851, 489 P.2d 564, 570 (1971).
[68] California case law provides a clear definition of "slungshot." In People v. Williams (1929) 100 Cal.App. 149, 279 P. 1040 (Williams ), the  court adopted the following dictionary definition: "a small mass of metal or stone fixed on a flexible handle, strap or the like, used as a weapon." People v. Fannin, 91 Cal. App. 4th 1399, 1401-02, 111 Cal. Rptr. 2d 496, 498 (Cal. Ct. App. 2001)
[69] "A sword cane looks like an ordinary cane but is in fact a sword with a sheath made to look like the lower part of a cane." State v. McCoy, 618 N.W.2d 324, 326 (Iowa 2000), quoting Commonwealth v. Walton, 252 Pa.Super. 54, 380 A.2d 1278, 1279 n. 1 (1977).
[70] English v. State 35 Tex 473 (Supreme Court of Texas, 1872).

properly known by the name of 'arms'. ... To refer the deadly devices and instruments called in the statute "(sic)"deadly weapons," to the proper or necessary arms of a "well-regulated militia," is simply ridiculous.  No kind of travesty, however subtle or ingenious, could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit.  The word "arms" in the connection we find it in the constitution of the United States, refers to the arms of a militiaman or soldier, and the word is used in its military sense.  The arms of the infantry soldier are the musket and bayonet; of cavalry and dragoons, the sabre, holster pistols and carbine; of artillery, the field piece, siege gun, and mortar, with side arms.  The Terms dirks, daggers, slungshots, swordcanes, brass-knuckles and bowie knives, belong to no military vocabulary.  Where a soldier on duty found with any of these things about his person, he would be punished for an offense against discipline. ... We confess it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together.[71]

It seems as though Judge Walker believes that the Second Amendment only protects military arms. Confusingly, he glosses over the fact that pistols are, by his own admission, used by the military and regulated by the challenged statute.  In retrospect, his reasoning is also suspect, as several of the other weapons mentioned have been used by the military at one point or another.  American soldiers used brass-knuckle knives for trench warfare in WWI.[72] Bowie knives, dirks, and daggers are not so different from the K-Bar knives carried by the Navy Seals[73] or the Kukri carried by some of the most feared soldiers in the world, the Gurkhas,[74] or the trench knives that have been standard issue in various armed forces around the world.[75] Spears were standard for the Spartan military[76].  Perhaps Judge Walker meant that the Second

---

[71] Id.
[72] See Evan Nappen, Knuckle Down With Knuckle Knives, Knives 2008 at 42 (2007). See also Sharon Spencer, Weapon: a Visual History of Arms and Armor 284 Dk Publishing (2006).
[73] See Fred Pushies, Weapons of the Navy Seals, 93-95 MBI publishing company (2004).
[74] See Mike Chappell, The Gurkhas 31 Osprey Publishing, 1994.
[75] Sharon Spencer, Weapon: a Visual History of Arms and Armor 284 Dk Publishing (2006).
[76] Nick Sekunda, The Spartan Army 52 Osprey Publishing 1998.

Amendment only protected what the U.S. military currently used.  It seems doubtful that the founders would allow the state to ban muskets on the basis that the military now uses M-16s.

The Supreme Court did not adopt Judge Walker's reasoning, nor did the Supreme Court adopt Judge Walker's interpretation of the Second Amendment.  Justice Scalia merely cited to Judge Walker's opinion when referring to "historical prohibitions on the carrying of 'dangerous or unusual weapons'"[77].

Perhaps this is part of the history to which the Supreme Court refers.  After all, this 1872 case misuses the term, "dangerous and unusual weapons" in much the same way that Supreme Court misuses it in Heller.  However, English v. State does not rely upon the phrase "dangerous and unusual weapons".  Instead, they rely upon an interpretation of the prefatory clause that is contrary to the interpretation that the Supreme Court in Heller used[78], combined with a definition of arms that is contrary to the interpretation that the Supreme Court in Heller used.[79]

### D.  State v. Lanier

It is perplexing that the court cites State v. Lanier.  The court in Heller was pointing to the tradition of riding armed with dangerous and unusual weapons as support for the constitutionality of legislation against particular types of uncommon weapons as seen in Miller.  In State v. Lanier, a man rode unarmed through an empty courthouse.  The Lanier court does say "The elementary writers say that the offence of going armed and dangerous or unusual weapons

---

[77] See D.C. v. Heller 554 U.S. at 627.

[78] Compare English v. State 35 Tex. 473 (Texas Supreme Court 1872) "To refer the deadly devices and instruments called in the statute 'deadly weapons', to the proper or necessary arms of a 'well-regulated militia,' is simply ridiculous" with D.C. v. Heller 544 U.S. 570, 578(2008), "apart from that clarifying function, a prefatory clause does not limit or expand the scope of the operative clause."

[79] Compare English v. State 35 Tex. 473 (Texas Supreme Court 1872) "The word 'arms' in the connection we find it in the constitution of the United States, refers to the arms of a militiaman or soldier, and the word is used in its military sense" with D.C. v. Heller 544 U.S. 570, 581 (2008), "The term was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity."

D. Page, pg 25

is a crime against the public peace by terrifying the good people of the land, and this Court has declared the same to be the common law in State v. Huntley 3 Ired. 418"[80]

However, the court also states, "In this case we attach no importance to the fact that the defendant had no arms, for we think it may be conceded that driving or riding without arms through a court house or a crowded street at such a rate or in such a manner as to endanger the safety of the inhabitants amounts to a breach of the peace and is an indictable offence at the common law."[81]   Clearly this is not a case about outlawing certain types of weapons.  If dangerous and unusual weapons really did describe classes of weapons rather than classes of dangerous behavior, why mention dangerous and unusual weapons in this case where the defendant was unarmed? State v. Lanier is a case punishing a certain types of behavior, whether the person was armed or not.  It mentions dangerous and unusual weapons because that is common law outlawing a certain type of dangerous behavior; it is not common law outlawing certain classes of rare weapons.

IV.     Post-Heller interpretations of dangerous and unusual weapons

In the third district of California, Judge Sims upheld California's ban on so-called "assault weapons" based primarily on Heller's reasoning that prohibitions based upon classes of weapons were fairly supported by the traditional prohibition on the carrying of dangerous and unusual weapons.[82] California law outlaws possession of so-called "assault weapons", a term that is defined in a way that baffles the mind.  The law outlaws a semi-automatic centerfire rifle that can accept a clip and has a thumbhole stock.[83] A thumbhole stock is a stock that one can put his

---

[80] State v. Lanier 71 N.C. 288, 1874 WL 2582 (N.C.) (1874).
[81] Id at 2
[82] See Generally People v. James 174 Cal. App. 4th 662, 94 Cal. Rptr. 3d 576 (2009).
[83] Id at 669.

thumb through as he grips the rifle.  The same rifle without a thumbhole stock is legal.[84]  That legal rifle would then be illegal if the owner installed a forward pistol grip.[85] A forward pistol grip is a piece of material (usually plastic or metal) that attaches to the underside of the barrel. It allows the shooter to hold the rifle with his knuckles facing horizontally rather than vertically. With and without the modifications, the rifle has the same capabilities.  With the modifications, the rifle is deemed to be an "assault weapon", and is therefore illegal.  Without it, the rifle is not classified as an "assault weapon" and is therefore lawful. Other authors have noticed the misleading definition of the scare term "assault weapons".[86] "For example, the term 'assault weapon' has become so elastic that it has been applied to a revolving firearm and even a single shot firearm."[87]

The part of this statute that was challenged was the prohibition on so-called "assault weapons" and a prohibition on a gun that shoots a particular type of bullet, a 50 caliber bmg.[88] The court upheld this law based on a faulty definition of dangerous and unusual.  The court found that "the Legislature enacted the [law]in order to address the proliferation and use of unusually dangerous weapons."[89]  "[The Second Amendment] is the right to possess and carry weapons typically possessed by law-abiding citizens for lawful purposes such as self-defense. ...as the court's discussion makes clear, the Second Amendment right does not protect possession of a military M-16 rifle."[90] This represents a fundamental misunderstanding of the term "dangerous and unusual weapons" as well as a fundamental misunderstanding of the Second Amendment.

---

[84] Id.
[85] Id.
[86] For a more in-depth look at the absurdity for California's "assault weapons" ban, see Eric C. Morgan's note, Assault Rifle Legislation: Unwise and Unconstitutional, 17 Am. J. Crim. L. 143 (1990).  Available online at http://www.saf.org/LawReviews/EMorgan1.html.
[87] Robert Dowlut 5 St. Thomas L. Rev. 203, 208 (1992).
[88] Id at 666.
[89] Id at 674.
[90] Id at 676.

To review, the Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[91]  Judge Sims interpreted that amendment to not protect the possession of the United States Army's standard issue rifle.  This rifle is used by all branches of the military, including the National Guard.  He arrived at this conclusion through the reasoning in Heller that was supposedly supported by the tradition of prohibiting the carrying of dangerous and unusual weapons.

Judge Sims goes on to say, "These are not the types of weapons that are typically possessed by law-abiding citizens for lawful purposes such as sport hunting or self-defense; rather, these are weapons of war."[92]  Reading this alongside a case Heller cited, English v. State (the case that upheld a law banning non-military weapons), the government could ban all firearms.  Obviously, one of these cases must be wrong.   Judge Sims continues,

> [O]ur conclusion that Heller does not extend Second Amendment protection to assault weapons and .50 caliber BMG rifles is supported by post-Heller federal precedent.  In U.S. v. Fincher (8th Cir. 2008) 548 F.3d 868 (Fincher), the Eighth Circuit Court of Appeals held that Fincher's possession of a machine gun was "not protected by the Second Amendment" because "[m]achine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use."[93]

Judge Sims also states that .50 caliber BMG rifles are also dangerous and unusual.[94]  This case upheld an asinine law through historically inaccurate reasoning.

The defendant in the case over which Judge Sims presided, Michael Eugene James, was on a state registry for firearms.  He was then subject to a restraining order that directed him to "turn in

---

[91] U.S. Const. amend. 2.
[92] People v. James 174 Cal. App. 4th at 676.
[93] Id.
[94] Id.

or sell all firearms in his possession by a certain date."[95] The information on the state database was enough to obtain a search warrant for his house. The police then found the banned weapons in Mr. James' house. Michael Eugene James went to prison because of a law that was upheld through the misinterpretation of a historical phrase. A similar law was upheld in Cook county, Illinois in Wilson v. Cook County.[96]

In Heller v. District of Columbia[97], Heller challenges, among other things, the ban on so called "assault weapons" in the District of Columbia.[98] The district court says the following, "As the Heller Court made clear, the Second Amendment does not confer the right to use *any* type of firearm in self-defense. [citation omitted] Rather, the Second Amendment protects only those weapons 'in common use' and 'typically possessed by law-abiding citizens for lawful purposes' [citation omitted], as opposed to weapons considered 'dangerous and unusual'".[99]

## V.   Common Use as Used Today

Under the current interpretation of the Second Amendment, the common use test is valid and is being used by several lower courts.[100] Under this test, courts are upholding prohibitions on certain classes of firearms. The courts ask whether a type of firearm is commonly used by law-abiding citizens. This is an insidious question, as some of these bans have been in place for some time. When the government prohibits the possession of a type of firearm, the possessors of those firearms cease to be law-abiding citizens. Therefore, under a common use test, no court would strike down a firearms ban that had been in place for an

---

[95] Id at 665.

[96] See generally, Wilson v. Cook County 943 N.E. 2d 768, 348 ill. Dec. 160 (appellate Court of Illinois, First District, Third Division, 2011).

[97] This is not to be confused with D.C. v. Heller. Heller v. D.C. is a case involving the same parties and was brought in D.C. District Court.

[98] See Generally, Heller v. District of Columbia 698 F. Supp. 2d 179 (D.C. District Court, 2010).

[99] Id at 193.

[100] See generally, Wilson v. Cook County 943 N.E. 2d 768, People v. James 174 Cal. App. 4th 662, and Heller v. District of Columbia 698 F. Supp. 2d 179.

extended period of time. Applying the common use test without falling into this circular trap is a difficult task. It is also difficult to determine how much weight the Supreme Court is willing to place on a common use test. After all, in Heller, the Supreme Court struck down a ban on pistols that had in effect since 1976.[101]

Apparently, the Supreme Court did not think these weapons were dangerous and unusual enough to outweigh the plaintiffs' rights to self defense. But if no law-abiding private citizen our nation's capital had a handgun for thirty-two years, what could be more unusual? Or did the court look to see if the weapon were unusual in places where it was not banned? Many questions about the nature of this test remain unresolved. This murky test is bound to bring about differing results to similar fact patterns.

Another puzzle arises when one considers the idea of a new weapon. Suppose the starship Enterprise landed in Oklahoma tomorrow, and set up a factory producing phasers. A court would have no problem upholding a ban on these 'dangerous and unusual' weapons. Nobody owns them, and they can be set to stun or disintegrate a victim. This type of reasoning could ban any type of new weapon, yet this is obviously not what the Supreme Court envisioned. It said,

> Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, e.g., Reno v. American Civil Liberties Union, 521 U.S. 844, 849, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), and the Fourth Amendment applies to modern forms of search, e.g., Kyllo v. United States, 533 U.S. 27, 35-36, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.[102]

---

[101] See http://voices.washingtonpost.com/rawfisher/2008/06/dc_gun_ban_the_decision.html.
[102] D.C. v. Heller 554 U.S. at 582

D. Page, pg 30

So if the court wants modern firearms to be protected under the Second Amendment, how should the common use test be applied to newly invented weapons?

The most frustrating part of the common use test is that it doesn't measure how dangerous a society would be if a given ban remained in effect or if it was lifted.[103] What place does popularity have in determining whether a gun ban should be constitutional?  Under Heller, the answer is "it has at least some weight".

The common use test is not supported under an originalist style of interpretation, and it was not included in the original meaning or understanding of the Second Amendment. It is circular, allows for arbitrary and cosmetic distinctions between firearms, and will result in differing outcomes for similar fact patterns. However, it is currently the law of the land.  Why is this included in D.C. v. Heller?

There are several possible reasons.  First, it could be a mistake.  The authors could have wanted a one hundred percent historically accurate originalist interpretation.  Maybe the court missed it.

Another possibility is that the court did not care about the history as much as they did the outcome of the case and the precedent it sets.  But if this is the case, why write an originalist opinion?  Was Justice Scalia simply trying to inundate the reporters with his style of interpretation?  And if this is the case, why not explain why the policy outweighs the history in this particular matter?

---

[103] Both sides of the gun control debate can probably agree with this statement.  On one side, people who want more gun control want the court to be able to determine how dangerous a weapon is to society when deciding whether to keep a ban.  On the other side, people who want less gun control want a court to consider how undesirable society will become when that option for self defense (against private or governmental aggressors) is taken away, along with their liberty to possess a type of weapon.

D. Page, pg 31

A third possibility is strategic fallacy.  If Justice Scalia wanted to write an opinion that protected firearms, save for three exceptions,[104] and if one of the other judges that was needed for a majority wanted a fourth exception,[105] what does a strategic judge do?  A strategic judge would provide the strongest possible support for every part of the majority opinion, save for the part with which he or she disagreed.  Perhaps, in the hopes that someday when the makeup or the disposition of the court is different the court will revisit the issue, Justice Scalia posited the shakiest argument that he thought would escape unnoticed by his colleagues.  This would set the stage for a future court to examine the case, upholding three of the exceptions, striking down the fourth, and declaring, "The Supreme Court never had a good reason for this."

**Conclusion**

The future of firearms litigation is far from clear.  So long as courts continue to use the historically inaccurate definition of "dangerous and unusual weapons" embraced in Heller, common use tests are bound to be a part of second amendment jurisprudence.  A re-examination of the definition of "dangerous and unusual weapons" may result in a more historically accurate Second Amendment jurisprudence, as well as a more rational approach to firearms regulation.

---

[104] For example, restrictions on place, manner of use, and manner of manufacture.
[105] For example, an exception to certain classes of weapons.